UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LAKENA N. GAMBLE O/B/O Z.L.T.,

                                    Plaintiff,
                                                        5:16-cv-00636
v.                                                      (FJS/TWD)

COMM'R OF SOC. SEC.,

                                    Defendant.
_____

APPEARANCES:                        OF COUNSEL:

LAKENA N. GAMBLE
Plaintiff, *pro se*
135 W. Lafayette Avenue
Syracuse, New York 13205

U.S. SOCIAL SECURITY ADMIN.         JOSHUA LENARD KERSHNER, ESQ.
OFFICE OF REG'L GEN. COUNSEL –
REGION II
  Counsel for Defendant
26 Federal Plaza, Room 3904
New York, NY 10278

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the

Honorable Frederick J. Scullin, Senior United States District Judge, pursuant to 28 U.S.C. §

636(b) and Northern District of New York Local Rule 72.3. This case has proceeded in

accordance with General Order 18 of this Court which sets forth procedures to be followed when

appealing a denial of Social Security Benefits. Lakena N. Gamble ("Plaintiff"), on behalf of her

son, Z.L.T. ("Claimant" or "Z.L.T."), filed this action against the Commissioner of Social

Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

*Pro se* Plaintiff has not filed a brief although she was provided ample opportunity to do so. (Dkt. Nos. 12, 13, 15.) Defendant filed a brief. (Dkt. No. 16.) Oral argument was not heard. For the reasons discussed below, the Court recommends that the decision of the Commissioner be affirmed and the Complaint (Dkt. No. 1) be dismissed.

## I. RELEVANT BACKGROUND

### A. Factual Overview

Z.L.T., the child for whom Plaintiff brings this action, was born in December 2006, making him 5 years old at his alleged onset date of July 2, 2012, and 9 years old at the date of the final Social Security Administration ("SSA") decision issued April 4, 2016. (T. 1-5, 23, 139.[1]) Generally, Plaintiff alleges Z.L.T. suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), allergies, and asthma. (T. 143.) At the time the application was filed, Z.L.T. was a preschooler, and at the time of the administrative hearing he was a school-age child. 20 C.F.R. § 416.926a(g)(2)(iv); *see also* T. 23. Z.L.T. is enrolled in the Syracuse City School District (the "school" or "SCSD"). (T. 185-218.)

### B. Procedural Background

On January 17, 2013, Plaintiff protectively filed an application for Social Security Income ("SSI") benefits under the Social Security Act on behalf of her son, Z.L.T. Claimant was 7 years old at the time of the administrative hearing. (T. 23, 41.) Plaintiff alleges Z.L.T. has suffered from ADHD, allergies, and asthma since July 2, 2012. (T. 139.)

---

[1] The Administrative Transcript is found at Dkt. No. 8. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

Plaintiff's application for SSI benefits was denied on July 10, 2013. (T. 61, 121-126.)

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (T. 67-69.)

On December 16, 2014, both Plaintiff and Claimant appeared before ALJ Elizabeth W.

Koennecke, and Plaintiff provided testimony. (T. 37-53.) On January 20, 2015, the ALJ issued

a written decision finding Z.L.T. was not disabled under the Social Security Act. (T. 20-33.) On

April 4, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's

decision the final decision of the Commissioner. (T. 1-5.) Plaintiff commenced this action on

June 3, 2016. (Dkt. No. 1.) Plaintiff was initially represented in this action by counsel who was

later permitted to withdraw (Dkt. No. 11) on motion with proper notice to Plaintiff. (Dkt. Nos. 7,

9, 10.)

C.     **The ALJ's Decision**

Generally, in her decision, the ALJ applied the three-step sequential evaluation process to

determine whether an individual under the age of eighteen is disabled. (T. 20-33.) The ALJ

made the following findings of fact and conclusions of law. *Id*.

First, the ALJ, as required by 20 C.F.R. § 416.924(b), found that Z.L.T. had not engaged in

substantial gainful activity since the date of his application for benefits. (T. 23.) Next, the

ALJ determined that Z.L.T. had a severe impairment under 20 C.F.R. § 416.924(c), consisting

of a mental impairment, variously characterized. *Id*. The ALJ also found that Z.L.T.'s alleged

allergies and asthma were not severe impairments. *Id*. The ALJ then found Z.L.T.'s mental

impairment did not meet or medically equal impairments in 20 C.F.R. Pt. 404, Subpart P, App.

1 (the "Listings"). (T. 24; *see also* 20 C.F.R. §§ 416.924, 416.925, 416.926.) Next, as

required by 20 C.F.R. § 416.926a, the ALJ determined that Z.L.T. did not have an impairment

or combination of impairments that functionally equaled the severity of the Listings. (T. 24-

33; *see also* 20 C.F.R. §§ 416.924(d), 416.926a.) Specifically, the ALJ evaluated Z.L.T. in terms of the six functional equivalence domains and found that he had (1) less than marked limitation in acquiring and using Information (T. 26-27); (2) marked limitation in attending and completing tasks (T. 28-29); (3) less than marked limitation in interacting and relating with others (T. 29-30); (4) no limitation in moving about and manipulating objects (T. 30-31); (5) less than marked limitation in caring for himself (T. 31-32); and (6) less than marked limitation in health and physical well-being (T. 32-33). Because Z.L.T. did not have an impairment or combination of impairments resulting in either marked limitations in two domains of functioning or an extreme limitation in one domain of functioning, the ALJ found that he was not disabled under the Act. (T. 33.)

### D.     The Parties Briefing on Their Cross-Motions

Plaintiff has not submitted a brief although the Court gave her opportunities to do so. (Dkt. Nos. 12, 13, 15.)

Defendant asserts two arguments in support of her motion for judgment on the pleadings. (*See generally* Dkt. No. 16.) Defendant generally argues that the ALJ's determination was supported by substantial evidence. *Id*. at 8-21.[2] More specifically, Defendant first asserts that the ALJ evaluated and weighed the record evidence before making her determination, and that the assignment of weight to the opinion evidence in the record was supported by substantial evidence. *Id*. at 8-14. In support of this argument, Defendant notes the ALJ properly considered evidence from State agency pediatric consultant J. Randall, M.D., consultative psychological

---

[2] Page references to documents identified by docket number are to the numbers assigned by the Court's CM/ECF docketing system.

examiner Christina Caldwell, Psy.D., the questionnaire from Z.L.T.'s teacher, Ms. Angela Finistrella, and Z.L.T.'s medical treatment providers. *Id.*

Defendant also argues substantial evidence supports the ALJ's determination in each of the six domains and that Z.L.T. did not have a marked limitation in two domains of functioning or an extreme limitation in one domain of functioning. *Id.* at 15-21. Defendant emphasizes the ALJ's reliance on Z.L.T.'s school records, Dr. Caldwell's opinion, and State agency psychiatric consultant Dr. Randall's opinion, all demonstrate the ALJ had substantial evidence to support her determination. *Id.*

  **E.**   **Claimant's Medical and School Records**

   1.   <u>Syracuse Community Health Center</u>

Since 2010, Z.L.T. treated mainly with Melanie Dunham, N.P., and sometimes with other providers at Syracuse Community Health Center ("SCHC"). (T. 225-56, 263-68.) Most of Z.L.T.'s visits to SCHC have been for routine well-child visits, acute onset illnesses, and follow up appointments. (T. 225-56.) Z.L.T. has been treated for mild persistent asthma, well controlled, and chronic allergies. (*See, e.g.,* T. 239, 243-44, 248-49.) He has also been treated for ADHD. (T. 225-29, 231-37, 240-41.)

On April 20, 2011, NP Dunham noted that Z.L.T. had behavioral problems and exhibited aggressive and hyperactive behaviors. (T. 241.) On October 14, 2011, Plaintiff complained to NP Dunham that Claimant was "too hyper." (T. 240.) On January 20, 2012, Claimant was diagnosed with ADHD and started on medications to address it. (T. 236.) On March 10, 2012, NP Dunham noted Claimant's ADHD was not controlled so she increased his medication dosage. (T. 233.) On May 24, 2012, a physician assistant at SCHC noted the Claimant's ADHD medication was to be given by mouth in the morning and at noon. (T. 231.) On January 15,

2013, Plaintiff complained that Claimant had behavioral and focus issues at school, and that she

had lost the prescription for the ADHD medication. (T. 229.) NP Dunham noted the Claimant's

ADHD and asthma were not controlled so his ADHD medication was restarted, asthma

medications were adjusted, and a new nebulizer was ordered. *Id.* On February 12, 2013, NP

Dunham charted in a subjective report that Claimant had no more crying episodes, as controlled

on the medication, but that his behavior was out of control. (T. 228.) NP Dunham increased

Claimant's ADHD medication and encouraged a therapist. *Id.* On February 28, 2013, Plaintiff

reported that Z.L.T.'s "school worried about stomach ache this week and that [Z.L.T.] is not his

'happy self' and seems more 'irritable.'" (T. 227.) NP Dunham kept Claimant's ADHD

medication at the same dose and again emphasized the need for a therapist. *Id.* On March 12,

2013, Z.L.T.'s morning dose of medication for ADHD was increased, although he was active

and talking in the exam room and eating but had reported a stomach ache. (T. 226.) On April

12, 2013, Claimant was noted to be very active in the exam room, and his mother reported that

the ADHD "medicine was not working at all morning or afternoon." (T. 225.) At that time,

Claimant's ADHD medication was changed. *Id.* There are no further treatment notes from

SCHC in the record, and at the hearing on December 16, 2014, Plaintiff's attorney at the time

indicated to the ALJ that the administrative record was complete except for some school

records.[3] (T. 40.)

About a year and a half after Z.L.T.'s last office visit at SCHC, on November 6, 2014,

NP Dunham completed a Medical and Functional Capacity Assessment which was countersigned

by Latrice Belfon-Kornych, M.D. (T. 264-68.) As to the domains of functioning, NP Dunham

noted marked limitations for Claimant in attending and completing tasks, and in interacting and

---

[3] The ALJ held the record open, but no further records were submitted by Plaintiff. (T. 20.)

relating with others.  (T. 266-67.)  She noted moderate limitations in caring for himself and in health and well-being.  (T. 267-68.)  NP Dunham was unable to assess Claimant in the domain of acquiring and using information, and noted he had none to slight limitation in moving and manipulating objects.  (T. 266-67.)

        2.     <u>Consultative Examination</u>

On May 23, 2013, Claimant was examined by Christina Caldwell, Psy.D.  (T. 257-60.) Z.L.T. was a six year-old male who took a taxi to the evaluation with his mother.  (T. 257.) He lived with his mother and two siblings, and was enrolled in kindergarten in  regular education.  *Id*.  On mental status examination, Z.L.T. had a normal demeanor and  was cooperative; his manner of relating, social skills, and overall presentation were fair-to-poor;  he was somewhat sad and reported not having any friends.  (T. 258.)  Claimant's dress was appropriate; he was well groomed; posture and motor behavior were normal; and eye contact was appropriate.  *Id.*  Z.L.T.'s overall  intelligibility was  good; his voice  was clear; and his expressive  and  receptive languages were age appropriate.  *Id*.  His thought processes were clear and goal  directed  with  no evidence of hallucinations, delusions, or paranoia.  *Id*.  His affect was  somewhat  sad;  mood  was  neutral;  sensorium  clear;  he  was  fully  oriented;  his attention  and  concentration were mildly impaired; his recent and remote memory skills were mildly impaired;  his intellectual functioning was average to below average; and insight and judgment were fair-to-poor.  (T. 258-59.)

Z.L.T.'s mother reported that Z.L.T. needed help getting himself dressed,  bathed, and groomed; needed to be told repeatedly to complete household chores and often needed help completing them; he was mean to his peers and had difficulty interacting with his family; he was physically aggressive; he played outside; and "he play[ed] with girl baby dolls."  (T. 259.)  Dr.

Caldwell diagnosed disruptive behavioral disorder, ADHD, and rule-out mood disorder. (T. 260.) She recommended that Z.L.T. receive individual psychological counseling, consider intelligence testing, continue psychiatric intervention, and consider alternative educational placement. *Id.* Prognosis was fair to guarded. *Id.* Dr. Caldwell opined that Z.L.T. did not have any limitations in his ability to follow and understand simple directions and instructions. (T. 259.) The doctor then repeated several limitations reported by Z.L.T.'s mother, but did not offer any opinion as to those limitations. *Id.*

3.      State Agency Consultant

State agency pediatric consultant Dr. Randall reviewed the record and provided his expert opinion in a report dated July 8, 2013. (T. 54-60.) The doctor identified diagnoses of Attention Deficit Disorder ("ADD")/ADHD and rated Z.L.T.'s ability to function in each of the six functional domains. (T. 57.) The doctor opined that Z.L.T. had less than marked limitation in acquiring and using information, explaining that Z.L.T. was not enrolled in special education, but his mother indicated that he was doing poorly in school. *Id.* Z.L.T. had not been held back in school and his intellectual functioning was estimated in the average to below average range. *Id.*

Dr. Randall found Z.L.T. had less than marked limitation in attending and completing tasks, noting Z.L.T. was taking medication for his mental impairment, and the consultative examiner observed mildly impaired attention and concentration; but Z.L.T. was still enrolled in regular education classes. *Id.* Z.L.T. had less than marked limitation interacting and relating with others, which the doctor supported by noting that Z.L.T. had poor family and peer relations, and Z.L.T. reported having no friends. *Id.* Dr. Randall also noted that Z.L.T. could become aggressive at times. *Id.*

Dr. Randall opined that Z.L.T. had no limitation in moving about and manipulation of objects. *Id.* He had less than marked limitation caring for himself, explaining that Z.L.T. needed assistance with dressing, bathing, and grooming himself, and his mother indicated he continued to experience bed wetting. *Id.* Lastly, Z.L.T. had less than marked limitation in health and physical well-being, with the doctor pointing out that Z.L.T. was being treated with medication for allergies, and had a history of using an inhaler to control asthma attacks although he had not required an office visit or emergency room visit in the past year. *Id.* Dr. Randall concluded by stating Z.L.T.'s impairments do not functionally equal the Listings, although he does have a medically determinable severe impairment. (T. at 58.)

### 4. School Records

Z.L.T.'s teacher, Ms. Finistrella, completed a teacher questionnaire on November 19, 2014. (T. 193-200.) She had been Z.L.T.'s teacher for three months at the time she completed the form and taught Z.L.T. all day in every subject in a second grade class of twenty-two students. (T. 193.) She reported that Z.L.T. read at a kindergarten to first grade level, and had math and written language skills at a first grade level. *Id.* The questionnaire evaluated Z.L.T.'s limitations in each of the six functional domains. (T. 194-99.)

In the domain of acquiring and using information, Ms. Finistrella reported serious to very serious problems. (T. 194.) She stated that Z.L.T. struggled with reading and tried to avoid reading and writing. *Id.* He also struggled with second grade math concepts and often would not even try. *Id.* Oral directions often needed to be repeated to Z.L.T. before he would comply. *Id.*

In the domain of attending and completing tasks, Ms. Finistrella reported slight to very serious problems. (T. 195.) Specifically, Z.L.T. had only slight problems sustaining

attention during play/sports activities and organizing his own things or school materials, but had greater problems with other tasks in this domain. *Id.* The teacher explained that Z.L.T. had difficulty focusing, especially in the second half of the day, and was easily distracted; transitions were extremely difficult for him, and he was more likely to get into arguments with others during transitions between activities. *Id.*

In the domain of interacting and relating with others, Ms. Finistrella reported slight to very serious problems. (T. 196.) Specifically, Z.L.T. had only slight problems relating experiences and telling stories, using language appropriate to the situation, and using adequate vocabulary and grammar to express his thoughts; he had very serious problems seeking attention appropriately, expressing anger appropriately, respecting adults in authority, and following rules; otherwise, he had only obvious problems in other areas in this domain. *Id.* The teacher explained that Z.L.T. has had to go to timeout, was often disruptive in other classrooms, and would often "shut down," make noises, or mock others. *Id.*

In the domain of moving about and manipulating objects, Ms. Finistrella opined that Z.L.T. had no limitations. (T. 197.) In the domain of caring for himself, she reported Z.L.T. did not exhibit problems caring for his hygiene and physical needs; obvious problems being patient and knowing when to ask for help; serious problems using good judgment regarding personal safety, appropriately asserting his emotional needs, calming himself, and using appropriate coping skills; and a very serious problem handling frustration appropriately. (T. 198.) The teacher explained that Z.L.T. had no problem taking care of his personal or physical needs, but needed to learn other methods for dealing with his anger and frustration. *Id.* She noted that when Z.L.T. followed instructions to go to a timeout at the back of the room for ten minutes to settle down and relax, there were no further problems that day. *Id.*

Lastly, in the domain of health and physical well-being, Ms. Finistrella noted that Z.L.T. had ADHD, asthma, and allergies, and took medication for his conditions. (T. 199.) She noted Z.L.T.'s behavior had been good during the first month or so of school, but around the time Z.L.T. stopped receiving his second dose of ADHD medication at lunchtime, his behavior in class deteriorated. *Id.*

School attendance records also show Z.L.T. had significant absences and tardiness during the 2012-2013 and 2013-2014 school years, as well as repeated instances of absence and tardiness for the fall of the 2014-2015 school year. (T. 206-18.) However, Claimant has not been held back any grades, nor is he in special education; and he does not have an individualized education plan ("IEP"). (T. 185-92.)

## II.     RELEVANT LEGAL STANDARD

### A.     Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see also Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation and citation omitted). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and "may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.      Standard to Determine Disability**

An individual under the age of 18 is disabled, and thus eligible for SSI benefits, if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

1382c(a)(3)(C)(i). However, that definitional provision excludes from coverage any "individual under the age of 18 who engages in substantial gainful activity. . . ." *Id.* § 1382c(a)(3)(C)(ii). By regulation, the agency has prescribed a three-step evaluative process to determine whether a child can meet the statutory definition of disability. 20 C.F.R. § 416.9249(a)-(d); *accord Kittles ex rel. Lawton v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, No. 02-CV-3127 (LAP/GWG), 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003).[4] First, the ALJ must consider whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). If so, the child is not disabled. *Id.*

Next, the ALJ must determine whether the child has a "medically determinable impairment [ ] that is severe." *Id.* § 416.924(c). If not, or if the impairment is a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," then the child is not disabled. *Id.*

Third, if the impairment is severe, the ALJ must determine whether the impairment meets or is medically or functionally equal to a disability in the Listings. *Id.* § 416.924(d). "An impairment meets the severity of a Listing if it matches the precise definition in the listings," while an impairment is "medically equivalent to a listed impairment if it is 'at least equal in severity and duration to the listed findings.'" *McCaskill v. Massanari*, 152 F. Supp. 2d 270, 273 (E.D.N.Y. 2001) (quoting 20 C.F.R. § 416.926(a)).

Functional limitations are evaluated in six "domains:" (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-

---

[4] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). An impairment will functionally equal a listed impairment if it results in a "marked" limitation in two of the domains or an "extreme" limitation in one domain. *Id*. § 416.926a(d). A "marked" limitation is found where the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." *Id*. § 416.926a(e)(2)(i). "An 'extreme' limitation—which means 'more than marked' and is given only to the worst limitations—signifies the impairment 'interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities.'" *Ramos*, 2003 WL 21032012, at *8 (quoting 20 C.F.R. § 416.926a(e)(3)(i)).

If the impairment meets (or is medically or functionally equal to) a disability in the Listings and satisfies the twelve-month duration requirement, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1). In essence, a child is disabled under the Social Security Act "if his impairment is as severe as one that would prevent an adult from working." *Sullivan v. Zebley*, 493 U.S. 521, 529 (1990).

## III. ANALYSIS

### A. Plaintiff's Failure to File a Brief in Response to Defendant's Motion for Judgment on the Pleadings

This Court's General Order 18 sets forth the briefing schedule in Social Security cases. After Plaintiff's attorney withdrew, the Court extended the time within which Plaintiff had to file her brief. (Dkt. No. 12.) After Plaintiff failed to comply with that order extending her time to file a brief, the undersigned issued an order on April 17, 2017, which directed Plaintiff to file her brief within 45 days after service of Defendant's brief. (Dkt. No 13.) Defendant then requested an extension of time to file her brief, which was granted, and Plaintiff was then directed to file her brief by August 25, 2017. (Dkt. No. 15.) Despite this, Plaintiff filed neither papers opposing

Defendant's motion nor a request to enlarge the time within which to oppose Defendant's motion.

In the usual civil case, a plaintiff's failure to comply with court orders would subject the complaint to dismissal under Federal Rule of Civil Procedure 41(b). In addition, other Districts in the Second Circuit have held that where a Social Security plaintiff files a complaint but fails to file a brief on the merits, the complaint is conclusory and insufficient to defeat a motion for judgment on the pleadings. *Winegard v. Barnhart,* No. 02-CV-6231 CJS, 2006 WL 1455479, at *9-10 (W.D.N.Y. Apr. 5, 2006); *Feliciano v. Barnhart*, Civ. No. 04-9554 KMW AJP, 2005 WL 1693835, at *10 (S.D.N.Y. July 21, 2005); *Reyes v. Barnhart*, Civ. No. 01-4059 LTS JCF, 2004 WL 439495, at *3 (S.D.N.Y. Mar. 9, 2004).

In this District, however, General Order 18 permits a different course in Social Security cases. General Order 18 contains the following: "Notification of the Consequences of Failing to File a Brief . . . . A party's brief is the only opportunity to set forth arguments that entitle the party to a judgment in its favor. The failure to file a brief by either party may result in the consideration of the record without the benefit of a party's arguments. In the event a plaintiff fails to submit a brief, the defendant may file a motion to dismiss for failure to prosecute, pursuant to Federal Rule of Civil Procedure 41(b), and the action may be dismissed with prejudice on the basis of plaintiff's failure to file a brief." (General Order 18 at 7.) General Order 18 thus states that the Court may consider the matter on the merits without plaintiff's brief. Here, Defendant did not file a motion to dismiss for failure to prosecute. Accordingly, the Court has, despite Plaintiff's failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence. Additionally, in a case such as this wherein the plaintiff is proceeding *pro se*, a consideration of

the merits complies with the special solicitude that the Second Circuit mandates for *pro se* litigants.

**B.** **Whether Substantial Evidence Supports the ALJ's Determination Regarding the Weight Accorded the Opinion Evidence**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in Defendant's memorandum of law. (*See* Dkt. No. 16 at 8-14.) To those reasons, the Court adds the following analysis.

The medical opinions of a claimant's treating physician are generally given more weight than those of other medical professionals. "If . . . a treating source's opinion . . . is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with other substantial evidence . . . [it] will [be] give[n] controlling weight." 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2). "Medically acceptable techniques include consideration of a patient's report of complaints, or the patient's history, as essential diagnostic tools." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003). Generally, the longer a treating physician has treated the claimant and the more times the claimant has been seen by the treating source, the more weight the Commissioner will give to the physician's medical opinion. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).

An opinion from a treating source that the claimant is disabled cannot itself be determinative. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). However, a lack of specific clinical findings in the treating physician's report is not, by itself, a reason to justify an ALJ's failure to credit the physician's opinion. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (citing *Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998)).

"An ALJ who refuses to give controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion."

*Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted). This analysis must be conducted to determine what weight to afford any medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). This is necessary because the ALJ is required to evaluate every medical opinion received. *Id.* These factors include: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Generally, the opinion of the treating physician will not be afforded controlling weight when the treating physician issued opinions that were not consistent with those of other medical experts and is contradicted by other substantial evidence in the record. *Halloran*, 362 F.3d at 32; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Snell*, 177 F.3d at 133 ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."). Other findings, including the ultimate finding of whether the claimant is disabled, are reserved to the Commissioner. *Snell*, 177 F.3d at 133; 20 C.F.R. §§ 404.1527(c)(2), 416.927(d).

The Regulations require the Commissioner's notice of determination or decision to "give good reasons" for the weight given a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416. 927(c)(2). This is necessary to assist the court's review of the Commissioner's decision and it "let[s] claimants understand the disposition of their cases." *Halloran*, 362 F.3d at 33 (citing *Snell*, 177 F.3d at 134). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Snell*, 177 F.3d at 133; *Halloran*, 362 F.3d

at 32-33. However, remand is unnecessary where application of the correct legal standard could lead to only one conclusion. *Schaal*, 134 F.3d at 504.

       1.    <u>SCHC Providers</u>

As noted above, Plaintiff's primary pediatric care providers at SCHC completed a functional capacity assessment form on November 6, 2016, which was about a year and a half after Claimant's last office visit at SCHC. (T. 264-68.) It was signed by NP Dunham and countersigned by Dr. Belfon-Kornych. (T. 268.) As to the domains of functioning, NP Dunham noted marked limitations for Claimant in the domains of attending and completing tasks, and in interacting and relating with others. (T. 266-67.) She noted moderate limitations in the domains of caring for himself and in health and well-being. (T. 267-68.) NP Dunham was unable to assess Claimant in the domain of acquiring and using information, and finally noted he had none to slight limitation in the domain of moving and manipulating objects. (T. 266-27.)

The ALJ accorded less weight to this opinion finding that the health providers indicated that the report was based primarily on the subjective reports of Plaintiff, and did not have support in terms of clinical evidence. (T. 26, 264-68.) Indeed, much of the treatment notes from SCHC are based upon the subjective complaints of Plaintiff, with very little objective findings related to Claimant's ADHD. (T. 225-37.) Plaintiff also completed forms upon which the providers based their findings. (T. 236, 242, 254.) The ALJ also noted that the opinion was contradicted by other opinion evidence in the record. (T. 26.) The opinions of Dr. Caldwell, Dr. Randall, and Z.L.T.'s teacher, Ms. Finistrella, differed from the opinion of NP Dunham, as further discussed below. Accordingly, the Court finds that the ALJ gave good reasons for giving less weight to the opinion from the SCHC providers.

2.    Dr. Caldwell

The ALJ gave significant weight to the specific opinion of Dr. Caldwell that Z.L.T. did not have any limitations in his ability to follow and understand simple instructions.  (T. 26, 259.) The ALJ noted this was the extent of Dr. Caldwell's opinion, since the rest of her comments in the medical source statement of her report are specifically based upon what the Plaintiff reported to Dr. Caldwell.  (T. 26, 259-60.)  Upon exam, Dr. Caldwell found Z.L.T. had a normal demeanor and was cooperative, but his manner of relating, social skills, and overall presentation were fair-to-poor and he reported being sad and not having any friends.  (T. 258.)  Z.L.T. was well groomed and his eye contact was appropriate.  *Id*.  His overall intelligibility was good; his voice was clear; and his expressive and receptive languages were age appropriate.  *Id*.  His thought processes were clear and goal directed.  *Id*.  While his affect was somewhat sad and his mood was neutral, his sensorium was clear and he was fully oriented.  (T. 258-59.)  Dr. Caldwell also found Claimant's attention, concentration, and memory skills were only mildly impaired; his intellectual functioning was average to below average; and insight and judgment were fair-to-poor.  *Id*.  The ALJ noted these findings were consistent with Claimant's lack of an IEP, lack of being held back in school, and lack of structured mental health treatment.  (T. 26.)  The ALJ also explained that Dr. Caldwell personally evaluated Z.L.T. and took a history from Plaintiff.  Id.

The Court finds that the ALJ considered Dr. Caldwell's opinion appropriately.  The ALJ considered the nature and extent of the evaluation, along with Dr. Caldwell's findings in support of her sole opinion that Z.L.T. did not have any limitations in his ability to follow and understand simple instructions.  (T. 26.)  Dr. Caldwell is a psychological specialist and the ALJ noted that her opinion was consistent with other evidence in the record as a whole.  *Id.*

### 3. State Agency Consultant

The ALJ also gave significant weight to the opinion of Dr. Randall, the State agency medical consultant. (T. 25.) He reviewed the record and provided his expert opinion. (T. 54-60.) The ALJ explained that Dr. Randall had expertise in Social Security disability programs and standards, had relevant professional expertise, and his opinion was consistent with records from Z.L.T.'s school. (T. 25.) Dr. Randall pointed out that Z.L.T. was not enrolled in special education and had not been held back in school. (T. 57.) The ALJ found that the doctor's opinion was consistent with records from Claimant's school. (T. 25, 185-202.) In addition, the ALJ noted that Dr. Randall discussed Z.L.T.'s treatment history and that Z.L.T. had not been to the emergency room for asthma nor had he been to a doctor in the recent past. (T. 25, 225-56.) Accordingly, the Court finds the ALJ properly gave Dr. Randall's well-supported opinion significant weight. State agency consultants are qualified experts in the field of Social Security disability, and an ALJ is entitled to rely on their opinions in issuing decisions. *See* 20 C.F.R. § 416.912(b)(6); SSR 96-9p, 1996 WL 374180, at *2; *see also Diaz v. Shalala*, 59 F.3d 307, 315 n.5 (2d Cir. 1995) (the opinions of non-examining sources may even override treating source opinions provided they are supported by evidence of record).

### 4. School Records

The ALJ appropriately gave significant weight to the teacher questionnaire from Ms. Finistrella of the SCSD. (T. 25.) She knew Claimant for three months at the time of her assessment and saw him on a daily basis. (T. 193.) She indicated he missed the first week of school and was often tardy. *Id.* The ALJ noted that while the questionnaire identified many serious and some very serious problems, Z.L.T.'s behavior was good for a month and then worsened when his ADHD medication was decreased such that he stopped receiving the second

dose. (T. 25-26, 199.) The teacher stated that Z.L.T.'s most disruptive behavior occurred after 11a.m., and that his behavior changed with medication. (T. 199.) The ALJ found that Ms. Finistrella's statements demonstrate that with appropriate medication, Z.L.T. did not have any behavior difficulties. (T. 25.) The Court finds the weight given to Ms. Finistrella's questionnaire is appropriate and supported by the evidence in the record overall. She was with Z.L.T. on a daily basis in the fall of the 2014-2015 academic year.

Accordingly, the Court finds the ALJ's assignment of weight to all of the opinion evidence in the record is supported by substantial evidence.

### C. Whether Substantial Evidence Supports the ALJ's Determination that Z.L.T.'s Impairment or Combination of Impairments Functionally Equaled the Severity of the Listings was Supported by Substantial Evidence

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in Defendant's memorandum of law. (*See* Dkt. No. 16 at 14-21.) To those reasons, the Court adds the following analysis.

The ALJ appropriately considered whether Z.L.T.'s impairments functionally equaled the Listings. (T. 26-33.) As noted above, for a child's impairments to functionally equal the Listings, he must have a "marked" limitation in at least two domains or an "extreme" limitation in at least one domain. 20 C.F.R. § 416.926a(a). The ALJ found that Z.L.T. had a marked limitation in the domain of attending and completing tasks. (T. 28-29.) The ALJ found no limitation in the domain of moving about and manipulating objects, (T. 30-31), and less than marked limitations in the remaining four domains of functioning. (T. 26-27, 29-33.) Accordingly, the ALJ found Z.L.T. was not disabled. (T. 33.)

1. <u>Acquiring and Using Information</u>

The ALJ found that Z.L.T. had a less than marked limitation in the domain of acquiring and using information. (T. 27.) This domain considers how well a child is able to acquire or learn new information, and how well a child uses the information learned. 20 C.F.R. § 416.926a(g). The record shows that Z.L.T. was not enrolled in special education classes, and had not been held back in school. (T. 41, 185-192.) In completing the function report (T. 129-38), the Plaintiff reported that Z.L.T. could deliver phone messages, repeat stories, tell jokes accurately, explain why he did something, and use sentences with "because," "what if," and "should have been." (T. 132.) Plaintiff noted he also talks with family and friends, generally gets along with teachers, and completes his homework. (T. 132, 135, 137.) His instructional level was one grade level behind, but he was in a classroom with a total of 22 students and one teacher. (T. 193.) His teacher just started using "alternate written work in math and reading seatwork" for Z.L.T. (T. 194.) The consultative examiner, Dr. Caldwell, found his intellectual functioning to be average to below average (T. 259) and the State agency psychiatric consultant, Dr. Randall, found that Z.L.T. had a less than marked limitation in this domain. (T. 57.) The providers at SCHC did not assess this domain. (T. 266.)

Based on the above-outlined materials, the Court finds there is substantial evidence in the record to support the ALJ's finding that Z.L.T. had a less than marked limitation in the domain of acquiring and using information.

2. <u>Attending and Completing Tasks</u>

The ALJ found Z.L.T. had a marked limitation in the domain of attending and completing tasks. (T. 28.) This domain considers how well the child focuses and maintains attention, and how well he begins, carries through, and finishes activities. *See* 20 C.F.R. § 416.926a(h). The

providers at SCHC indicated Z.L.T. had a marked limitation in this domain. (T. 266.) Plaintiff indicated that although Claimant could read capital and small letters, print his name and some letters, he had difficulty reading simple sentences, spelling most three and four letter words, writing simple stories, and telling time. (T. 133.) She testified he acted out at school. (T. 43-45.) Ms. Finistrella, his teacher, indicated transitions were difficult for him, he had difficulty focusing especially in the second half of the day, and was easily distracted and needed "constant redirection." (T. 195.) He only had a slight problem with sustaining attention during play activities and with organizing his own things or school materials. *Id.* However, he was not in special education classes and had never been held back. (T. 193.) Consultative examiner Dr. Caldwell found Z.L.T.'s overall intelligibility good and his expressive and receptive languages were age appropriate. (T. 258-59.) Dr. Caldwell also found Z.L.T.'s thought processes were clear and goal directed; his attention and concentration were mildly impaired; and his recent and remote memory skills were mildly impaired. *Id.* Thus, substantial evidence in the record supports the ALJ's finding that Z.L.T. had a marked impairment in the domain of attending and completing tasks.

### 3. Interacting and Relating with Others

The ALJ found that Z.L.T. had a less than marked limitation in the domain of interacting and relating with others. (T. 29-30.) This domain considers how well the child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. *See* 20 C.F.R. § 416.926a(i). Plaintiff indicated Z.L.T. generally got along with teachers, although she noted he did have a problem having friends. (T. 48, 135.) Both Plaintiff and his teacher reported Z.L.T. had to go to "timeout" because of his

behavior. (T. 46, 196.) Ms. Finistrella also indicated Z.L.T. had an obvious problem playing cooperatively, taking turns, and often had an "I don't care" attitude, but she further reported that he was the "first one to try to break up fights others are starting." (T. 196.) The teacher found only slight problems in his ability to relate experiences and tell stories, use language appropriate to the situation, and use adequate vocabulary and grammar to express thoughts in general, everyday conversation. *Id.* She also indicated that Z.L.T.'s speech was almost always understandable when the topic of conversation was known. (T. 197.) Dr. Caldwell said he was cooperative and used appropriate eye contact (T. 258), and Dr. Randall opined Z.L.T. had a less than marked limitation in this domain. (T. 57.) Accordingly, the Court finds substantial evidence in the record supports the ALJ's finding of a less than marked impairment in this domain.

### 4. Moving About and Manipulating Objects

The ALJ determined Z.L.T. had no limitation in the domain of moving about and manipulating objects. (T. 31.) This domain considers how well a child is able to move his body from one place to another and how a child manipulates and moves objects. *See* 20 C.F.R. § 416.926a(j). Plaintiff has not alleged any limitations in this domain. (T. 143.) Ms. Finistrella reported Z.L.T. had no problems in this domain and his functioning in the domain was age appropriate. (T. 197.) The providers at SCHC found Z.L.T.'s limitation in this domain as "none to slight." (T. 267.) Based on the above, substantial evidence supports the ALJ's finding of no limitation in this domain.

### 5. Caring for Oneself

The ALJ found Z.L.T. had a less than marked limitation in the domain of caring for oneself. (T. 32.) This domain assesses how well the child maintains a healthy emotional

and physical state, including how well he has his physical and emotional needs met in appropriate ways, and whether he cares for his own health, possessions, and living area. *See* 20 C.F.R. § 416.926a(k). The record shows Z.L.T. did not always use good judgment regarding his personal safety and did not always respond appropriately to changes in his own mood. (T. 198.) However, Z.L.T. had no problems taking care of his personal hygiene, caring for his physical needs, taking medication, or picking up and putting away his toys. (T. 136, 198.) He was able to eat by himself using silverware. (T. 136.) The providers at SCHC noted that he could dress himself, and he ate and slept well. (T. 229, 241, 248.) He did not engage in any self-injurious behavior, and was able to pursue enjoyable activities and interests. Dr. Randall, whose opinion the ALJ assigned significant weight, opined that Z.L.T. had less than marked limitation in this domain. (T. 57.) Accordingly, the Court finds substantial evidence supports the ALJ's finding of less than marked limitation in this domain.

6.    Health and Physical Well-Being

The domain of health and physical well-being considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on the child's health and functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects. 20 C.F.R. § 416.926a(l). Unlike the other five domains of functional equivalence, which address the child's abilities, this domain does not address typical development and functioning. *Id*. Instead, this domain addresses how recurrent illness, the side effects of medication, and the need for ongoing treatment affect the child's health and sense of physical well-being. *Id.* Here, the ALJ found Z.L.T. to have a less than marked limitation. (T. 32.) Z.L.T.'s records from SCHC show he has asthma and allergies (T. 229, 231, 233, 239, 243 -45, 248-49) but his asthma was well controlled. (T. 239.) Plaintiff reported

Z.L.T. had not needed to use his inhaler "in a few months;" his teacher could not recall any visits to the nurse for these impairments and noted he did not frequently miss school due to illness; and at a recent health evaluation, the examination was "entirely normal." (T. 199, 239, 263.) Dr. Randall opined Z.L.T. had a less than marked limitation in this domain. (T. 57.) Therefore, the Court finds substantial evidence supports the ALJ's determination in this domain.

To summarize, the ALJ considered all of the relevant evidence and her determination of Z.L.T.'s functional limitations in all domains is supported by substantial evidence. "When reviewing a child's impairments for functional equivalence, adjudicators must consider 'all of the relevant evidence,' and employ a 'whole child' approach.'" *Carrera v. Colvin*, No. 1:13-cv-1414 (GLS/ESH), 2015 WL 1126014, at *3 (N.D.N.Y. Mar. 12, 2015). "'All of the relevant evidence' includes objective medical evidence and other relevant evidence from medical sources; information from other sources, such as school teacher, family members, or friends; the claimant's statement (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in all setting[s] (i.e., at home, at school, and in the community)." *Id*. at *3 n.8 (citing SSR 09-2P, 2009 WL 396032, at *11 (SSA Feb. 18, 2009)). The "whole child" approach requires the ALJ to "to consider a child's everyday activities, determine all domains involved in performing them, consider whether that child's medically determinable impairment accounts for limitations in activities, and determine what degree such impairment limits that child's ability to function age-appropriately in each domain." *Id*. at *3 (citing SSR 09-1P, 2009 WL 396031, at *2-3 (SSA Feb. 18, 2009)). Here, the ALJ considered Z.L.T.'s medical and school records, his every day activities, and Plaintiff's statements. The ALJ also reviewed how Claimant functioned

at home, in school, and in the community. The ALJ discussed evidence from medical, consultative examinations, and school records and considered Claimant's functioning in a variety of settings. As such, the Court finds the ALJ considered all of the relevant evidence and employed the "whole child" approach when evaluating Z.L.T.'s functional limitations.

**ACCORDINGLY**, based on the finding above, it is hereby

**RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, and Defendant's motion for judgment on the pleadings (Dkt. No. 16) be **GRANTED**, and the complaint (Dkt. No. 1) be **DISMISSED**; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[5] Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: September 11, 2017
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[5] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2003 WL 21032012
United States District Court,
S.D. New York.

Enid M. RAMOS o/b/o Michelle E. Soto, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 02Civ.3127(LAP)(GWG).
|
May 6, 2003.

*REPORT AND RECOMMENDATION*

GORENSTEIN, Magistrate J.

**\*1** Plaintiff Enid Ramos brings this action on behalf of her daughter pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for supplemental security income ("SSI") benefits. The Commissioner has moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Ramos opposes the motion and has cross-moved for judgment on the pleadings. In the alternative, Ramos requests the matter be remanded to the Commissioner for a new hearing and decision. For the reasons below, the Commissioner's motion should be denied. Ramos' motion should be granted in part and denied in part.

I. *BACKGROUND*

A. *Insulin Dependent Diabetes Mellitus and Hyper/Hypoglycemia*
Diabetes is a medical condition that affects the manner in which the body handles glucose  a sugar derived from food that appears in the bloodstream. In the typical case of juvenile or "Type I" diabetes, the pancreas fails to produce sufficient insulin, which is the hormone necessary to allow the cells of the body to use the glucose in the bloodstream. In the absence of insulin, and particularly after eating, glucose remains in the blood in abnormally high concentrations, resulting in the condition known as "hyperglycemia." *See Stedman's Medical Dictionary* 489 91, 849 (27th ed.2000). If the patient requires insulin

injections to control his or her blood glucose levels, the condition is known as insulin-dependent diabetes mellitus ("IDDM").

Diabetics using insulin may at times also experience "hypoglycemia," which occurs where the glucose level is abnormally low. *See id.* at 861. Although medical authorities apparently do not agree what constitutes a normal glucose level, Ramos has alleged  and the Commissioner does not dispute  that hypoglycemia in children occurs where their glucose level falls below 50  80 mg/dL. *See* Plaintiff's Memorandum of Law in Opposition to the Commissioner's Rule 12(c) Motion for Judgment on the Pleadings and in Support of Plaintiff's Rule 12(c) Motion for Judgment on the Pleadings, dated January 7, 200[3] ("Pl.Mem."), at 7  9 (citing authorities).

B. *Ramos' Claim for Benefits and Procedural History*
Ramos filed for SSI disability benefits on behalf of her daughter, Michelle Soto Ramos, on February 22, 2000. R. 67 69. Ramos alleged that Michelle was disabled due to IDDM. R. 67 69, 84 94. The application was denied initially and again on reconsideration. R. 39 44, 47 50. Ramos thereafter requested a hearing before an administrative law judge ("ALJ"), R. 51, which was held on March 12, 2001. R. 18 38. Ramos and Michelle appeared at the hearing before ALJ Mark Sochaczewsky and were represented by counsel. R. 18 38. Dr. Sree Devi T.N. Chandrasekhar, a medical expert, also attended and testified at the hearing. R. 29 36. [2]

[1]    "R. refers to the administrative record relating to Ramos' application.

[2]    The hearing transcript identifies this medical expert as "Dr. Chan Shaffer (Phonetic). R. 29.

On August 22, 2001, ALJ Sochaczewsky ruled that Michelle was not disabled. R. 11 17. This decision became final on February 7, 2002, when the Appeals Council denied Ramos' request for review. R. 3 4. On April 23, 2002, Ramos filed the instant complaint on behalf of Michelle seeking review of the denial of her claim.

C. *Evidence Presented at the Hearing before the ALJ*

1. *Testimony*

**\*2** Michelle testified at the hearing. At that time, she was fifteen years old and in the tenth grade in school. R. 21 22. Michelle was diagnosed with diabetes when she was six years old and living in Puerto Rico. *See* R. 22. As a consequence of her condition, she was required to take daily medication, including administering insulin injections three times each day, and to follow a "very careful diet." R. 22, 24. However, when asked if her blood sugar level was under control even when she adhered to her diet and took her medication Michelle replied "[s]ometimes it's kind of good and sometimes it doesn't." R. 23. When questioned further, she testified to having hyperglycemic attacks approximately two or three times per week during which her sugar level would get as high as 250 or 300 mg/dL, despite following her regimen. R. 23 24. She explained that when her sugar level was high she would take an "extra dose" of insulin. R. 24.

Michelle testified further that her diabetes prevented her from participating in certain activities. R. 25 28. She testified that she also suffered hypoglycemic attacks two or three times per week and that it took 20 to 25 minutes to stabilize her blood sugar level on each occasion. R. 25 26. Because of these attacks, she was unable to ride a bicycle or participate in "any kind of running activities" and had limited ability to play basketball. R. 25 28. However, she was able to take part in at least some activities in gym class and testified that she had friends in school, would sometimes go to the park with her family, and would often study at night and on weekends. R. 26 27.

When asked if she ever "cheat[ed]" on her diet, Michelle replied "maybe sometimes." R. 28. However, she stated that she still had two or three hypoglycemic attacks per week even when she adhered to her diet and did "what [she was] supposed to do." R. 28.

Dr. Chandrasekhar, an independent medical expert, was also present at the hearing. After Michelle's initial testimony, the ALJ asked Dr. Chandrasekhar if Michelle should be asked further questions. R. 28 30. Dr. Chandrasekhar requested that Michelle describe the hypoglycemic attacks and asked whether and to what extent she was having problems with abdominal pain and bloating. R. 30. Michelle stated that she "[s]ometimes" experienced abdominal pain and that she had headaches "[e]very time" her blood sugar level "is too low" and "when it's high." R. 30. When her sugar level is low, she testified that she gets "dizzy," "don't know what [she is]

doing," and "cannot do nothing." R. 31. When her sugar level is high, she stated that "I get a lot of headaches and my mind wants to explode. I have a lot of pain." R. 31. Michelle further testified that when she is in school and feels a hypoglycemic attack coming, she has to leave the classroom in order to get something to eat. R. 32. She acknowledged, however, that the teacher allowed her to eat at her desk. R. 32 33.

**\*3** Dr. Chandrasekhar then asked more specific questions about the hypoglycemic attacks. He asked whether Michelle checked her sugar level with each attack, to which she replied "[s]ometimes I check the sugar, sometimes I just eat." R. 33. When asked if her sugar level was low on the occasions she checked her blood, Michelle answered "yes." R. 33. Michelle then testified that she had told her doctors the previous month about the attacks and accompanying "dizziness" and that they had changed her regimen, R. 33 34, after which the following exchange took place:

Q. Do you still have incidences where it's too high or too low?

A. Yes.

Q. But not as frequently?

A. No.

Q. How often has it happened in the last month?

A. Maybe twice or maybe once.

R. 34. A subsequent question phrased as "[o]nce or twice a week" went unanswered. R. 34. Michelle also testified that she had not been hospitalized for her diabetes since coming to the United States three years earlier. R. 22, 34.

After this additional questioning, Dr. Chandrasekhar testified. Based on his expert analysis, he concluded that Michelle had insulin-dependent diabetes but that her condition did not meet, medically equal or functionally equal any listed impairment. R. 34 35. Michelle's attorney then asked Dr. Chandrasekhar about the recent hypoglycemic attacks, and the following exchange took place:

A. It is not clear that she has had recent episodes of hypoglycemia as such. We haven't had any records of blood glucose when she's had those symptoms. And

with the correct management with snacks she appears to be doing fairly well. And according to her statement also, after she spoke to her doctor, her management has seems to have improved.

Q. Isn't it true though that in her statement that even after they changed her Insulin that she still has two times a week episodes of hypoglycemia?

A. She has had symptoms, but we don't know the exact level of sugar that she's went down to.

R. 36. The attorney then asked Michelle about the last time she had a hypoglycemic attack and recorded her blood sugar level. R. 36. Michelle testified that during an attack approximately ten days earlier while she was in school she tested her blood and found it to be 48 49 mg/dL. R. 36 37.

2. *Medical Reports, Progress Notes and Other Evidence*
The written medical evidence in the record shows the following:

Michelle was treated at Columbia Presbyterian Medical Center ("Columbia Medical") during the period from July 1997 through October 2000. R. 201 19, 224 52, 269 75. On February 26, 1999, Michelle (then thirteen years old) visited the Pediatric Diabetes Clinic at Columbia Medical. R. 203. She reported "occasional" low blood glucose levels in the afternoon and night, but it was noted that she "still plays basketball." R. 203. It was further noted that Michelle would sometimes argue with her mother over not eating and that she was told to eat three meals and three snacks a day but would "often" skip breakfast and lunch. R. 203. The doctor spent approximately one hour with Michelle and Ramos reviewing the need for better monitoring and improved glucose control given that Michelle's target range was "80 180" mg/dL but that she was "out of range 50% daily." R. 203. The doctor recommended that Michelle increase her daily insulin injections to three times a day (from two injections a day) and that she monitor her blood glucose levels four times a day. R. 203.

**\*4** On April 14, 1999, Michelle returned to Columbia Medical for an "education visit" and evaluation. Because she was still administering two insulin shots a day and was checking her glucose levels only twice a day it was again recommended that Michelle increase the injections

to three times a day and test her glucose levels four times daily. The doctor reviewed "basic diabetes information" with Michelle and discussed, *inter alia,* the causes of hyper/hypoglycemia. R. 214.

Michelle made another education visit to Columbia Medical on May 19, 1999. As the doctor was concerned that Michelle was "miss[ing] meals" and "skipp[ing] snacks" in an effort to lose ten pounds, the doctor discussed with Michelle the "importance of consistency in meals [and] snacks" and noted that a change in diet would help control her glucose levels. In addition, the physician notes indicate that Michelle had increased her daily insulin injections and blood glucose testing; that her blood sugar levels had "improved;" and that she exercised three to four times per week with, *inter alia,* karate, baseball, and basketball. R. 212.

On June 28, 1999, Ramos reported that Michelle had been "noncomplian[t]" with her treatment and that she had "reverted back" to twice daily insulin injections and blood sugar testing. Michelle reported having "lots of friends" and doing well in school. However, the doctor noted that although her diabetes was in "good control," Michelle had "poor behavior" and poor approach to control and emphasized the need for Michelle to cooperate with her mother. R. 211.

Michelle returned to Columbia Medical on September 27, 1999. The treating physician noted that her diabetes was in "fair control" but that her blood glucose levels ranged from "57 163" mg/dL in the morning and from "62 240" mg/dL in the afternoon. Although Michelle had been injecting insulin three times a day and checking her sugar levels four times daily over the summer, she reverted back to twice daily injections and blood testing in late August and "note[d]" a change in her blood glucose as a result. The physical examination was normal. R. 210.

On October 20, 2000, Dr. Ileana Vargas, a pediatric endocrinologist at Columbia Medical, completed a medical report for Michelle. In the report Dr. Vargas noted that Michelle visited the clinic on a monthly basis, alternating between a doctor, nutritionist and nurse educator. She further noted that Michelle's prognosis was "guarded." R. 269. In addition, Dr. Vargas identified Michelle's symptoms as the following: episodic vision blurriness, frequency of urination, difficulty thinking/concentrating, abdominal pain, hyper/

hypoglycemic attacks, and nausea/vomiting. R. 269. The doctor further noted that "Michelle has been trying to take better care of herself but now has abdominal pain, nausea [and] bloating sensation post eating." R. 269. Dr. Vargas stated that Michelle was not a "malingerer" and that she was compliant with treatment. R. 270, 275. "[E]motional factors" reportedly contributed to the severity of her symptoms and functional limitations and were "severe enough" to interfere with her attention and concentration "frequently." R. 270. According to Dr. Vargas, Michelle's impairments were "likely to produce 'good days' and bad days' ' such that she could be expected to be "absent from work" on average more than four times per month. R. 274.

### 3. Consultative Examinations

**\*5** On March 13, 2000, Dr. Tomasito Virey examined Michelle. The doctor noted that Michelle had a history of juvenile onset IDDM first diagnosed when she was six years old and "presented with polyuria, polydipsia, weight loss and a blood sugar of 585." R. 253. Dr. Virey further noted that although Michelle had been hospitalized "about six times for diabetic ketoacidosis," all admissions were in Puerto Rico and the last one occurred approximately four years earlier. R. 253. The doctor reported that Michelle "[u]sually" had a fair appetite; was on an "insulin regimen sliding scale;" performed well in school; enjoyed exercising, watching television, playing basketball, baseball and volleyball; had no history of "learning disability; and was not in special education. R. 253. The physical examination was unremarkable. R. 254. Dr. Virey concluded that Michelle was "moderately affected" in her ability to do age-related activities and that her prognosis was "[f]air to guarded." R. 254.

On April 13 and September 18, 2000, state agency physicians, Drs. G. Shukla and D. Santos, evaluated the record evidence. R. 264 67. The doctors concluded, in relevant part, that although Michelle's IDDM was a severe impairment, it did not "meet, medically equal, or functionally equal the severity of a listing." R. 264 67. On May 5, 2000, another state agency physician, Dr. Steve Goldstein, reviewed the record evidence and appears to have examined Michelle. R. 256 57. He noted that Michelle was a juvenile with IDDM and further opined that "[a]lthough she does have occasional low blood sugars, these usually occur when she skips meals or exercizes [sic] without taking appropriate food beforehand." R. 257. Dr. Goldstein found Michelle's

physical examination to be "normal" and concluded that her impairment "does not meet or equal listings 109.08." R. 257.

Dr. Virey re-evaluated Michelle on August 28, 2000. The findings and conclusions reached after this re-evaluation were largely the same as those in the first examination, except it was noted that Michelle's appetite was "usually [] bad" as opposed to "fair." R. 259 61.

The record also indicates that Michelle continued to perform well in school despite her IDDM. A letter from her teacher dated March 7, 2001 described Michelle as an "excellent student." However, the teacher noted that Michelle's IDDM "got critical a couple of times," requires "constant[ ] monitori[ng]," and had at times adversely affected her performance and attendance. R. 268.

## II. DISCUSSION

The Commissioner argues that the determination that Michelle was not disabled is supported by substantial evidence. See Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, dated November 4, 2002 ("Def.Mem."), at 15 20; see also Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Further Support of Defendant's Motion for Judgment on the Pleadings, dated January 31, 2003 ("Def. Reply Mem."), at 1 4. Ramos argues in response that judgment on the pleadings should be granted in her favor because the record shows that Michelle is in fact disabled. See Pl. Mem. at 24 28; see also Memorandum of Law in Further Opposition to Defendant's Motion for Judgment in [sic] the Pleading [sic] and in Further Support of Plaintiff's Motion for Judgment on the Pleadings, dated February 13, 2003 ("Pl. Reply Mem."), at 4 8. In the alternative, Ramos seeks a remand for a new hearing and decision, arguing that the ALJ's decision was inadequate and that the ALJ failed to develop the record adequately. See Pl. Mem. at 18 24; Pl. Reply Mem. at 1 3.

### A. Legal Standards for Actions Brought Pursuant to 42 U.S.C. 405(g)

#### 1. Scope of Judicial Review

**\*6** Review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" to support the determination. See 42 U.S.C. § 405(g)

("[t]he findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive"); *see, e.g., Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Brown v. Apfel,* 174 F.3d 59, 61 (2d Cir.1999) (per curiam). The Supreme Court has observed that substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). The reviewing court must be careful not to " 'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." ' *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984)); *accord Rosa,* 168 F.3d at 77. Even if the administrative record supports disparate findings, the ALJ's factual determinations must be accepted as conclusive. *Quinones v. Chater,* 117 F.3d 29, 36 (2d Cir.1997); *see also Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990). Thus, the role of this Court is "quite limited and substantial deference is to be afforded the Commissioner's decision." *Burris v. Chater,* 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996) (citation omitted).

Notwithstanding this deferential standard, however, it is well settled that the ALJ has an affirmative duty to develop the administrative record in a disability benefits case and that remand is appropriate where this duty is not discharged. *See, e.g., Rosa,* 168 F.3d at 79 83; *Clark v. Comm'r of Social Security,* 143 F.3d 115, 118 19 (2d Cir.1998). The non-adversarial nature of a Social Security hearing requires the ALJ "to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel,* 530 U.S. 103, 111 (2000) (citing *Perales,* 402 U.S. at 400 01); *accord Ceballos v. Bowen,* 649 F.Supp. 693, 698 (S.D.N.Y.1986). This duty applies even in cases where, as here, the claimant is represented by counsel. *See, e.g., Rosa,* 168 F.3d at 79 (citing *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996)); *Ceballos,* 649 F.Supp. at 698. The ALJ's duty to develop the administrative record encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity. *See, e.g., Cruz v. Sullivan,* 912 F.2d 8, 11 12 (2d Cir.1990);

*Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d 751, 755 56 (2d Cir.1982).

**\*7** Further, while the ALJ need not "reconcile every conflicting shred of medical testimony," *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981), he or she must discuss the relevant evidence and factors "crucial" to the overall determination with "sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984) (citing *Treadwill v. Schweiker,* 698 F.2d 137, 142 (2d Cir.1983)); *accord Polidoro v. Apfel,* 1999 WL 203350, at *7 (S.D.N.Y. Apr. 12, 1999) ("The ALJ's failure to mention [certain relevant] evidence and set for the reasons for his conclusions with sufficient specificity hinders the ability of a reviewing court to decide whether his determination is supported by substantial evidence.") (citation omitted). Thus,

> [t]here are limits ... upon the extent to which a reviewing court may permit an ALJ's conclusion to be based upon an unarticulated finding of fact or analysis, for it is the function of the Commissioner, and not a reviewing court, to pass upon the credibility of witnesses, and to set forth clearly its findings which form the basis for its decision.

*Stupakevich v. Chater,* 907 F.Supp. 632, 637 (E.D.N.Y.1995) (citations omitted).

2. *Standard Governing Evaluation of Disability Claims by the ALJ*

In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and established a new definition of disability in children. *See* Pub.L. No. 104 193, codified at 42 U.S.C. § 1382c(a)(3) (C). An individual under eighteen years of age is disabled if that individual has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Regulations interpreting this statute define the statutory standard of "marked and severe" limitations in terms of an impairment that meets, "medically equals," or "functionally equals" the severity

of an impairment in the Listing of Impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). *See* 20 C.F.R. § 416.924(d). The ALJ must follow a three-step analysis in determining whether a child meets this criteria. *See id.* § 416.924(a)-(d).

First, the ALJ must consider whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). If so, the child is not disabled. *Id.* Next, the ALJ must determine whether the child has a "medically determinable impairment[ ] that is severe ." *Id.* § 416.924(c). If not, or if the impairment is a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," then the child is not disabled. *Id.* Third, if the impairment is severe, the ALJ must determine whether the impairment meets or is medically or functionally equal to a disability in the listings. *Id.* § 416.924(d). "An impairment meets the severity of a listing if it matches the precise definition in the listings," while an impairment is "medically equivalent to a listed impairment if it is 'at least equal in severity and duration to the listed findings.' " *McCaskill v. Massanari,* 152 F.Supp.2d 270, 273 (E.D.N.Y.2001) (quoting 20 C.F.R. § 416.926(a)).

**\*8** Functional limitations are evaluated in six "domains:" i) acquiring and using information; ii) attending and completing tasks; iii) interacting and relating with others; iv) moving about and manipulating objects; v) caring for oneself; and vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). An impairment will functionally equal a listed impairment if it results in a "marked" limitation in two of the domains or an "extreme" limitation in one domain. *Id.* § 416.926a(d). A "marked" limitation is found where the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(2)(i). An "extreme" limitation   which means "more than marked" and is given only to the worst limitations   signifies the impairment "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3)(i).

If the impairment meets (or is medically or functionally equal to) a disability in the listings and satisfies the twelve-month duration requirement, the claimant will be deemed disabled. *Id.* § 416.924(d)(1).

**B.** *Ramos' Application*

**1.** *The ALJ's Decision*

ALJ Sochaczewsky issued his decision on August 22, 2001. R. 11  17. The ALJ noted that Michelle was not engaged in substantial gainful activity. R. 15, 16. Next, he determined Michelle's diabetes was a "severe impairment" and that it satisfied the duration requirement. R. 15, 16. The ALJ concluded that the impairment "neither meets nor medically equals the clinical criteria of any impairment" in the listings, R. 15, and proceeded to analyze whether Michelle's impairment was functionally equal to those in the listings. *See* R. 15  16. He concluded that Michelle had at most a less than marked limitation in four of the six domains and thus found that she was not disabled. R. 16. He included in his decision a finding that "[t]he testimony at the hearing was credible, but does not establish a valid basis for a finding of disability." R. 16; *see also* R. 16 ("although the claimant and her mother's testimony were generally credible, there is no valid basis to establish disability").

Ramos appealed the decision. R. 7 10. The Appeals Council denied the request for review, R. 3 4, thus rendering the ALJ's decision final. *See, e.g., Perez,* 77 F.3d at 44.

**2.** *Analysis*

Ramos' principal argument is that the ALJ failed to analyze properly whether Michelle actually met the requirements in the listings. Listing 109.08 reads:

Juvenile diabetes mellitus (as documented in 109.00C) requiring parenteral insulin. And one of the following, despite prescribed therapy:

A. Recent, recurrent hospitalizations with acidosis; or

B. Recent, recurrent episodes of hypoglycemia; or

C. Growth retardation as described under the criteria in 100.02 A or B; or

**\*9** D. Impaired renal function as described under the criteria in 106.00ff.

As noted in section II.A.2 above, ALJ Sochaczewsky was required to consider at the third step of the analysis whether Michelle's IDDM met or was medically or functionally equal to a disability in the listings,

including Listing 109.08. This analysis required the ALJ to consider the facts relevant to the listing. *See, e.g., Morales v. Barnhart,* 218 F.Supp.2d 450, 459 60 (S.D.N.Y.2002); *see also Aviles v. Bowen,* 715 F.Supp. 509, 513 14 (S.D.N.Y.1989). Despite the facial relevance of 109.08(B) making explicit reference to "[r]ecent, recurrent episodes of hypoglycemia" the ALJ did not mention Listing 109.08 in his decision. Indeed, the decision did not mention hypoglycemia at all. This omission is rendered all the more inexplicable given that Michelle appears to have based her claim for SSI benefits specifically on the ground that she suffered hypoglycemic attacks, *see, e.g.,* R. 85, 103, and a considerable portion of the hearing before the ALJ was devoted to the issue. *See* R. 25 26, 28 34, 36 37.

Instead, the decision merely states the conclusion that the medical evidence presented "neither [met] nor medically equal[ed]" the listings. R. 15. This was insufficient. *Morales,* 218 F.Supp.2d at 460 62 (reversing decision in child diabetes case where, *inter alia,* ALJ failed to address 109.08 listing requirements); *see, e.g., Colon v. Apfel,* 133 F.Supp.2d 330, 343 (S.D.N.Y.2001) (conclusory findings "without explanation and analysis have little or no value" in child disability case); *McCaskill,* 152 F.Supp.2d at 274 ("It is not sufficient for the [ALJ] to make a single, conclusory statement.") (quotation marks and citation omitted) (brackets in original); *accord Scott v. Barnhart,* 297 F.3d 589, 595 96 (7th Cir.2002) (discussion of applicable listing necessary so that reviewing court "may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review").

In reaching his conclusion that Michelle failed to demonstrate a listed impairment, ALJ Sochaczewsky passed over the testimony presented at the hearing concerning Michelle's hypoglycemia, *see* R. 25 26, 28 34, 36 37 testimony that in his decision he twice referred to as "credible," R. 16 as well as certain record evidence. For example, Michelle testified that she had two to three hypoglycemic attacks per week notwithstanding that she adhered to her prescribed therapy. R. 28. While Listing 109.08 does not define "recent" or "recurrent" episodes of hypoglycemia, the testimony concerning Michelle's episodes required analysis of what these terms meant as applied to her case. The ALJ appears to have likewise ignored the import of the October 20, 2000 report completed by one of Michelle's treating physicians, Dr. Vargas, who noted that Michelle suffered

from hypoglycemic attacks and "frequently" experienced symptoms associated with her diabetic condition. R. 269 70. While the ALJ referenced this report in noting that Michelle suffered from "serious blood sugar fluctuations," R. 15, he did not explain how the report impacted on his decision that Michelle failed to satisfy the listings. R. 15 16. Because Michelle's hypoglycemic attacks represented a significant issue before the ALJ, his "failure to mention such evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability ... to decide whether his determination is supported by substantial evidence." *Polidoro,* 1999 WL 203350, at *7; *accord Ferraris,* 728 F.2d at 587.

**\*10** The Commissioner argues that the decision reached by the ALJ should not be disturbed as the Court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence ." Def. Reply Mem. at 2. The Commissioner cites *Berry v. Schweiker,* 675 F.2d 464, 469 (2d Cir.1982), in support of this proposition. The Commissioner is correct that *Berry* was willing to ignore the ALJ's failure to explain his rejection of the claimed listed impairments because the court there was "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Id.* at 469. Nonetheless, *Berry* took pains to note that in some cases

> we would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ. In such instances, we would not hesitate to remand the case for further findings or a clearer explanation for the decision. *Thus, in future cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment.*

*Id.* at 469 (internal citations omitted) (emphasis added). Here, as noted, the ALJ failed to set forth any rationale in support of his finding that Michelle's impairment failed to satisfy the listings, let alone a "sufficient" one. *See id.*

The Commissioner urges that "four physicians, after review of the evidence, concluded that plaintiff's condition did not meet or equal the requirements of a listed impairment" and that these findings constitute substantial evidence. *See* Def. Reply Mem. at 2; *accord* Def. Mem. at 16 17. Specifically, she points to the conclusions reached by Drs. Shukla, Santos, Goldstein and Chandrasekhar. *See* Def. Reply Mem. 2; *see also* Def. Mem. at 16 17. These conclusions are not in any way explained by references to the text of the listing itself and, in any event, it is for the ALJ not a physician to make the ultimate determination as to whether a listing has been met.

The Commissioner also cites to *Mongeur v. Heckler,* 722 F.2d 1033 (2d Cir.1983) and *Miles v. Harris,* 645 F.2d 122 (2d Cir.1981), to support her argument that a remand is unnecessary. These cases, however, merely stand for the proposition that an ALJ need not specifically reference "every item of testimony presented to him or ... explain[ ] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur,* 722 F.2d at 1040; *accord Miles,* 645 F.2d at 124 ("we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony"). This authority does not excuse an ALJ from addressing an issue central to the disposition of the claim. *See, e.g., Ferraris,* 728 F .2d at 587 ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (citations omitted); *Morales,* 218 F.Supp.2d at 459 ("because the ALJ found that [claimant] suffered the 'severe' impairment of [IDDM], it is difficult to reconcile its failure to consider whether [the] impairment met Listing 109.08"); *Polidoro,* 1999 WL 203350, at *7 (ALJ's failure to mention certain evidence in the record relevant to claimed impairment "hinders the ability of a reviewing court" to find substantial evidence); *accord Scott,* 297 F.3d at 595 (ALJ left the reviewing court with "grave reservations as to whether his factual assessment addressed adequately the criteria of the [applicable] listing" where he failed to discuss the listing).

C. *Whether the Case Should be Remanded with an Instruction to Award Benefits*

**\*11** Ramos argues that the case should be remanded with an instruction that benefits be awarded on the ground that

a remand would "serve no purpose" given that the record "contain[s] ample substantial evidence that [Michelle] does suffer hyopglycemic [sic] attacks." Pl. Mem. at 28; Pl. Reply Mem. at 7. Remand, however, is not appropriate where there are gaps in the administrative record or where the ALJ has applied an improper legal standard. *See Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980). Here, the ALJ has failed to explain the applicability of the critical regulation relating to Ramos' disability claim. Certainly, this is not a case where "the record provides persuasive proof of disability and ... further evidentiary proceedings would serve no purpose." *Id.* (citation omitted). Rather, because of the "lack of specificity" in the ALJ's decision and the "inconclusiveness of the record, it is appropriate to remand the case to [the Commissioner] in order to ensure that the correct legal principles are applied" to the determination of Ramos' claim. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987). [3]

[3]    Ramos argues separately that the ALJ failed to develop the administrative record on the issue of Michelle's hypoglycemia and seeks a ruling to that effect, Pl. Mem. at 23 24. *See, e.g., Rosa,* 168 F.3d at 79 83; *Ceballos,* 649 F.Supp. at 698. Whether the record needs further development, however, will depend on how the Commissioner decides Ramos' application and how the new decision deals with the issue of Michelle's hypoglycemic episodes. Rather than adjudicate the argument as to record development in a vacuum, the Court assumes that the Commissioner's decision will be based on an adequate record and that the Commissioner will reopen the record if necessary.

III. *CONCLUSION*

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings should be denied. Ramos' cross-motion for judgment on the pleadings should be granted in part and denied in part. The case should be remanded to the Commissioner for further proceedings consistent with this decision.

*PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any objections.

*See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Honorable Loretta A. Preska, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Preska. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985).

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21032012, 87 Soc.Sec.Rep.Serv. 361

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Hubbard v. Commissioner of Social Security, N.D.N.Y., January 4, 2016

2006 WL 1455479

United States District Court,
W.D. New York.

Mark A. WINEGARD, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 02-CV-6231 CJS.
|
April 5, 2006.

**Attorneys and Law Firms**

Mark A. Winegard, Rochester, NY, for plaintiff, pro se.

Brian M. McCarthy, A.U.S.A., U.S. Attorney's Office, Rochester, NY, for defendant.

### DECISION AND ORDER

SIRAGUSA, J.

### INTRODUCTION

**\*1** This Social Security case is before the Court on the Commissioner's motion (# 10) for judgment on the pleadings. For the reasons stated below, the Commissioner's decision denying benefits is affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for Supplemental Security Income ("SSI") benefits on July 1, 1998. (R. 64-66.) The application was denied initially (R. 35, 37-40) and upon reconsideration (R. 36, 49-52). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and on November 7, 2001, a hearing was held before ALJ James E. Dombeck, at which time plaintiff appeared *pro se* and testified. (R. 21-34.) On December 17, 2001, the ALJ issued his decision finding that plaintiff's impairments met the requirements of Listings 12.04 and 12.09 of the Commissioner's Listing of Impairments, 20 C.F.R. Part

404, Subpart P, Appendix 1. (R. 9-20.) However, the ALJ also determined that plaintiff's drug abuse and alcoholism were contributing factors material to the determination of disability. (R. 15.) The ALJ concluded that, independent of his drug abuse and alcoholism, plaintiff was able to perform his past relevant work as an auto body painter. (R. 18.) Accordingly, the ALJ determined that plaintiff was not disabled for purposes of the Act. The ALJ's decision became the final decision of the Commissioner when, on March 22, 2002, the Appeals Council denied plaintiff's request for review. (R. 5-6.) Plaintiff filed a complaint in this Court on April 25, 2002, and the Commissioner filed her motion for judgment on the pleadings on January 14, 2003. The Court set Feburary 28, 2003, as the date for all responsive papers. To date, plaintiff has not filed any response to the Commissioner's motion.

### NONMEDICAL EVIDENCE

Plaintiff was born on June 9, 1957 (R. 64) and completed high school (R. 78). He has past relevant experience in an auto body repair shop, performing collision and painting work. (R. 30, 78.) Plaintiff testified before the ALJ that while he was incarcerated from 1995 to 1998, he worked "doing different things. At first, we just drove around in this dam [sic] van all day. They had us, well, I stringed a fence. Made us do some roofing." (R. 30.) In response to a question from the ALJ, he further testified that he was able to do that work "[t]o a degree...." (*Id.*) He also testified that while in prison, he did not use drugs "to any degree," and was able to "function all right there in the prisons." (R. 31.) Plaintiff further testified that he applied for disability because

> Well, I had a, I've got a terrible track record for one thing. I can't hold a job. I've been in jail a million times. I had a back injury a while back, and the problems with my neck drives me half nuts.... The main thing, I guess, as far as my physical well-being is that somehow I've contracted Hepatitis C, and it leaves me real fatigued.

(R. 25.) Plaintiff indicated that he had been prescribed pain pills and muscle relaxers, "but none of that stuff really worked." (R. 27.) He also explained that physical

therapy, which he attended about two years earlier, helped.

**\*2** When the ALJ asked plaintiff about whether he had been receiving any treatment for his diagnosis of hepatitis C, plaintiff responded,

> Well, I can't get any treatment until I, my doctor me [sic] I don't have, I mean, a bit of alcohol. And that seems to be-it is a problem for me. I haven't managed to just totally quit drinking. See, well, no doctor will give me treatment, you know, I'm still drinking and whatever [sic]. I don't know, but he doesn't want to, he says he's not going to do nothing [sic] until I quit drinking.

(R. 28.) As for his asthma, plaintiff testified that he,

> did bodywork on and off, and you know, painting, collission [sic] painting and stuff. And then, I breathed a bunch of stuff that I shouldn't have breathed. So, they got me on an inhaler and they got, the had me do this thing that you inhale some kind of fumes, I forget what it's called though. I don't know if it's really asthma. I think it was something from the painting.

(R. 29.) Plaintiff further testified that he has never sought emergency room treatment or been hospitalized for breathing problems. (R. 29.) Likewise, his stated that his back pain has never required any hospital treatment. (*Id.*) When asked about his current drug use, plaintiff stated that he still takes drugs, "[n]ot a lot.... I don't do enough to-I don't think it's a problem, I guess." (R. 30.)

### MEDICAL EVIDENCE

*Medical Evidence Prior to Plaintiff's Alleged Onset Date*
The record contains health and physical therapy records dated January 2, 1991 through January 2, 1992 from the Orleans Correctional Facility, where plaintiff was incarcerated. (R. 123-63.) According to this information,

plaintiff was periodically treated for congestion, scratchy throat and neck pain.

An August 8, 1991 physical therapist consult with Kathleen Lindaman, P.T., showed a normal neurological examination. (R. 143.) Ms. Lindaman noted that plaintiff had a poor sitting posture and a fair standing posture. She recommended that he engage in range of motion exercises.

On August 22, 1991, plaintiff began a course of physical therapy as a result of his complaints of chronic cervical neck pain and stiffness. (R. 141-42.) The therapy included moist heat, ultrasound, manual therapy and progressive postural flexibility and strengthening exercises. (R. 142.) Evidently as a result of the therapy, in September 1991, Ms. Lindaman noted on a request for consultation (for rash and bites) that plaintiff showed some improvement in his strength and posture. (R. 132.)

On January 27, 1998, plaintiff began treatment with Harsha Mulchandani, M.D., at Rochester General Hospital, as a result of his complaints of neck stiffness, intermittent tinnitus and retrorbital pain. (R. 185-86.) Upon examination, Dr. Mulchandani noted that plaintiff had normal range of neck motion and that his lungs had poor air entries bilaterally. Dr. Mulchandani diagnosed tension headaches for which he prescribed Elavil and Tylenol as needed. He also diagnosed hepatitis C and referred plaintiff to the gastrointestinal clinic. Dr. Mulchandani warned plaintiff to strictly abstain from alcohol, and also encouraged him to quit smoking. (*Id.*) Plaintiff had a follow-up appointment on March 12, 1998. (R. 186.) At that appointment, plaintiff related to Dr. Mulchandani that he consumed up to a six-pack of beer about one to two times per week. He described a "cracking sensation" in his neck, stating that it was not pain, but stiffness. Plaintiff also related that he suffered from retrorbital pain about two to three times per week, but denied suffering from hallucinations or delusions, or feeling depressed. (R. 186.) Upon examination, Dr. Mulchandani noted that plaintiff had no palpable tenderness of the neck or paraspinal cervical muscles, had normal range of neck motion, full strength in all extremities and that his reflexes were equal and positive bilaterally. (R. 187.) Dr. Mulchandani concluded that plaintiff had chronic hepatitis secondary to hepatitis C. (R. 187.) He explained to plaintiff the importance of quitting any form of alcohol. As for plaintiff's neck stiffness, Dr. Mulchandani concluded that there was no

objective evidence of cervical spine disease, or myelopathy or cord compression. Dr. Mulchandani concluded that, based upon his history, plaintiff likely had an obsession about a physical symptom. (R. 188.)

**\*3** In an April 2, 1998 follow-up appointment with Dr. Mulchandani, plaintiff reported suffering from sleeping difficulties. (R. 188.) He also reported that he had stopped taking Elavil, and that he was drinking four to five beers per week. Dr. Mulchandani prescribed Prozac and plaintiff agreed that his "depression" or "psych" might be responsible for his physical symptoms. (*Id.*)

*Medical Evidence Subsequent to Plaintiff's Alleged Onset Date*
Plaintiff attended physical therapy from April 2, 1998 to May 28, 1998 at Physical Medicine and Rehabilitation at Rochester General Hospital based on a referral from Dr. Mulchandani. (R. 178-84.) At his initial evaluation, physical therapist Jacquelyn Dear noted that plaintiff related a six to seven year history of low back and neck pain of unknown etiology, initially felt in his neck and radiating to his left leg. (R. 183.) Plaintiff reported that he was currently in between jobs, but generally worked in auto repair shops, performing collision and painting work. Ms. Dear noted that prior x-rays had revealed spondylosis, Grade I spondylolisthesis at L5/S1, and degenerative disc disease at L5/S1. She also noted that a CAT scan of plaintiff's neck was negative. Upon examination, Ms. Dear remarked that plaintiff's cervical range of motion was normal tor forward bending and bilateral rotation with minimal limitation to the right; that his upper extremity range of motion and strength were normal; and that his sensation to light touch was intact. Ms. Dear concluded that plaintiff could benefit from therapy and that the prognosis for plaintiff's neck pain was good. (R. 184.) She remarked that treatment would consist of moist heat, joint mobilization, manual distraction, postural exercise, education and a home program. (R. 184.)

On May 28, 1998, Ms. Dear discharged plaintiff from physical therapy with instructions for a home program and further treatment from his primary physician, Dr. Mulchandani. (R. 178.) Ms. Dear reported in her discharge letter to Dr. Mulchandani that plaintiff continued to complain of right-sided neck pain, but that plaintiff had made improvement in range of motion. Ms.

Dear also concluded that plaintiff appeared to have some degenerative changes in the cervical region. (*Id.*)

On June 2, 1998, plaintiff returned to Dr. Mulchandani complaining of a cold with nasal congestion. (R. 176.) He denied having a fever, chills, shortness of breath, wheezing, or ear pain. (R. 176.) Plaintiff also reported temporary relief of his neck pain from physical therapy. Upon examination, plaintiff's lungs were clear to auscultation. He had poor air entries, but no wheezing. Plaintiff's extremities were normal. Dr. Mulchandani assessed chronic hepatitis C with probable cirrhosis. (R. 175.) He advised plaintiff to completely quit drinking alcohol. As for plaintiff s chronic neck stiffness, Dr. Mulchandani concluded that it was probably psychosomatic in origin as there were no clinical signs of physical disease. (R. 175.)

**\*4** On July 14, 1998, plaintiff returned to Dr. Mulchandani for a comprehensive physical examination. (R. 172-73.) He presented with no complaints. (R. 172.) He was still smoking "quite a lot" and drinking beer almost every day, which he characterized as "not a lot"; however, Dr. Mulchandani noted that he drank about one-half to one pitcher daily. (R. 172.) Upon examination, plaintiff had poor air entries bilaterally, with no wheezing or rhonchi. Plaintiff had full strength throughout his extremities and his reflexes were positive bilaterally. Dr. Mulchandani assessed clinical hepatitis C with partial hypertension. (R. 173.) He instructed plaintiff to follow-up with the gastrointestinal clinic during the week, and, again, to absolutely abstain from alcohol. Dr. Mulchandani indicated that pulmonary function testing suggested reactive airways disease, although plaintiff continued to smoke. (R. 173.) He noted that plaintiff did not have shortness of breath on exertion. Dr. Mulchandani started plaintiff on Albuterol as needed and instructed him to return in three to four months.

On September 22, 1998, plaintiff was examined consultatively by George Sirotenko, M.D. (R. 204-08.) Plaintiff related a four year history of low back pain, a history of asthma since 1998 and hepatitis C. (R. 204.) He explained that he injured his back when he fell while working in jail. Plaintiff claimed that the hepatitis C caused fatigue, such that after one to two hours of moderate physical activity, he needed to rest for about thirty to forty-five minutes. Plaintiff stated he was also unsure what triggered his asthma, but he denied

any hospitalizations or emergency room treatment. He explained to Dr. Sirotenko that repetitive forward flexing and lifting objects weighing greater than fifty pounds exacerbated his back pain. (R. 204.) Additionally, plaintiff stated he was taking Prozac, which fairly controlled his depression. (R. 205.) He also reported that he smoked a pack of cigarettes a day, but denied any alcohol use since he quit in 1998. Finally, plaintiff related a history of IV drug use approximately ten years ago. Upon examination, Dr. Sirotenko noted in his report the following: that plaintiff's gait and station were normal and he could walk on his heels and toes; that his neck was supple with no jugular venous distention, thyromegaly, adenopathy or bruits; that his chest was clear to auscultation; that his percussion was normal; that there was no cyanosis, clubbing or edema in his extremities; that he showed no evidence of muscle atrophy; that he was able to make a fist; that his fine motor coordination was intact bilaterally; that his grip strength was 5/5; that he had full range of motion in all joints and straight leg raising was negative bilaterally; and that he had no sensory deficits. (R. 205-06.) Dr. Sirotenko also reported on a x-ray of his lumbosacral spine revealed degenerative disc disease at L5-S1 with significant osteophyte formation. (R. 206; *see also* R. 208 (Ralph N. Ricco, M.D.'s radiological report of Sep. 22, 1998).) Dr. Sirotenko's impression was a history of low back pain which caused no limitations, a history of hepatitis C with no sequelae of liver disease noted, a history of asthma, with a pulmonary function test revealing borderline obstructive disease and a subjective history of depression controlled with Prozac. (R. 206-07.) Dr. Sirotenko advised plaintiff to avoid respiratory triggers which may exacerbate his asthma, avoid repetitive forward flexion and avoid repetitive lifting of objects weighing greater than fifty pounds. (R. 207.) He also wrote that "a formal psychiatric or psychological evaluation may be warranted" in light of plaintiff's history of depression. (R. 207.)

 **\*5** On the same day as his consultative examination by Dr. Sirotenko, September 22, 1998, plaintiff also underwent a psychological consultative examination by Joel Schorr, Ed.D. (R. 213-16.) At his visit, plaintiff denied any psychiatric treatment history on an in-patient basis, although he stated he had received some minimal counseling which he was required to attend while incarcerated. (R. 213.) Plaintiff reported that he began drinking alcohol at the age of ten and "using cocaine, pot and IV drugs at a relatively somewhat later age." (R.

214.) He told Dr. Schnorr that his last recreational drug usage was about two months prior and he last drank about one month ago. (*Id.*) Plaintiff also reported a lengthy arrest history, including three arrests for DWI, one for burglary, and many arrests for petit larceny. His most lengthy and most recent incarceration was from 1995 to 1997. Upon examination, plaintiff was mildly guarded with respect to his responses. (R. 214.) He denied crying spells, but admitted a great deal of difficulty with a lack of motivation or energy. He reported difficulty sleeping and fatigue during the day. (R. 215.) Dr. Schorr wrote that plaintiff's "short-term memory is reported to be extremely poor, and, indeed, he has difficulty remembering more than one out of three objects after a five minute delay." (R. 215.) Dr. Schorr also reported that plaintiff did not take his drug and alcohol abuse seriously and that he tended to minimize and deny. (*Id.*) He noted that plaintiff's attention and concentration were fair during the interview. (*Id.*) Dr. Schorr concluded that plaintiff was in need of a long-term dual diagnosis treatment in order to obtain a reasonable and lasting recovery with regard to his substance dependence and resultant emotional issues. (R. 215.) He stated that plaintiff's ability to work was severely limited by his physical condition as well as by his tendency to be somewhat depressed and unmotivated. He also noted that plaintiff's chemical dependency would clearly interfere in a work situation. Dr. Schorr diagnosed the following:

> Axis I Alcohol dependence, episodic, current remission questionable. Dependence on a combination of opioid and other nonalcoholic substances, in remission for two months by examinee['s report. Dysthymic disorder, chronic.
>
> Axis II Question of personality disorder, unspecified with antisocial and dependent features.

(R. 216.) Dr. Schorr wrote that he "highly recommended that the claimant be referred for evaluation treatment in dual diagnosis in patient treatment program with follow-up in a half way house or supervised living...." (R. 216.) He concluded that plaintiff was not capable of working without this type of intervention. (*Id.*)

On January 12, 1999, Dr. Mulchandani completed a New York State Department of Social Services form entitled "Medical Examination for Employability Assessment, Disability Screening and Alcoholism/Drug Addiction Determination." (R. 231-32.) In that report,

Dr. Mulchandani listed the following physical functional limitations: lifting, carrying, stairs and other climbing (moderately limited); and pushing, pulling and bending (very limited). (R. 231.) He indicated that plaintiff had no physical functional limitations in walking, standing, sitting, seeing, hearing, speaking, or using his hands. (*Id.*) With regard to his mental abilities, Dr. Mulchandani indicated that plaintiff had no limitations in understanding, remembering and carrying out instructions, maintaining attention and concentration, making decisions, interacting with others and maintaining socially appropriate behavior in a work setting. (R. 231.) Section VIII, "Screening for Possible SSI Referral," asked, "[b]ased on the evidence available to you, does this individual have severe impairment(s) which has lasted, or is expected to last a[t] least 12 months?" In his "YES" response, Dr. Mulchandani stated in explanation, "patient [with] chronic active hepatitis C which is expected to progress." In response to the question, "[i]f substance abuse is also found, would such impairment be expected to continue if use of drugs and/or alcohol were to cease?", Dr. Mulchandani also checked "YES." Dr. Mulchandani further indicated on the form that as a result of plaintiff's physical, mental and addiction limitations, he should refrain from strenuous physical activity, smokey/dusty conditions and working at heights. (R. 232.) Dr. Mulchandani wrote that he recommended that plaintiff participate in an alcohol detoxification program.

**\*6** On June 9, 2000, Kevin Casey, M.D., a physician, completed a New York State Office of Temporary and Disability Assistance Division of Disability Determination form based on his May 5, 2000 examination of plaintiff. (R. 239-49.) Dr. Casey indicated that he has been treating plaintiff for hepatitis C and alcohol abuse since April 20, 1998. (R. 239.) Dr. Casey noted on the form that since his initial evaluation of him, plaintiff chronically complained of fatigue. (R. 240.) Dr. Casey indicated that plaintiff had no notable mental abnormalities. (R. 247.) He also marked on the form that plaintiff was not limited in lifting/carrying, standing/walking, sitting, or pushing and pulling. (R. 248.) Further, he marked that plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (R. 249.)

On August 5, 2000, plaintiff was examined consultatively by Richard Wolfe, Ph.D., a psychologist. (R. 253-59.) Plaintiff related to Dr. Wolfe complaints of difficulty

sleeping, decreased appetite, loss of ten pounds of weight, and decreased sexual drive and interest. (R. 254.) Dr. Wolfe also noted that plaintiff claimed that he was often depressed, had lost interest in most activities of daily living, was irritable and "extremely fatigued" and had difficulties with memory and concentration. (*Id.*) Plaintiff further reported to Dr. Wolfe that he experienced "panic attacks three or four times a week characterized by nausea, sweating, difficulty breathing, dizziness and chest pain." (R. 254.) While plaintiff stated to Dr. Wolfe that he did not currently use drugs or alcohol, he admitted that, until a few months ago, he drank beer on a regular basis, and also admitted that he had used cocaine on a regular basis since age twenty-eight. (R. 255.) Upon examination, Dr. Wolfe noted: that plaintiff's thought processes were coherent with no evidence of confusion or loosening of association; that his affect was irritable and otherwise dysphoric; and that his mood was mildly apprehensive. (R. 256.) Dr. Wolfe reported that plaintiff's responses to tests of calculation and memory suggested that his attention and concentration were only mildly impaired by his depression and anxiety. Additionally, Dr. Wolf indicated that tests of plaintiff's remote and recent memory suggested that these skills were also mildly impaired. Dr. Wolfe concluded that plaintiff's cognitive functioning was in the low average range or below and, based upon his history of drug and alcohol use, concluded that plaintiff's judgment was poor. (R. 257.) Dr. Wolfe diagnosed the following:

> Axis I Depressive disorder, NOS
>
> Anxiety disorder, NOS
>
> Alcohol abuse, in partial remission
>
> Cocaine abuse, in partial remission
>
> Axis II Personality disorder, with mixed features.

(R. 258.)

As a result of his diagnoses, Dr. Wolf recommended that plaintiff "resume his involvement in [a] drug and alcohol treatment program ... [and] be evaluated by a psychiatrist who could assess his need for psychotropic medication." (R. 258.) Dr. Wolfe expressed his belief based on his examination that plaintiff "would have [a] mild to moderate degree of difficulty performing complex tasks independently and dealing appropriately with the normal stressors of a competitive work environment." (R.

257.) Moreover, he wrote that plaintiff "would also have some problems with sustained concentration and effort working at a competitive pace and remembering instructions, largely as a result of his depression and anxiety." (R. 258.) Dr. Wolfe concluded that plaintiff would be an appropriate candidate for vocational rehabilitation if he remained clean and sober. However, he cautioned that, although plaintiff was intellectually capable of managing his own funds, he might may not use good judgment in light of his history of drug and alcohol abuse. (R. 258.)

**\*7** On August 5, 2000, plaintiff was given an internal medical examination by Dr. Sirotenko. (R. 260-64.) Plaintiff related that he had been abstinent from alcohol since 1999, when he completed rehabilitation. (R. 261.) He also stated that he smoked and snorted cocaine until about six months prior. Upon examination, Dr. Sirotenko reported: that plaintiff was in no acute distress; that his gait was normal and he could walk on his heels and toes; that he had full range of motion in the shoulders, elbows, forearms, wrists and fingers; that his strength was 5/5 in the upper extremities; that his cervical and thoracic spinal examination was normal; that he experienced paralumbar tenderness from L2 to L5; that his straight leg raising was negative bilaterally; that his strength was 5/5 in the lower extremities; that his deep tendon reflexes were physiologic and equal; that he had no sensory deficits; that he had no evident muscle atrophy evident; that his hand and finger dexterity were intact; and that his grip strength was 5/5. (R. 261-63.) In the portion of his report entitled "Impression," Dr. Sirotenko wrote that: plaintiff had a history of hepatitis C, currently with no features of heptomegaly; a history of degenerative joint disease of the cervical spine, currently with mild limitations in range of motion of the cervical spine and paraspinal tenderness from C5 to C7; no features of upper extremity radiculopathy; a history of low back pain with no features of lower extremity radiculopathy; and a history of anxiety and depression. (R. 263.) While Dr. Sirotenko concluded that plaintiff should avoid cervical spine extension or rotation, repetitive forward flexion or extension and repetitive kneeling, squatting, bending and stair climbing, he fount that plaintiff was able to push, pull and lift objects weighing up to twenty pounds on an intermittent basis and had no limitations in upper extremity use or fine motor activity. (R. 263-64.)

1     Plaintiff had been seen by Dr. Sirotenko in a consultative examination conducted on September 22, 1998, and discussed above.

On September 12, 2001, Dr. Casey completed a "Medical Source Statement of Ability to Perform Work-related Activities (Physical)." (R. 293-96.) Dr. Casey concluded that plaintiff had no limitations in lifting/carrying, standing/walking, sitting and pushing/pulling. (R. 293-94.) Dr. Casey also found that plaintiff could frequently climb, balance, kneel, crouch, crawl and stoop. (R. 294.)

On September 14, 2001, M.[2] Dlugozima, M.D., completed a "Medical Source Statement of Ability to Perform Work-related Activities (Physical)." (R. 301-04.) Dr. Dlugozima indicated on the form that plaintiff could lift/carry less than ten pounds, but had no limitations in standing/walking and sitting and could occasionally climb, balance, kneel, crouch, crawl and stoop. (R. 294 .) In the portion of the form calling for medical and clinical findings that supported Dr. Dlugozima conclusions is written: "Pt. only comes in when he needs a form filled out, not on a regular basis." (R. 303.)

2     Dr. Dlugozima's first name is not written on the form. (R. 304.)

## STANDARDS OF LAW

### The Standard for Finding a Disability

**\*8** SSI benefits may not be paid to an individual unless that individual meets the income and resource limitations of 42 U.S.C. §§ 1382a and 1382b, and is disabled. 42 U.S.C. § 1382(a). For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998).

The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.

If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal,* 134 F.3d at 501 (citations and internal quotation marks omitted). Plaintiff bears the burden of proof for steps one through four. The burden of proof shifts to the Commissioner for the fifth step. *See DeChirico v. Callahan,* 134 F.3d 1177, 1179-80 (2d Cir.1998); *Colon v. Apfel,* No. 98 Civ. 4732(HB) 2000 WL 282898, *3 (S.D.N.Y., Mar. 15, 2000).

*The Standard of Review*
The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard ." *Schaal,* 134 F.3d at 501. It is well settled that

> it is not the function of a reviewing court to determine de novo whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980); *see also Williams v. Callahan,* 30 F.Supp.2d 588, 592 (E.D.N.Y.1998); *Fishbum v. Sullivan,* 802 F.Supp. 1018, 1023 (S.D.N.Y.1992). Thus, the scope of review involves first the determination of whether the ALJ applied the correct legal standards, and second, whether the ALJ's decision is supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987).

Substantial evidence is more than a mere scintilla. It is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quotation omitted). Although district court is not bound by the Commissioner's conclusions and inferences of law, the ALJ's findings and inferences of fact are entitled to judicial deference. *Grubb v. Chater,* 992 F.Supp. 634, 637 (E.D.N.Y.1998).

**\*9** Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Parker,* 626 F.2d at 235. However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id .*

*Treating Physician Rule*
The law gives special weight to the opinion of the treating physician. The SSA's regulations provide:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The various factors applied when the treating physician's opinion is not given controlling weight include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. *Id.* The regulations further provide that the SSA "will always give good reasons" for the weight given to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2) (2004); *see*

*also, Schaal, 134 F.3d at 503-504; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir.1998).*

ANALYSIS

Plaintiff has not filed any papers in opposition to the Commissioner's motion, despite ample time and notice to do so. (*See* Motion Scheduling Order (# 12), *Winegard v. Barnhart,* No. 02-CV-6231 (Jan. 16, 2003) (setting the time for response to the motion at February 28, 2003).) The Court has no indication that its motion scheduling order was returned undelivered. Therefore, plaintiff's only filing in this case is his form complaint, which states in broad terms that, "[t]he decision of the hearing examiner, as affirmed by the Appeals Council, was erroneous and not supported by either the substantial evidence on the record or the applicable law." (Compl.¶ 10.) In a similar situation, the Southern District of New York observed:

> Thus, Alvarez does not point to any specific testimony or evidence which he believes the ALJ overlooked, unjustly weighted, or otherwise should have considered. Alvarez's complaint is overly conclusory, and without more, insufficient to defeat the Commissioner's motion for judgment on the pleadings. *E.g., Counterman v. Chater,* 923 F.Supp. 408, 414 (W.D.N.Y.1996) (Court rejects plaintiff's allegations that the ALJ "failed to consider [minor claimant's] parent's testimony as medical evidence, failed to consider all the medical evidence, failed to consider [child's] mother's testimony with respect to the IFA analysis, and failed to render his decision based upon the record as a whole," on the ground that they are "broad and conclusory. She offers no specific testimony or evidence which she believes that the ALJ overlooked and should have considered."); *Steiner v. Dowling,* 914 F.Supp. 25, 28 n. 1 (N.D.N.Y.1995) (rejecting plaintiffs' argument that the State's social security regulations are too restrictive as "neither sufficiently explained nor seriously advanced by plaintiffs-providing only a single conclusory paragraph in their Statement of Undisputed Facts ..., and in their Attorney's Affirmation ...."), *aff'd,* 76 F.3d 498 (2d Cir.1996)....

**\*10** *Alvarez v. Barnhardt,* No. 02CIV.3121 JSM AJP, 2002 WL 31663570, *8 (S.D.N.Y. Nov. 26, 2002), *report and recommendation adopted* No. 02 CIV. 3121 JSM AJP, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); *see also Reyes v. Barnhart,* No. 01 CIV. 4059(LTS) (JCF), 2004

WL 439495, *3 (S.D.N.Y. Mar. 9, 2004) ("conclusory allegations of Plaintiff's complaint are insufficient to defeat the Commissioner's motion for judgment on the pleadings.").

The ALJ found that plaintiff had not engaged in any substantial gainful activity since the alleged onset of his disability, that he had an impairment or combination of impairments considered to be "severe" under the Commissioner's regulations, but that "[c]onsidering only the limitations that would remain if the claimant stopped using drugs and alcohol, he would not be subject to any impairment or combination of impairments that meets or equals the requirements of the listing of impairments...." (R. 19.) Further, the ALJ determined that plaintiff was not entirely credible regarding his limitations, and retained the residual functional capacity to lift and carry up to 50 pounds occasionally and 25 pounds frequently, with no limitations on his ability to sit, stand and walk, or occasionally bend and climb. (R. 19.) The ALJ also determined that plaintiff had moderate limitations in his ability to maintain attention and concentration for extended periods, understand, remember and carry out complex tasks and to interact with the public. (*Id.*) Based on those physical limitations, the ALJ concluded that plaintiff was not precluded from his past relevant work as an auto painter.

The law bars a finding of disability if drug addiction or alcoholism is a "contributing factor material to" the determination of disability. 42 U.S.C. § 423(d)(2)(c) and 1382(a)(3)(1) (2006).[3] In determining whether plaintiff's drug or alcohol abuse are material factors, the ALJ was required to apply the Commissioner's rule codified at 20 C.F.R. § 416.935. That rule states:

3      Enacted by Pub.L. 104 121, 110 Stat. 847 (1996).

> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism. (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of

disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

**\*11** (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 416.935 (1995).

Here, plaintiff alleged an inability to work due to degenerative disc disease, neck pain, hepatitis C and depression. (Tr. 74.) As required by the rule quoted above, the ALJ evaluated plaintiff's complaints of physical and mental impairments independent of his drug and alcohol abuse and determined that he would be able to perform his past relevant work as an auto body painter. (R. 18-19.) The Commissioner argues that substantial evidence supports the ALJ's decision. The Court agrees.

Medical assessments from plaintiff's treating physicians indicate that his impairments caused minimal to no exertional limitations. Dr. Mulchandani, who has treated him since January 1998, concluded that plaintiff had no limitations in sitting, standing or walking. (R. 231.) He found plaintiff moderately limited in lifting and carrying and very limited in pushing, pulling and bending. (*Id.*) With regard to his mental abilities, Dr. Mulchandani indicated that plaintiff had no limitations in understanding, remembering and carrying out instructions, maintaining attention and concentration, making decisions, interacting with others and maintaining socially appropriate behavior in a work setting. He also indicated that plaintiff did not have limitations as a result of his addictions, but that his hepatitis C would remain even if plaintiff were to cease use of

drugs and alcohol. (R. 232.) Nevertheless, no evidence in the record shows that Dr. Mulchandani's indicated limitations would preclude plaintiff from returning to his past relevant work as an auto body painter. Dr. Casey, who has treated him since April 1998, concluded that plaintiff had no notable mental abnormalities, and was not limited in lifting/carrying, standing/walking or sitting. (R. 248.) Consequently, plaintiff's treating physicians' findings support the ALJ's conclusion that plaintiff is not disabled and could perform his past relevant work.

Additionally, physical examination findings and opinions from consultative examiner Dr. Sirotenko likewise support the ALJ's determination. Dr. Sirotenko's conclusions after examination show: that plaintiff was able to make a fist; that his fine motor coordination was intact bilaterally; that his grip strength was 5/5; that he had full range of motion in all joints; that straight leg raising was negative bilaterally; and that no sensory deficits were noted. Based upon his evaluation, Dr. Sirotenko advised plaintiff only to avoid respiratory triggers which might exacerbate his asthma, to avoid repetitive forward flexion, and to avoid repetitive lifting of objects weighing greater than fifty pounds. (R. 207.) Like the limitations noted by Dr. Mulchandi, these limitations are consistent with an ability to perform medium [4] work.

4    The ALJ determined that the job of auto body painter requires medium exertion. (R. 18 (*citing* Dictionary of Occupational Titles 8405.31 014).)

**\*12** In determining whether plaintiff could return to his past relevant work, the ALJ also considered plaintiff's subjective complaints and allegations of total disability and found that they were not consistent with his activities and the detailed medical findings of examining and treating physicians. (R. 15, 17-18.) In this regard, the ALJ noted that plaintiff "has not always been honest with treating and examining physicians regarding his medical history and drug and alcohol abuse." (R. 17.) The ALJ then cited the following examples in support of his conclusion:

On September 22, 1998, he told Dr. Sirotenko that he had been sober since 1998 and had not used illegal drugs in ten years (Exhibit 4F [R. 205] ). On that same date, he told Dr. Schorr that he had last used drugs 2 months prior and drank 1 month prior to the examination (Exhibit 5F [R. 214] ). The claimant told Dr. Wolfe in August of 2000 that he had an appetite disturbance and

had lost 10 pounds (Exhibit 13F [R. 254] ). However, records from his reveal that he had a weight gain not a weight loss (Exhibit 12F [R. 244] ). The claimant had reported injuring his back to treating physicians in 1990 (Exhibit 2F pp. 12-13 [R. 183-84] ). He later changed his history to include an injury to his low back while working on a car in 1993 (Exhibit 14F [R. 260] ).

The claimant had testified at the hearing that he had worked in autobody repair for 10 to 12 years. However, employer records reveal that the claimant had worked in autobody repair much less than that (Exhibit 3D [R. 68-73] ).

(R. 17-81.) Additionally, plaintiff testified at the administrative hearing that while incarcerated, he did not use drugs to any degree and was able to "function all right there," including being able to do some fencing and roof work. (R. 30-31.) The Court agrees that substantial evidence supports the ALJ's credibility finding and determines that plaintiff's allegations of complete functional incapacity are not supported by the medical evidence or his own testimony. Therefore, the ALJ was entitled to discredit plaintiff's allegations and subjective complaints.

The ALJ's determination that plaintiff's cervical pain and asthma were not severe is also supported by the evidence in the record. (R. 14.) He based this determination on x-ray and CT scan results showing no abnormalities and the observation that, "his treating physician reported no objective evidence of any cervical spine disease." (R. 14, 123-71, 172-94.) Plaintiff's complaint does not point out any contrary evidence.

Based on the record before it, the Court concludes that the ALJ, in carrying out his responsibility to determine plaintiff's residual functional capacity, *see* 20 D.F.R. §§ 416.927(e)(2), 416.946; *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999), he reasonably concluded that plaintiff retained the ability to do his past relevant work. The record, including the findings and opinions of plaintiff's treating physicians, fully supports the ALJ's residual functional capacity finding. Accordingly, the Commissioner's decision must be affirmed.

CONCLUSION

**\*13** Accordingly, the Commissioner's motion for judgment on the pleadings (# 10) is granted and, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.

It is So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1455479, 111 Soc.Sec.Rep.Serv. 186

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 1693835
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ethel FELICIANO, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 04 Civ.9554 KMW AJP.
|
July 21, 2005.

**Attorneys and Law Firms**

Ethel Feliciano (Regular & Certified Mail), Susan D. Baird, Judge Kimba M. Wood, pro se.

### REPORT AND RECOMMENDATION

PECK, Chief Magistrate J.

 **\*1** Pro se plaintiff Ethel Feliciano brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") to deny Feliciano Supplemental Social Security ("SSI") benefits. (Dkt. No. 2: Complaint.) The Commissioner has moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). (Dkt. No. 10: Notice of Motion.)

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings should be GRANTED.

### PROCEDURAL BACKGROUND

On February 28, 2002, plaintiff Ethel Feliciano applied for SSI benefits alleging that she had a disability since September 1, 1997, alleging an inability to engage in substantial gainful activity. (*See* Dkt. No. 9: Administrative Record filed by the Commissioner ["R."] at 101-04.) Feliciano's application was denied initially (R. 64-67), and Feliciano requested a hearing before an Administrative Law Judge ("ALJ") (R. 68-71). The ALJ held a hearing on June 17, 2004, at which Feliciano

appeared and testified. (R. 31-63.) On July 9, 2004, the ALJ issued his decision, finding that Feliciano was not disabled. (R. 9-19.) The ALJ's decision became the final decision when the Appeals Council denied Feliciano's request for review on September 3, 2004. (R. 5-7.)

The issue before the Court is whether the Commissioner's decision that Feliciano was not disabled is supported by substantial evidence. The Court finds that it was.

### FACTS

*Hearings Before the ALJ*

At the start of the June 17, 2004 hearing before ALJ Michael I. Gewirtz, Feliciano confirmed that the ALJ was not missing any medical records. (R. 36-37.) She confirmed the ALJ's conclusion from his review of the medical records that she has "allegations and diagnosis of dysthymia, borderline personality, substance abuse in remission, carpal tunnel syndrome, myofascial pain, being overweight, degenerative disk disease, osteoarthritis, and scoliosis, gastroesophageal reflux, and Hepatitis C." (R. 37; *see also* R. 57.) The ALJ explained to Feliciano that although she claimed a disability onset date of September 1997, SSI benefits only are available from the date of application, in Feliciano's case February 28, 2002. (R. 38.)

1    On April 6, 2004, a hearing was held before ALJ Michael I. Gewirtz (R. 20 30), who gave Feliciano leave to find legal counsel. (*Id.*) On June 17, 2004, the hearing continued with Feliciano appearing without legal representation. (R. 31 63.) The ALJ reminded Feliciano of her right to have an attorney or other representative, and Feliciano elected to proceed without a representative, since she had been unable to obtain one. (R. 33 35.)

Feliciano testified that she was born on December 31, 1949, was fifty-four years old at the time of the hearing and forty-seven years old in September 1997, her claimed date of disability. (R. 37.) Feliciano is a United States citizen (*see* R. 105), who has a GED and an Associate's degree in Liberal Arts (R. 38, 43). While enrolled in Hostos Community College, she worked from September 2003 to April 2004 in a Federal Work Study program, working four hours per day and twenty hours per week, earning $400 per month. (R. 38-41, 210.) Feliciano "delivered mail," "made phone calls to other students to participate in activities," and "[m]ost of the time [she]

was moving or walking around because [she] couldn't stay to[o] long sitting." (R. 41.) During the four hour workday, Feliciano would spend "two hours sitting and two hours walking." (*Id.*) She did not lift anything heavy while employed in this program, and would use a push cart to transport office supplies. (R. 41-42.) Before that, she worked at "Wildcat" in 1995, where she received "on-the-job training." (R. 43.) Feliciano also worked while incarcerated, [2] receiving industrial training with the Department of Motor Vehicles, as well as working as a law clerk in prison, where she answered phones, performed research and did "clerical type work." (R. 57.) Feliciano testified that she planned to return to college to receive a four-year Bachelor's degree, if accepted, in order to become a social worker or counselor. (R. 44, 58.) [3]

[2] Feliciano has a history of three drug related incarcerations for a total of approximately 10 years in jail. (R. 174.)

[3] Records submitted to the Court show that Feliciano enrolled in Lehman College. (*See* Compl. Atts.)

 **\*2** Feliciano testified that she has back and neck pain, and as a result is unable to lift twenty pounds, although she is able to pick up a gallon of milk with her left hand. (R. 51-53, 58.) She testified that she can only sit for two hours at a time because she has "to keep getting up to stretch [her] legs or they'll fall asleep." (R. 58.) Feliciano can only stand for a half-hour at a time before she has to sit down due to pain in her legs. (R. 59.) Injections and leg raise exercises have helped relieve the pressure on her lower back and neck. (R. 52.) Feliciano has pain going down her neck, and carpal tunnel syndrome in her right arm with numbness in her right thumb. (R. 53-54.) She has received injections in her right wrist which have increased mobility in her fingers. (R. 54.)

Feliciano has been on and off various medications for various periods of time. (*See generally* R. 47-54.) She currently controls her hepatitis C through her diet and not with medication. (R. 45, 49.) She used to be on medication to relieve pain in her liver, but the pain ceased in June 2003 once she discontinued use of the pain medication Neurontin. (R. 46-47, 49.) Feliciano also takes Prilosec for gastroesophageal reflux disease ("GERD"). (R. 50.) The medication has reduced her GERD symptoms, without side effects. (R. 50-51.) Feliciano feels stress, but is no longer on stress medication. (R. 49-50.) Feliciano said she

was "trying to" do something about her weight, by trying to diet, but that was all. (R. 51.)

Feliciano had problems with substance abuse in the past, specifically with "cocaine, crack, marijuana." (R. 54.) She stopped using drugs when she went to prison in 1995 (R. 55), and went to drug counseling until 2002 (R. 55-56). She has not had a drug problem since. (R. 55.) As part of her drug counseling, Feliciano was diagnosed with "dysthyemia and a borderline personality disorder." (R. 55.) As noted above, she was taking Neurontin for that but discontinued it in 2003 because of liver pain. (R. 56.)

The ALJ summed up all the medical and psychological issues that they had discussed and asked Feliciano if he had missed anything. (R. 57.) Feliciano responded:

> No. I think that my only problem, it's my criminal record that holds me back, you know, because I've tried to get jobs ... And, you know, you can't escape the past so my criminal record, when it comes up it's like they look at me and it's like don't worry, we'll call you. Don't call us. And they never call me. That's why I decided to go back to school.

(R. 57.)

To attend her ALJ hearing, Feliciano traveled on her own using public transportation, as she normally does. (R. 42, 59.) Feliciano does her own grocery shopping (*id.*), and knits as a hobby (*id.*). Feliciano attends church and social activities regularly (R. 60), dresses and feeds herself (R. 60-61), takes care of her own hygiene (R. 60-61), takes her medication on her own (R. 61), and manages her own money (*id.*). Feliciano filled out all the paperwork for her work-study and college courses on her own (*id.*), and has been applying for jobs since her release from prison in September 2001, and the "only problem" preventing her from working was her "criminal record" (R. 57).

*The Medical Evidence Prior to February 28, 2002*

 **\*3** The medical evidence before the ALJ for the period before February 28, 2002 consisted of records from Feliciano's treating physicians at H.S. Systems (R. 147), North Central Bronx Hospital (R. 115, 152, 163,

207), Wyckoff Heights Medical Center (R. 205), and a counselor for her prior substance abuse (R. 154).

*Physical Health*
On October 4, 2001, Dr. Liebman reviewed an x-ray of Feliciano's lumbosacral spine which showed "minimal degenerative changes." (R. 147.) December 1997 medical records showed mild scoliosis of the lumbar spine associated with osteoarthritis and narrowing of the L5-S1 disks. (R. 145; *see also* R. 146.)

Dr. Sylvia Fernandes and Dr. Uma Tejwani treated Feliciano beginning in November 2001 at the North Central Bronx Hospital. (R. 115-16, 152, 163, 207.) On December 24, 2001, Dr. Tejwani reported that Feliciano had diabetes mellitus, hyperlipidemia, GERD (gastroesophogeal reflux disease), hepatitis C and low back pain. (R. 152, 207.) At her next visit on February 6, 2002, Feliciano received an injection in the right upper trapezius. (R. 163.) Feliciano was 4#10# tall and 183 pounds, and was considered "morbid[ly] obes [e]." (R. 163.) The physicians prescribed Vioxx and physical therapy once or twice a week for four weeks, and recommended general weight loss. (*Id.*)

Feliciano was seen at the Wyckoff Heights Medical Center on January 13, 2002. (R. 205.) X-rays of the neck showed "arthritis in C4-C6 with joint space narrowing and compression of nerve, causing numbness and tingling in [the right] arm." (*Id.*) Nevertheless, a CT scan of the neck was normal, and showed no compressed nerves and normal discs without herniation. (R. 205.) Cervical radiculopathy and carpal tunnel syndrome were diagnosed. (*Id.*)

*Substance Abuse*
Prior to the period at issue, Feliciano had a history of drug addiction, incarcerations for possession and sale of controlled substances, and treatment for substance abuse. (R. 153-60.) Feliciano was released from prison in September 2001 and was in a substance abuse rehabilitation program from October 27, 2001 to February 28, 2002, where she saw a counselor three to five times a week. (R. 153-55.) She was diagnosed with a borderline personality disorder. (R. 155.)

*The Medical Evidence After February 28, 2002*

The medical evidence before the ALJ for the period after February 28, 2002 consisted of a consultative physician's report (R. 176-77), Feliciano's treating physicians at North Bronx Healthcare Network (R. 169-72, 211-21), and treating and consultative psychiatrists (R. 154-60, 173-93).

*Physical Health*
On March 19, 2002, Dr. Mohammad Khattak performed a consultative orthopedic examination of Feliciano for the Social Security Administration. (R. 176-77.) Dr. Khattak observed that Feliciano ambulated without assistance, her gait was steady, she sat and stood normally, and she got on and off the examining table without assistance. (R. 176.) Feliciano's cervical and lumbar spine were found to be normal, as were her upper and lower extremities. (*Id.*) X-rays of the lumbosacral spine were negative, and Dr. Khattak diagnosed Feliciano with obesity and lumbosacral derangement. (R. 177.) Dr. Khattak concluded that Feliciano's "ability to bend and lift may be 'mildly' limited, but there are no limitations in sitting, standing, walking or reaching with gross and fine manipulations in her hands." (*Id.*)

**\*4** Feliciano was treated by the North Central Bronx Healthcare Network from November 2002 through May 2004. (R. 169-70, 211-21.) On November 19, 2002, the physical therapy outpatient department noted that Feliciano was obese and in need of abdominal strengthening. (R. 169-70.)

On April 30, 2004. Dr. Fernandes and Dr. Tejwani at the North Central Bronx Healthcare Network completed "Medical Assessment" forms sent by the Commissioner. (R. 211-21.) They diagnosed Feliciano's carpal tunnel syndrome as "mild," and stated that she had "no cervical radiculopathy." (R. 211.) X-rays and an MRI reflected degenerative joint disease of the knee (*id.*), and myofascial pain syndrome was diagnosed (R. 212). The physicians concluded that Feliciano could occasionally lift and carry up to twenty pounds, and could frequently carry up to ten pounds. (R. 214, 219.) They concluded that she had no problems in grasping, pushing, pulling, reaching, fingering, or fine manipulation with either hand. (R. 213-14.) According to the doctors, Feliciano could sit and stand for two hours at a time before needing to sit down or walk around, could sit and stand and walk for at least six hours per day, and could walk four city blocks without stopping. (R. 214, 217-18.) They opined

that Feliciano did not need a cane or other assistive device (R. 219), but that she would need to change positions at will and would sometimes need to take one or two ten to twenty minute unscheduled breaks during a workday (R. 217-19). The physicians noted that Feliciano could travel by bus or subway. (R. 214.) According to the physicians, Feliciano's symptoms did not interfere with her attention and concentration, and she could tolerate moderate work stress. (R. 217.) They further reported that Feliciano should avoid concentrated exposure to aggravating environmental factors such as temperature extremes, chemical irritants, fumes, dust, and high humidity. (R. 220.) Although Dr. Tejwani reported that Feliciano could rarely stoop or climb ladders, never crouch, and only occasionally twist (R. 219), Dr. Fernandes noted that Feliciano had no postural limitations (R. 213.).

Dr. Ballard completed a "Physical Residual Functional Capacity Assessment" of Feliciano on May 15, 2002, based on her back disorder. (R. 196-202.) He concluded that she could: occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds; sit, stand or walk six hours in an eight hour day; and was unlimited as to push and pull activities. (R. 197.) He found no postural, manipulative, communicative, or environmental limitations. (R. 198-200.)

*Mental Health*

On March 13, 2002, treating psychiatrist Dr. Bruce Phariss reported that Feliciano was diagnosed with substance dependence in remission, and a personality disorder. (R. 154-60.) Dr. Phariss is a board certified psychiatrist and specialist in addiction, and was the medical director for Exponents Treatment Exchange, the drug rehabilitation program Feliciano attended. (*Id.; see also* Dkt. No. 11: Gov't Br. at 7.) Dr. Phariss examined Feliciano and reported that she was euthymic, had good hygiene and grooming, was cooperative, answered questions easily, and was logical and goal-oriented. (R. 155-57.) Feliciano told Dr. Phariss that she had interests and hobbies, shopped and cooked, and commuted by subway. (R. 157.) Dr. Phariss noted no limitation in understanding and memory, sustained concentration and persistence, social interaction, or adaption. (R. 158-59.) Dr. Phariss noted that she had back pain and arthritis but that those are not conditions he treated. (R. 159.)

*5 Dr. Herbert Meadow performed a psychiatric consultative examination on Feliciano for the Social Security Administration on March 19, 2002. (R. 174-75.) Dr. Meadow reported that Feliciano has a history of three drug-related incarcerations for a total of approximately 10 years in jail. (R. 174.) Dr. Meadow noted that Feliciano has a history of cocaine abuse and stopped in 1992. (*Id.*) Feliciano takes Vioxx for her back problems and Lansoprazole for acid reflux. (*Id.*) Feliciano has a GED, and can read and write. (*Id.*) Dr. Meadow observed that Feliciano was in a rehabilitation program and lived in a shelter at the time of his report. (*Id.*) Further, he stated that "she has a poor appetite and her sleeping pattern is variable. She has no history of auditory or visual hallucinations, no history of homicidal/ suicidal ideation." (*Id.*) Dr. Meadow observed that Feliciano's "speech was logical, coherent, [and] goal directed. There was no loosening of associations, circumstantial or tangential thinking. No thought disorder was evident.... Her mood was mildly depressed. Her affect was appropriate." (*Id.*) Dr. Meadow noted that Feliciano reportedly spent her afternoons in the library and at the shelter, watches television, listens to music, and reads. (*Id.*) Her intelligence level was in the "average range" with unimpaired insight and judgment. (*Id.*) Dr. Meadow concluded that Feliciano's mental impairment (dysthymia) would not prevent her from working. (R. 175.)

In contrast, in May 2004, when asked to describe any limitations that would affect her ability to work at a regular job on a sustained basis, Dr. Tejwani reported that Feliciano's history of anxiety may affect her ability to work. (R. 221.) Dr. Tejwani did not explain in detail to what extent he felt that Feliciano's ability to work would be affected by her anxiety.

In April 2002, Dr. Allan Hochberg completed a "Mental Residual Functional Capacity Assessment" of Feliciano. (R. 178-93.) He found no significant limitations in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (R. 178-79.) Dr. Hochberg made his decision based on categories 12.04 (affective disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders). (R. 182.) He concluded that Feliciano had "mild to moderate" dysthymia (R. 185) and borderline personality disorder (R. 189.) In terms of functional limitations, he found mild limitations in activities of daily living and social

functioning, and a moderate degree of limitation in maintaining concentration, persistence or pace. (R. 192.)

*The ALJ's Decision*

Th ALJ denied Feliciano's application for SSI benefits in a written decision dated July 9, 2004. (R. 9-19.) The ALJ applied the appropriate five step legal standard and reviewed all exhibits in the record, including all medical evidence, as well as the hearing testimony and the arguments presented. (R. 13.) The ALJ noted that Feliciano did not have any past relevant work experience at any time in the last fifteen years other than her participation in the work study program, which he found did not rise to the level of substantial gainful activity. (*Id.*) The ALJ concluded that "there is no indication that [Feliciano] has engaged in any substantial gainful activity at any time since her alleged onset date, September 1, 1997." (*Id.*)

**\*6** The ALJ found that Feliciano had dysthymia, borderline personality disorder and substance abuse which is in remission, all constituting "nonsevere impairments because they do not cause more than a minimal effect on [Feliciano's] ability to perform basic work activities." (*Id.*) Thus, these are non-severe impairments. (R. 14.) The ALJ found that Feliciano had hepatitis C, GERD, obesity, degenerative disc disease (osteoarthritis/scoliosis), carpal tunnel syndrome, and myofascial pain syndrome, all severe impairments that had more than a minimal impact on her functioning. (R. 13.)

The ALJ found at the third step that Feliciano did not have an impairment that met the criteria of any of the listed impairments in Appendix 1 to subpart P of the Regulations Part 404 (the Listing of Impairments), and that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." (R. 14.)

The ALJ concluded that Feliciano had the ability to lift and carry twenty pounds occasionally and ten pounds frequently, to stand and/or walk for six hours during the course of an eight hour workday, and no limitation on her ability to sit. (R. 17.) The ALJ stated that Feliciano "does not have any nonexertional limitations. She has only mild restrictions on her activities of daily living, on her ability to function socially and on her concentration,

persistence and pace." (*Id.*) Hence, Feliciano "has a residual functional capacity to perform light work." (*Id.*)

The ALJ concluded that Feliciano "is not disabled within the meaning of the Social Security Act and Regulations," and that "[s]ince [Feliciano] has not been under a disability at any time from September 1, 1997 through the date of this decision, she is not eligible for supplemental security income." (R. 18.)

*ANALYSIS*

I. *THE APPLICABLE LAW*[4]

[4] For additional decisions by this Judge discussing, *inter alia,* the standard of review in Social Security cases in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at \*5 8 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Serrano v. Barnhart,* 02 Civ. 6372, 2003 WL 22683342 at \*9 12 (S.D.N.Y. Nov. 14, 2003) (Peck, M.J.); *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at \*6 10 (S.D.N.Y. July 8, 2003) (Peck, M.J.), *report & rec. adopted,* 2003 WL 21755932 (S.D.N.Y. July 30, 2003) (Kaplan, D.J.); *De Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at \*6 10 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Acosta v. Barnhart,* 99 Civ. 1355, 2003 WL 1877228 at \*7 11 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); *Alvarez v. Barnhart,* 02 Civ. 3121, 2002 WL 31663570 at \*5 7 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 272063 (S .D.N.Y. Jan. 16, 2003) (Martin, D.J.); *Jimenez v. Massanari,* 00 Civ. 8957, 2001 WL 935521 at \*6, 8 (S.D.N.Y. Aug. 16, 2001) (Peck, M .J.); *Morel v. Massanari,* 01 Civ. 0186, 2001 WL 776950 at \*4 6 (S .D.N.Y. July 11, 2001) (Peck, M.J.); *Duvergel v. Apfel,* 99 Civ. 4614, 2000 WL 328593 at \*6 8 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); *Jones v. Apfel,* 66 F.Supp.2d 518, 535 37 (S.D.N.Y.1999) (Pauley, D.J. & Peck, M.J.); *Craven v. Apfel,* 58 F.Supp.2d 172, 180 82 (S.D.N.Y.1999) (Preska, D.J. & Peck, M.J.); *Vega v. Commissioner of Soc. Sec.,* 97 Civ. 6438, 1998 WL 255411 at \*5 8 (S .D.N.Y. May 20, 1998) (Peck, M.J.); *Pickering v. Chater,* 951 F.Supp. 418, 422 23 (S.D.N.Y.1996) (Batts, D.J. & Peck, M.J.); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at \*6 7 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.).

A. *Definition of Disability*

A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see, e.g., Barnhart v. Thomas,* 540 U.S. 20, 23, 124 S.Ct. 376, 379 (2003); *Barnhart v. Walton,* 535 U.S. 212, 214, 122 S.Ct. 1265, 1268 (2002); *Butts v. Barnhart,* 388 F.3d 377, 383 (2d Cir.2004); *Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002); [5]

[5]     *See also, e.g., Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000); *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999); *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); *Martinez v. Massanari,* 242 F.Supp.2d 372, 375 (S.D.N.Y.2003); *Garcia v. Barnhart,* 01 Civ. 8300, 2003 WL 68040 at *4 (S.D.N.Y. Jan. 7, 2003); *Rebull v. Massanari,* 240 F.Supp.2d 265, 268 (S.D.N.Y.2002); *Worthy v. Barnhart,* 01 Civ. 7907, 2002 WL 31873463 at *4 (S.D.N.Y. Dec. 23, 2002); *Perez v. Barnhart,* 234 F.Supp.2d 336, 339 (S.D.N.Y.2002).

The combined effect of all impairments must be of such severity that the person

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

**\*7** 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see, e.g., Barnhart v. Thomas,* 540 U.S. at 23, 124 S.Ct. at 379; *Barnhart v. Walton,* 535 U.S. at 218, 122 S.Ct. at 1270;

*Butts v. Barnhart,* 388 F.3d at 383; *Draegert v. Barnhart,* 311 F.3d at 472. [6]

[6]     *See also, e.g., Shaw v. Chater,* 221 F.3d at 131 32; *Rosa v. Callahan,* 168 F.3d at 77; *Balsamo v. Chater,* 142 F.3d at 79; *Garcia v. Barnhart,* 2003 WL 68040 at *4; *Soto v. Barnhart,* 01 Civ. 7905, 2002 WL 31729500 at *4 (S.D.N.Y. Dec. 4, 2002).

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983) (per curiam); *see, e.g., Brunson v. Callahan,* No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); *Brown v. Apfel,* 174 F.3d at 62; *Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983). [7]

[7]     *See also, e.g., Rivas v. Barnhart,* 01 Civ. 3672, 2005 WL 183139 at *16 (S.D.N.Y. Jan. 27, 2005); *Batista v. Commissioner of Soc. Sec.,* 03 Civ. 10121, 2004 WL 2700104 at *7 (S .D.N.Y. Nov. 23, 2004); *Rebull v. Massanari,* 240 F.Supp.2d at 268; *Worthy v. Barnhart,* 2002 WL 31873463 at *4.

### B. *Standard of Review*

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination. *E.g., Green-Younger v. Barnhart,* 335 F.3d 99, 105-06 (2d Cir.2003); *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Vapne v. Apfel,* No. 01-6247, 36 Fed. Appx. 670, 672, 2002 WL 1275339 at *2 (2d Cir. June 10, 2002), *cert. denied,* 537 U.S. 961, 123 S.Ct. 394 (2002); *Horowitz v. Barnhart,* No. 01-6092, 29 Fed. Appx. 749, 752, 2002 WL 337951 at *2 (2d Cir. Mar. 4, 2002); *Machadio v. Apfel,* 276 F.3d 103, 108 (2d Cir.2002); 42 U.S.C. § 405(g). [8] " 'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision." ' *Morris v. Barnhart,* 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002). [9]

[8]     *See also, e.g., Shaw v. Chater,* 221 F.3d 126, 131 (2d Cir.2000); *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Brown v. Apfel,* 174 F.3d 59, 61

(2d Cir.1999); *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983); *Dumas v. Schweiker,* 712 F.2d 1545, 1550 (2d Cir.1983); *Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *6 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Rodriguez v. Barnhart,* 03 Civ. 7272, 2004 WL 1970141 at *8 (S.D.N.Y. Aug. 23, 2004); *Martinez v. Massanari,* 242 F.Supp.2d 372, 375 (S.D.N.Y.2003); *Duran v. Barnhart,* 01 Civ. 8307, 2003 WL 103003 at *7 (S.D.N.Y. Jan. 13, 2003); *Garcia v.. Barnhart,* 01 Civ. 8300, 2003 WL 68040 at *3 (S.D.N.Y. Jan. 7, 2003); *Rebull v. Massanari,* 240 F.Supp.2d 265, 268 69 (S.D.N.Y.2002); *Worthy v. Barnhart,* 01 Civ. 7907, 2002 WL 31873463 at *3 (S.D.N.Y. Dec. 23, 2002); *Norris v. Barnhart,* 01 Civ. 0902, 2002 WL 31778794 at *3 (S.D.N.Y. Dec. 12, 2002); *Morales v. Barnhart,* 01 Civ. 4057, 2002 WL 31729526 at *6 (S.D.N.Y. Dec. 5, 2002)

9      *See also, e.g., Duran v. Barnhart,* 2003 WL 103003 at *9; *Florencio v. Apfel,* 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review. ) (internal quotations & alterations omitted).

The Supreme Court has defined "substantial evidence" as " 'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); *accord, e.g., Veino v. Barnhart,* 312 F.3d at 586; *Shaw v. Chater,* 221 F.3d at 131; *Curry v. Apfel,* 209 F.3d at 122; *Brown v. Apfel,* 174 F.3d at 61; *Rosa v. Callahan,* 168 F.3d at 77; *Tejada v. Apfel,* 167 F.3d at 773-74; *Perez v. Chater,* 77 F.3d at 46. [0] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1207 (1983). The Court must be careful not to " 'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." ' *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991); *see also, e.g., Veino v. Barnhart,* 312 F .3d at 586; *Toles v. Chater,* No. 96-6065,

104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996); *Rodriguez v. Barnhart,* 2004 WL 1970141 at *9; *Garcia v. Barnhart,* 2003 WL 68040 at *3; *Morales v. Barnhart,* 2002 WL 31729526 at *6. However, the Court will not defer to the Commissioner's determination if it is " 'the product of legal error." ' *E.g., Duvergel v. Apfel,* 2000 WL 328593 at *7; *see also, e.g., Tejada v. Apfel,* 167 F.3d at 773 (citing cases); *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004).

10      *See also, e.g., Green Younger v. Barnhart,* 335 F.3d at 106 (2d Cir.2003); *Batitsta v. Commissioner of Soc. Sec.,* 03 Civ. 10121, 2004 WL 2700104 at *5 (S.D.N.Y. Nov. 23, 2004); *Rodriguez v. Barnhart,* 2004 WL 1970141 at *9; *Martinez v. Massanari,* 242 F.Supp.2d at 375; *Duran v. Barnhart,* 2003 WL 103003 at *9; *Garcia v. Barnhart,* 2003 WL 68040 at *3; *Worthy v. Barnhart,* 2002 WL 31873463 at *3; *Norris v. Barnhart,* 2002 WL 31778794 at *3; *Morales v. Barnhart,* 2002 WL 31729526 at *6; *Soto v. Barnhart,* 01 Civ. 7905, 2002 WL 31729500 at *4 (S.D.N.Y. Dec. 4, 2002).

**\*8** The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; *see, e.g., Barnhart v. Thomas,* 540 U.S. 20, 24-25, 124 S.Ct. 376, 379-80 (2003); *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income). If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). [2] At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments

presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and, final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas,* 540 U.S. at 24-25, 124 S.Ct. at 379-80

(fns.omitted) *accord, e.g., Green-Younger v. Barhnart,* 335 F.3d at 106; *Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002); *Shaw v. Chater,* 221 F.3d at 132; *Curry v. Apfel,* 209 F.3d at 122; *Brown v. Apfel,* 174 F.3d at 62; *Rosa v. Callahan,* 168 F.3d at 77; *Tejada v. Apfel,* 167 F.3d at 774. [2]

11    Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003. *See* 68 Fed.Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); *see also Barnhart v. Thomas,* 540 U.S. at 25 n.2, 124 S.Ct. at 380 n.2. The amendments, *inter alia,* added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively. 20 C.F.R. § 404.1520; *see* 68 Fed.Reg. 51156. The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairments, the SSA will assess the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work. *See* 68 Fed.Reg. 51156. The ALJ appropriately utilized the residual functional capacity assessment amendments in this case. (*See* R. 15 17.)

12    *See also, e.g., Balsamo v. Chater,* 142 F.3d at 79 80; *Schaal v. Apfel,* 134 F.3d at 501; *Perez v. Chater,* 77 F.3d at 46; *Dixon v. Shalala,* 54 F.3d 1019, 1022 (2d Cir.1995); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *Batitsta v. Commissionerr of Soc. Sec.,* 2004 WL 2700104 at *6; *Rodriguez v. Barnhart,* 2004 WL 1970141 at *9 10; *Martinez v. Massanari,* 242

F.Supp.2d at 375 76; *Garcia v. Barnhart,* 2003 WL 68040 at *4; *Worthy v. Barnhart,* 2002 WL 31873463 at *4; *Norris v. Barnhart,* 2002 WL 31778794 at *3 4; *Perez v. Barnhart,* 234 F.Supp.2d 336, 339 (S.D.N.Y.2002); *Soto v. Barnhart,* 2002 WL 31729500 at *4 5.

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. *See, e.g., Barnhart v. Thomas,* 540 U.S. at 25, 124 S.Ct. at 379-80; *Green-Younger v. Barnhart,* 335 F.3d at 106; *Draegert v. Barnhart,* 311 F.3d at 472; *Curry v. Apfel,* 209 F .3d at 122; *Rosa v. Callahan,* 168 F.3d at 80; *Perez v. Chater,* 77 F.3d at 46; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *Rodriguez v. Barnhart,* 2004 WL 1970141 at *10.

**\*9** Where a claimant has multiple impairments, as the Second Circuit "has long recognized, the combined effect of a claimant's impairments must be considered in determining disability [and] the SSA must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." *Dixon v. Shalala,* 54 F.3d at 1031; *see, e.g., DeLeon v. Secretary of Health & Human Servs.,* 734 F.2d 930, 937 (2d Cir.1984). [3]

13    *See also, e.g., Miles v. Apfel,* 51 F.Supp.2d 266, 269 (E.D.N.Y.1999); *Nivar v. Apfel,* 98 Civ. 3930, 1999 WL 163397 at *4 5 & n.8 (S.D.N.Y. Mar. 23, 1999); *Vitale v. Apfel,* 49 F.Supp.2d 137, 142 (E.D.N.Y.1999); *Irvin v. Heckler,* 592 F.Supp. 531, 540 (S.D.N.Y.1984).

C. *The Treating Physician Rule*
The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); *see, e.g., Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *Kamerling v. Massanari,* 295 F.3d 206, 209 n.5 (2d Cir.2002); *Jordan v. Barnhart,* No. 01-6181, 29 Fed. Appx. 790, 792, 2002 WL 448643 at *2 (2d Cir. Mar. 22, 2002); *Bond v. Social Sec. Admin.,* No. 00-6333, 20 Fed. Appx. 20, 21, 2001 WL 1168333 at *1 (2d Cir. Sept. 27, 2001); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000). [4]

[14]  *See also, e.g., Rosa v. Callahan,* 168 F.3d 72, 78 79 (2d Cir.1999); *Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998); *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998); *Martinez v. Massanari,* 242 F.Supp.2d 372, 376 (S.D.N.Y.2003); *Garcia v. Barnhart,* 01 Civ. 8300, 2003 WL 68040 at *5 & n.4 5 (S.D.N.Y. Jan. 7, 2003).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); *see also, e.g., Shaw v. Chater,* 221 F.3d at 134; *Clark v. Commissioner,* 143 F.3d at 118; *Schaal v. Apfel,* 134 F.3d at 503; *Martinez v. Massanari,* 242 F.Supp.2d at 376; *Garcia v. Barnhart,* 2003 WL 68040 at *6; *Rebull v. Massanari,* 240 F.Supp.2d 265, 268 (S.D.N.Y.2002).

The Commissioner's current "treating physician" regulations were approved by the Second Circuit in *Schisler v. Sullivan,* 3 F .3d 563, 568 (2d Cir.1993).

## II. *THE GOVERNMENT'S MOTION SHOULD BE GRANTED, WITHOUT THE NEED TO APPLY THE FIVE STEP SEQUENCE TO FELICIANO'S CLAIM, BECAUSE FELICIANO'S COMPLAINT IS*

*CONCLUSORY AND SHE DID NOT FILE PAPERS OPPOSING THE GOVERNMENT'S MOTION* [5]

[15]  For additional decisions by this Judge discussing the grant of judgment on the pleadings to the Government in Social Security cases where the plaintiff has filed no opposing papers (or only conclusory papers) in language substantially similar to that in this entire section of this Report and Recommendation, *see Morgan v. Barnhart,* 04 Civ. 6024, 2005 WL 925594 at *9 10 (S.D.N.Y. Apr. 21, 2005) (Peck, M.J.); *Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *8 9 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at *9 (S.D.N.Y. July 8, 2003) (Peck, M.J.); *De Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at *10 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Alvarez v. Barnhardt,* 02 Civ. 3121, 2002 WL 31663570 at *6 8 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 272063 (S . D.N.Y. Jan. 16, 2003) (Martin, D.J.); *Morel v. Massanari,* 01 Civ. 0186, 2001 WL 776950 at *7 (S.D.N.Y. July 11, 2001) (Peck, M.J.); *Casiano v. Apfel,* 39 F.Supp.2d 326, 327 28 (S.D.N.Y.1999) (Stein, D.J. & Peck, M.J.), *aff'd mem.,* No. 99 6058, 205 F.3d 1322 (table), 2000 WL 225436 (2d Cir. Jan. 14, 2000).

In a proceeding to judicially review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability. *See, e.g., Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Melville v. Apfel,* 198 F.3d 45, 51 (2d Cir.1999) ("The claimant generally bears the burden of proving that she is disabled under the statute ..."); *Aubeuf v. Schweiker,* 649 F.2d 107, 111 (2d Cir.1981) ("It is well established that the burden of proving disability is on the claimant ."); *Dousewicz v. Harris,* 646 F.2d 771, 772 (2d Cir.1981); *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980); *Adams v. Flemming,* 276 F.2d 901, 903 (2d Cir.1960) ("The controlling principles of law upon [judicial] review [of a Social Security denial] are well established ..., namely, 'the burden of sustaining the claim for benefits is on the claimant' and The findings of the Social Security Agency are final and binding if there is a substantial basis for them." '). [6]

[16]  *See also, e.g., Pena v. Barnhart,* 01 Civ 502, 2002 WL 31487903 at *8 (S.D.N.Y. Oct. 29, 2002); *Reyes v. Barnhart,* 01 Civ 1724, 2002 WL 31385825 at *5 (S.D.N.Y. Oct. 21, 2002); *Ortiz v. Shalala,* 93 Civ. 3561, 1994 WL 673630 at *1 (S.D.N.Y. Dec. 1, 1994); *Morton v. Heckler,* 586 F.Supp. 110,

111 (W.D.N.Y.1984); Harvey L. McCormick, *Social Sec. Claims & Proc.* § 14:16 (5th ed. 1998) ("In a proceeding to review judicially a final decision of the Commissioner, the plaintiff has the burden of establishing the correctness of his or her contention. The procedure is akin to that in a regular civil appeal under the Federal Rules of Civil Procedure.... ).

**\*10** Here, Feliciano's pro se complaint states only that she should receive Social Security SSI benefits because of her psychiatric disorder. (Dkt. No. 2: Compl. ¶ 4.) Feliciano has not filed any brief or affidavit opposing the Commissioner's motion for judgment on the pleadings, and the filing deadline for doing so has passed. (*See* Dkt. No. 6: 2/9/05 Stip. & Order, setting a deadline of 5/20/05 for Feliciano's opposition papers.) Thus, Feliciano does not point to any specific testimony or evidence which she believes the ALJ overlooked or unjustly weighed. [7] Feliciano's complaint is conclusory, and without more, insufficient to defeat the Commissioner's motion for judgment on the pleadings. *See* cases cited in n. 15; *see also Reyes v. Barnhart,* 01 Civ. 4059, 2004 WL 439495 at \*3 (S.D.N.Y. Mar. 9, 2004) (following my decisions in *Jiang, Alvarez* and *Morel* ); *Counterman v. Chater,* 923 F.Supp. 408, 414 (W.D.N.Y.1996) (Court rejects plaintiff's allegations that the ALJ "failed to consider [minor claimant's] parent's testimony as medical evidence, failed to consider all the medical evidence, failed to consider [child's] mother's testimony with respect to the IFA analysis, and failed to render his decision based upon the record as a whole," on the ground that they are "broad and conclusory. She offers no specific testimony or evidence which she believes that the ALJ overlooked and should have considered."); *Steiner v. Dowling,* 914 F.Supp. 25, 28 n.1 (N.D .N.Y.1995) (rejecting plaintiffs' argument that the State's social security regulations are too restrictive as "neither sufficiently explained nor seriously advanced by plaintiffs-providing only a single conclusory paragraph in their Statement of Undisputed Facts ..., and in their Attorney's Affirmation ...."), *aff'd,* 76 F.3d 498 (2d Cir.1996); *see generally* S.D.N.Y. Local Civil Rule 7.1 ("all motions and all oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon in support of or in opposition to the motion.... Willful failure to comply with this rule may be deemed sufficient cause for the denial of a motion or for the granting of a motion by default.").

17      Attached to Feliciano's complaint are medical reports from a time in late 1994 after the ALJ and

Appeals Council's decisions. (Compl.: Atts.) They are contradictory. There is a 9/16/04 report from North Central Bronx Hospital that states that Feliciano "is now medically cleared and can return to work/ school on full duty on 9/17/04  (apparently related to vertigo from diabetes), and a 10/7/04 note from Dr. Fernandes that her back was "injected with lidocaine ... with beneficial results,  but also two mental health reports (8/27/04 and 10/19/04) that Feliciano is unable to work based on "serious and persistent mental illness.

Evidence not contained in the administrative record may not be considered when reviewing the findings of the Commissioner. *See, e.g.,* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security.... ); *Carnevale v. Gardner,* 393 F.2d 889, 891 n.1 (2d Cir.1968) (district court correctly refused to consider materials not properly in administrative record); *Morel v.. Massanari,* 01 Civ. 0186, 2001 WL 776950 at \*8 9 & n.20 (S.D.N.Y. July 11, 2001) (Peck, M.J.) ( & cases cited therein); *Duvergel v. Apfel,* 99 Civ. 4614, 2000 WL 328593 at \*2 n.6 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); *Casiano v. Apfel,* 39 F.Supp.2d 326, 330 (S . D.N.Y.1999) (Stein, D.J. & Peck, M.J.), *aff'd mem.,* 205 F.3d 1322 (2d Cir.2000).

Although the Court cannot consider new evidence, this Court may remand to the Commissioner to consider new evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.  42 U.S.C. § 405(g). The Second Circuit has summarized the three part showing required by this provision as follows:

" A]n appellant must show that the proffered evidence is (1) " 'new and not merely cumulative of what is already in the record,  and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently. Finally, claimant must show (3) good cause for her failure to present the evidence earlier. *Jones v. Sullivan,* 949 F.2d 57, 60 (2d Cir.1991) (citations omitted) (quoting *Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir.1988)); *accord, e. g.,Morel v. Massanari,* 2001 WL 776950 at \*8 & n.21 ( & cases cited therein).

In this case, the new doctors' evaluations are not material to Feliciano's claim because they are contradictory, and cover a period after the ALJ (and Appeals Council's) decision in this action, and thus are "not probative of plaintiff's condition during the period covered by the claim. *Casiano v. Apfel,* 39 F.Supp.2d at 331 32; *accord, Morel v. Massanari,* 2001 WL 776950 at \*8 ( & cases cited therein).

Accordingly, the Court need not remand to the Commissioner to consider this additional evidence. Feliciano may, however, file a new application for SSI benefits with the Social Security Administration based upon the new medical evidence that purports to show she is currently unable to work.

## III. *APPLICATION OF THE FIVE STEP SEQUENCE TO FELICIANO'S CLAIMS*

For the reasons set forth in Point II above, the Court need not apply the five-step sequence to Feliciano's claims. Even if the Court were to do so, however, the Commissioner's decision that Feliciano was not disabled should be affirmed since it is supported by substantial evidence.

### A. *Feliciano Was Not Engaged in Substantial Gainful Activity*

The first inquiry is whether Feliciano was engaged in substantial gainful activity after her application for SSI benefits. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." *20 C.F.R. § 404.1510.* [8] The ALJ's conclusion that Feliciano was not engaged in substantial gainful activity during the applicable time period is not disputed.

[18]      *See, e.g., Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at \*9 12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at \*10 (S.D.N.Y. July 8, 2003) (Peck, M.J.); *De Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at \*11 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Acosta v. Barnhart,* 99 Civ. 1355, 2003 WL 1877228 at \*11 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); *Alvarez v. Barnhart,* 02 Civ. 3121, 2002 WL 31663570 at \*9 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.) (citing my prior cases), *report & rec. adopted,* 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

### B. *Feliciano Had Demonstrated Severe Physical Impairments That Significantly Limited Her Ability To Do Basic Work Activities*

**\*11** The next step of the analysis is to determine whether Feliciano proved that she had a severe physical or mental impairment or combination of impairments that "significantly limit[ed][her] physical or mental ability to do basic work activities." *20 C.F.R. § 404.1521(a).* The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." *20 C.F.R. § 404.1521(b).* "Basic work activities" include:

> ... walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking .... [u]nderstanding, carrying out, and remembering simple instructions .... [u]se of judgment .... [r]esponding appropriately to supervision, co-workers and usual work situations.

*20 C.F.R. § 404.1521(b)(1)-(5).* [9] The Second Circuit has warned that the step two analysis may not do more than "screen out *de minimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). [20]

[19]      *See also, e.g., Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at \*10 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *De Roman v. Barnhart,* 03 Civ. 6372, 2003 WL 21511160 at \*11 (S.D .N.Y. Nov. 14, 2003) (Peck, M.J.); *Acosta v. Barnhart,* 99 Civ. 1355, 2003 WL 1877228 at \*11 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); *Alvarez v. Barnhardt,* 02 Civ. 3121, 2002 WL 31663570 at \*9 (S.D.N.Y. Apr. 10, 2002) (citing my prior cases), *report and rec. adopted,* 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

[20]      *Accord, e.g., Rodriguez v. Barnhart,* 2005 WL 643190 at \*10; *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at \*10 (S.D.N.Y. July 8, 2003); *De Roman v. Barnhart,* 2003 WL 21511160 at \*11; *Acosta v. Barnhart,* 2003 WL 1877228 at \*11; *Alvarez v. Barnhardt,* 2002 WL 31663570 at \*9.

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." *Rosario v. Apfel,* No. 97 CV 5759, 1999 WL 294727 at \*5 (E.D.N.Y. Mar. 13, 1999)

(citing 20 C.F.R. § 404.1520(C)); *accord, e.g., Rodriguez v. Barnhart,* 2005 WL 643190 at *10; *Jiang v. Barnhart,* 2003 WL 21526937 at *10. On the other hand, if the disability claim rises above the *de minimis* level, then the further analysis of step three and beyond must be undertaken.

*See, e.g., Dixon v. Shalala,* 54 F.3d at 1030. [2]

[21]    *See also, e.g., Rodriguez v. Barnhart,* 2005 WL 643190 at *10; *Jiang v. Barnhart,* 2003 WL 21526937 at *10; *De Roman v. Barnhart,* 2003 WL 21511160 at *11; *Acosta v. Barnhart,* 2003 WL 1877228 at *12; *Alvarez v. Barnhart,* 2002 WL 31663570 at *9.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* 1999 WL 294727 at *5 (quoting *Bowen v. Yuckert,* 482 U.S. 137, 154 n.12, 107 S.Ct. 2287, 2298 n.12 (1987)).

The ALJ found Feliciano "has Hepatitis C, GERD, obesity, degenerative disc disease (osteoarthritis/scoliosis), carpal tunnel syndrome and myofascial pain syndrome. These are impairments that cause more than minimal restrictions in the ability to perform basic work acitvity and therefore, they are severe impairments." (R. 13.) This finding is not disputed. [22]

[22]    The ALJ also found that Feliciano's dysthymia, borderline personality disorder and substance abuse in remission are non severe impairments. (R. 13 14.) The Court will review this at the later stages of the five step sequence.

### C. Feliciano Did Not Have A Disability Listed in Appendix 1 of the Regulations

The third step of the five-part test requires a determination of whether Feliciano had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." *Dixon v. Shalala,* 54 F.3d 1019, 1022 (2d Cir.1995). [23]

[23]    *Accord, e.g., Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *10 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Jiang v. Barnhart,* 03 Civ. 0077, 2003

WL 21526937 at *11 (S.D.N.Y. July 8, 2003) (Peck, M.J.); *De Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at *12 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Acosta v. Barnhart,* 99 Civ. 1355, 2003 WL 1877228 at *13 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); *Alvarez v. Barnhardt,* 02 Civ. 3121, 2002 WL 31663570 at *9 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.) (citing my prior cases), *report & rec. adopted,* 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

The ALJ found that although Feliciano's physical impairments were "severe," her impairments did not "meet or equal the specific requirements established for a listed impairment in the listings of impairments in Appendix 1, Subpart P...." (R. 14.)

**\*12** Appendix 1 provides a categorization of physical (and mental) impairments, including the musculoskeletal, respiratory, cardiovascular, digestive, and multiple body, systems. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00, 3.00, 4.00, 5.00, 10.00. Feliciano's physical impairment diagnoses from treating physicians were hepatitis C, GERD, obesity, degenerative disc disease (osteoarthritis/scoliosis), carpal tunnel syndrome, and myofascial pain syndrome. (*See* R. 13-15.)

Feliciano's hepatitis C does not satisfy the Appendix 1 requirement. Section 5.05 provides for chronic liver disease, including "chronic active hepatitis," and outlines certain conditions for these specific diseases. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 5.05. Feliciano's hepatitis C does not satisfy any of the conditions set forth in § 5.05. Indeed, Feliciano is able to control her hepatitis through her diet without needing medication. (R. 45, 49.) While she used to be on medication to relieve pain in her liver, the pain ceased once she discontinued use of the pain medication Neurontin. (R. 46-47, 49.)

The diagnosis of obesity is addressed generally throughout the Listing of Impairments in multiple sections, in the same language:

*Effects of obesity.* Obesity is a medically determinable impairment that is often associated with disturbance of the [cardiovascular] system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with [cardiovascular] impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at any

steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00(Q), 3.00(I), 4.00(F). Obesity thus must be considered in light of the effects it causes on the body. The ALJ found that Feliciano's obesity did not rise to the level of severity outlined in the Listings, noting that none of the physicians reported "findings equivalent in severity to the criteria of any listed impairment." (R. 14.)

The ALJ found that Dr. Tejwani's and Dr. Fernandes' diagnosis of osetoarthritis and scoliosis constituted a severe impairment but not one in the Listings. Sections 1.00(L) and 101.00(L) provide in pertinent part that "[a]bnormal curvatures of the spine (specifically, scoliosis ... ) can result in impaired ambulation, but may also adversely affect functioning in body systems other than the musculoskeletal system." 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1 .00(L), 101.00(L). Further, §§ 14.00(B)(6) and 14.09 address arthritis, stating "inflammation of major joints may ... caus[e] difficulties with ambulation or fine and gross movements, or the arthritis may involve other joints or cause less restriction of ambulation or other movements but be complicated by extra-articular features that cumulatively result in serious functional deficit," and further explains that "[t]he terms inability to ambulate effectively and inability to perform fine and gross movements effectively in 14.09A have the same meaning as in 1.00B2b and 1.00B2c and must have lasted, or be expected to last, for at least 12 months." [24] 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.00(B)(6). Additionally, § 14.00(b)(6)(D) provides that "extra-articular features of an inflammatory arthritis may satisfy the criteria," and that radiculopathy is a commonly occurring extra-articular impairment. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.00(B)(6)(d).

[24]     § 1.00(B)(2)(b) defines "ambulate  as:
Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the

use of a hand held assistive device(s) that limits the functioning of both upper extremities....
20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)
(1). § 1.00(B)(2)(b)(2) notes that:
To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to or from a place of employment or school.
Inability to perform fine and gross movements is defined as mobility to reach, push, pull, grasp and finger to be able to carry out activities of daily living.
§ 1.00(B)(2)(c).

**\*13** The treating and consultative physicians' reports found that Feliciano did not have difficulty ambulating, nor did she have radiculopathy. On March 19, 2002, Dr. Khattak observed that Feliciano ambulated without assistance, her gait was steady, she sat and stood normally, and got on and off the examining table without assistance. (R. 176). Moreover, on April 30, 2004, treating physician Dr. Fernandes found that Feliciano had "no cervical radiculopathy." (R. 211.) The ALJ therefore found that Feliciano's osetoarthritis and scoliosis did not rise to the level of severity outlined in the Listings of Impairments, noting that none of the physicians reported "findings equivalent in severity to the criteria of any listed impairment." (R. 14.)

Dr. Tejwani's diagnosis of gastroesophageal reflux disease ("GERD") is not specifically listed anywhere in the Listing of Impairments. Therefore, as the regulation provides, "in any case in which an individual has a medically determinable impairment that is not listed, an impairment that does not meet the requirements of a listing, or a combination of impairments no one of which meets the requirements of a listing, we will consider medical equivalence." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(H)(4). Looking to the digestive system categories of impairments under § 5.00 and beyond, Feliciano's GERD does not constitute an impairment. [25] As both physicians and the ALJ observed, Feliciano successfully curbs the pain of her gastroesophageal reflux by taking Prilosec. (See page 4 above.)

[25]     The appropriate sections provide:
§ 5.02 Recurrent upper gastrointestinal hemorrhage from undetermined cause with anemia manifested by hematocrit of 30 percent or less on repeated examinations.

§ 5.03 Stricture, stenosis, or obstruction of the esophagus (demonstrated by endoscopy or other appropriate medically acceptable imaging) with weight loss as described under listing 5.08.

§ 5.04 Peptic ulcer disease (demonstrated by endoscopy or other appropriate medically acceptable imaging). With:

A. Recurrent ulceration after definitive surgery persistent despite therapy; or

B. Inoperable fistula formation; or

C. Recurrent obstruction demonstrated by endoscopy or other appropriate medically acceptable imaging; or,

D. Weight loss as described under § 5.08.

Likewise, carpal tunnel syndrome does not specifically appear in the Listing of Impairments. § 1.02 outlines the musculoskeletal categories of impairments and addresses the major dysfunction of joints due to any cause, and provides that such dysfunction be characterized by:

[G]ross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: ...

B. *Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively* ...

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02 (emphasis added).

On April 30, 2004. Dr. Fernandes found that Feliciano's carpal tunnel syndrome was "mild." (R. 211.) Additionally, Dr. Khattak observed on March 19, 2002 that Feliciano's "ability to bend and lift may be 'mildly' limited, but there are no limitations in sitting, standing, walking or reaching with gross and fine manipulations in her hands." (R. 177.) Finally, treating physicians Dr. Fernandes and Dr. Tejwani found that Feliciano had no significant limitation in grasping, pushing, pulling, reaching, fingering, or fine manipulation with either hand. (R. 214, 219.) The ALJ found that Feliciano's carpal tunnel syndrome did not rise to the level of severity outlined in 20 C.F.R., Pt. 404, noting that none of the physicians reported "findings equivalent in severity to the criteria of any listed impairment." (R. 14.)

*14 The ALJ found that Dr. Tejwani's and Dr. Fernandes' diagnosis of general myofascial pain syndrome constituted a severe impairment but not one listed in 20 C.F.R., Pt. 404. On April 30, 2004, the physicians diagnosed Feliciano with myofascial pain syndrome after examining X-rays and an MRI. (R. 211-12.) As seen above, the listing of musculoskeletal impairments does not include general myofascial pain, and provides that the pain be coupled with limitation in motion. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02. Given the multiple physicians' reports that found no limitations in Feliciano's overall mobility and ambulation (*see* pages 4, 7 & 31 above), the ALJ's finding that Feliciano's general myofascial pain syndrome did not rise to the level of severity outlined in the Listings is supported by substantial evidence. (R. 14.)

Since none of Feliciano's treating or consulting physicians found that Feliciano was disabled due to physical impairment, the ALJ was entitled to rely on that absence of evidence of disability. *See, e.g., Salvaggio v. Apfel,* No. 01-6062, 23 Fed. Appx. 49, 51, 2001 WL 1388521 at *1 (2d Cir. Nov. 6, 2001) (lack of medical evidence supports the ALJ's determination that plaintiff was not disabled); *O'Connor v. Shalala,* No. 96-6215, 111 F.3d 123 (table), 1997 WL 165381 at *1 (2d Cir. Mar. 31, 1997) ("the Commissioner is also entitled to rely on the absence of contemporaneous evidence of the disability"); *Diaz v. Shalala,* 59 F.3d 307, 315 (2d Cir.1995); *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983) (Commissioner is "entitled to rely not only on what the [medical] record says, but also on what it does not say"); *Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *12; *Catrain v. Barnhart,* 325 F.Supp.2d 183, 192 (E.D.N.Y.2004) ("[T]he ALJ is entitled to rely on the absence of opinions...."); *Jiang v. Barnhart,* 2003 WL 21526937 at *13; *De Roman v. Barnhart,* 2003 WL 21511160 at *13; *Alvarez v. Barnhart,* 2002 WL 31663570 at *10; *De La Cruz v. Chater,* 937 F.Supp. 194, 197 (E.D.N.Y.1996).

The Court finds that the ALJ's decision that Feliciano did not satisfy any Appendix 1 Listing is supported by substantial evidence.

### D. *Feliciano Has the Ability to Perform Light Work*

The fourth prong of the five part analysis is whether Feliciano retains the residual functional capacity to return

to her past relevant work. As the ALJ correctly notes, Feliciano has no past relevant work experience at any time in the past fifteen years, other than non-qualifying part-time work in a work study program (R. 17), so this prong is inapplicable. The ALJ therefore turned to the fifth prong, on which the SSA has the burden of proof, to determine if Feliciano has the residual functional capacity to perform other jobs in the national economy. (R. 15-17.)

The ALJ found that Feliciano can perform light work despite her impairments. (R. 17.) In addition to her mobility not being limited (*see* pages 4, 7 & 31 above), both the physicians and the ALJ acknowledged that Feliciano is relatively active despite her reported impairments; she lives alone and is independent in self care, doing her own shopping and household chores, and using public transportation. (*See* pages 5 & 10 above.) She also has been going to college and received an Associate's degree, attended a drug rehabilitation program on a daily basis, and plans to get her Bachelor's degree. (*See* pages 3-5 above.)

**\*15** Dr. Tejwani reported that Feliciano's history of anxiety may affect her ability to work. (R. 221.) Yet, in light of the "treating physician's rule," the Court gives more weight to the treating psychiatrist's opinion as to Feliciano's mental health than Dr. Tejwani, who is an internal medicine practitioner. *See* 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii); *Taveras v. Callahan,* 96 Civ. 8014, 1997 WL 441905 \*5 n.3 (S.D.N.Y. August 6, 1997) ("[A] doctor's opinion in an area of non-expertise will be considered but will be given less weight than that of a doctor who treated Plaintiff in his or her area of expertise.")[26] Feliciano's treating psychiatrist, Dr. Phariss, reported on March 13, 2002 that Feliciano was euthymic, had good hygiene and grooming, was cooperative, answered questions easily, and was logical and goal-oriented. (R. 154-60.) Further, Dr. Phariss noted that Feliciano had no limitation in understanding and memory, sustained concentration and persistence, social interaction, or adaption.[27] (R. 157-58.) In light of Dr. Phariss's established expertise in psychiatry and his decisive report on Feliciano's mental state, the Court finds that substantial evidence supports the ALJ's ruling that Feliciano can perform light work despite her mental impairments. (R. 15.)

[26] 20 C.F.R. §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii) both provide that:

Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.

[27] In addition, Dr. Meadow, the consultative psychiatrist, concluded on March 19, 2002, that any mental impairment Feliciano may have would not prevent her from working. (R. 175.) The Court finds Dr. Meadow's report to be helpful, despite him being a consultative, and not a treating, physician. In light of the "treating physician's rule" and 20 C.F.R. 416.927(f)(2)(i), which states "administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence ..., the Court accords the appropriate deference to the treating and consultative psychiatrists here.

The ALJ's finding that Feliciano retained the residual functional capacity for light work despite her physical impairments also is supported by substantial evidence. Treating physicians Dr. Tejwani and Dr. Fernandes reported that Feliciano could sit or stand for six hours in an eight hour workday, carry twenty pounds occasionally and ten pounds frequently, and had no other restrictions that would prevent light work. (R. 16-17; *see also* pages 8, 9, 12 & 33 above.) Feliciano's daily activities-including attending school-further support the ALJ's conclusion. (R. 16-17; *see also* pages 5-6 & 35 above.) The consulting doctor concurred. (*See* page 10 above.) Based on Feliciano's age and education, and her limitations or lack thereof, the ALJ correctly found that she was not disabled. *See* 20 C.F.R. Part 404, Subpt. P, App. 2, § 202.13 (a person of "advanced" age who is a high school graduate or more, with unskilled or no prior work experience, is not disabled for light work); *see, e.g., Brown v. Barnhart,* 04 Civ. 2450, 2005 WL 991769 at \*4 (S.D.N.Y. Apr. 27, 2005) (affirming the ALJ's ruling that petitioner was not disabled in light of substantial evidence showing that "an individual of [petitioner's] age, education, and work experience ... was capable of performing the exertional requirement of sedentary, light,

and medium work"); *Davila v. Barnhart,* 03 Civ. 3981, 2004 WL 2914073 at *8-9 (S.D.N .Y. Dec. 15, 2004) (upholding the ALJ's use of the Medical Vocational Guidelines to determine that plaintiff could perform light work); *Loftin v. Barnhart,* 01 Civ. 1118, 2002 WL 31202760 at *12-14 (S.D.N.Y. Sept. 3, 2002) (upholding ALJ's determination that plaintiff could perform light work, based on the Medical Vocational Guidelines and plaintiff's own testimony, residual functional capacity assessment and medical testimony); *Elias v. Apfel,* 54 F.Supp.2d 172, 178-79 (E.D.N.Y.1999) (affirming the ALJ's use of the Medical Vocational guidelines in ruling that petitioner was not disabled because there was substantial evidence that petitioner, a high school graduate approaching advanced age, retained a residual functional capacity to perform light work).

## CONCLUSION

**\*16** For the reasons set forth above, the Commissioner's determination that Feliciano was not disabled within the meaning of the Social Security Act is supported by substantial evidence. The Commissioner's motion for judgment on the pleadings (Dkt. No. 10) should be granted.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, 500 Pearl Street, Room 1610, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

## All Citations

Not Reported in F.Supp.2d, 2005 WL 1693835

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 439495
United States District Court,
S.D. New York.

Leonardo REYES, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 01Civ.4059(LTS)(JCF).
|
March 9, 2004.

**Synopsis**

**Background:** Commissioner of Social Security denied claimant's application for Supplemental Social Security (SSI) benefits. Claimant petitioned for review.

**Holdings:** On Commissioner's motion for judgment on the pleadings, the District Court, Swain, J., held that:

[1] claimant did not carry his burden of establishing existence of disability;

[2] claimant was not disabled; and

[3] finding by ALJ was supported by substantial evidence.

Motion granted.

West Headnotes (3)

**[1]** **Social Security**
   👉 Course and conduct of proceedings

Supplemental Social Security (SSI) benefits claimant did not carry burden of establishing existence of disability by pointing to specific testimony or evidence which he believed Commissioner of Social Security overlooked, unjustly weighed, or otherwise should have considered, in his petition for review of decision by Commissioner denying his application, where claimant made only conclusory allegations in complaint and he did not file any brief or affidavit. Social Security Act, § 205(g), as amended, 42 U.S.C.A. § 405(g).

13 Cases that cite this headnote

**[2]** **Social Security**
   👉 Substantial gainful activity in general

**Social Security**
   👉 Past or customary work

Supplemental social security (SSI) benefits claimant was not disabled, although claimant's impairments were severe, claimant had not engaged in substantial gainful activity since his diagnosis with human immunodeficiency virus (HIV), and claimant was unable to perform his past relevant work of shipping clerk. Social Security Act, §§ 223(d)(2)(A), 1614(a)(3), as amended, 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3); 20 C.F.R. §§ 404.1520, 404.1527(d), 416.920.

1 Cases that cite this headnote

**[3]** **Social Security**
   👉 Actual availability of employment; ability to compete

Finding by ALJ, that claimant for Supplemental Social Security (SSI) benefits could perform other jobs existing in significant numbers in national economy, was supported by substantial evidence, although claimant was impaired as result of human immunodeficiency virus (HIV) and could not return to his prior work as shipping clerk; various medical reports, several of which were prepared by physicians who treated claimant over the course of several months, indicated that claimant was not limited in physical movement or in psychological adjustment. Social Security Act, §§ 223(d)(2)(A), 1614(a)(3), as amended, 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3); 20 C.F.R. §§ 404.1520, 404.1527(d), 416.920.

Cases that cite this headnote

*MEMORANDUM OPINION AND ORDER*

SWAIN, J.

**\*1** Pro se plaintiff Leonardo Reyes ("Plaintiff" or "Reyes") brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security to deny Reyes Supplemental Social Security ("SSI") benefits. The Commissioner has moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). The motion, which is unopposed, is granted for the following reasons.

## BACKGROUND

Reyes was born in 1958. (Tr. 40). He is a high school graduate, and worked as a shipping clerk until his termination in 1998. (Tr. 266, 267). He was unemployed from then until the time of the ALJ hearing. (Tr. 267). During the hearing, Reyes testified that, although he had looked for work, he was at that time planning to return to school to study computers. *Id.* Reyes also testified that he lived alone and used public transportation to travel. (Tr. 266). Over the summer before the hearing, Reyes's twelve-year-old daughter had lived with him. (Tr. 271). Reyes had also volunteered in the past at an AIDS center, and was planning to go back to volunteering there two to three times a week. *Id.*

### A. Medical History

Reyes was diagnosed with HIV on February 5, 1998, at the New York University Medical Center. (Tr. 46, 47). From May 1998 to December 1999, Reyes was treated by Dr. George McKenley at St. Luke's Roosevelt Hospital Center. (Tr. 116). Dr. McKenley reported in May 1998 that Reyes had no skin lesions and no thrush in his mouth and pharynx. (Tr. 96). In December 1998, Dr. McKenley reported that Reyes was "doing well on a regimen of COMBIVIR and CRIXIVAN." (Tr. 116). In May 1999, Dr. Grace Minamoto, who had treated Reyes since February 1999, reported that Reyes had no opportunistic infections, AIDS-related diseases or current symptoms. (Tr. 119 124). Dr. Minamoto further reported on the basis of the same examination that Reyes had no limitations in sitting, standing, walking, lifting,

carrying or handling of objects, and no limitations in social interactions and adaption. (Tr. 121 124). In another diagnostic examination which took place in April 1999, another physician, Dr. Peter Graham, concluded that Reyes was capable of performing activities such as sitting, standing, walking, lifting, carrying, and handling objects, though he may be limited by fatigue. (Tr. 131 133).

Dr. Sharff, a state agency physician, performed an assessment of Reyes's capacity to perform work-related activities in June 1999. (Tr. 134 141). Dr. Sharff concluded that Reyes could lift up to twenty-five pounds frequently and fifty pounds occasionally, stand and/or walk for about six hours in an eight-hour day and sit for about six hours in an eight-hour day. (Tr. 135).

In October 1999, Reyes was examined by Dr. Michael Polak. (Tr. 147 149). At this examination, Reyes complained of weakness, fatigue, and intermittent fevers and chills. (Tr. 147). Dr. Polak found Reyes to be well-developed, well-nourished, and in no acute distress, but "mildly impaired for carrying/lifting, pushing/pulling, walking and standing." (Tr. 148 149). However, he also found that Reyes had a normal gait and would have no problems performing activities requiring dexterity, bending or sitting. (Tr. 147 149). Finally, Dr. Polak noted that Reyes lived alone in a sixth floor apartment and cleaned, cooked, and shopped for himself.

**\*2** In July 2000, Dr. Mary Theodore reported that she has been treating Reyes for a generalized anxiety disorder since May 2000. (Tr. 255 261). Dr. Theodore reported that Reyes was alert, oriented, and had no psychotic symptoms. (Tr. 255). She reported that Reyes had mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and some difficulty concentrating and focusing on tasks. (Tr. 256 257). Dr. Theodore concluded, however, that Reyes did not have difficulties following through with tasks and could make occupational adjustments. (Tr. 257 258).

### B. Procedural History

On April 19, 1999, plaintiff Reyes applied for SSI benefits, alleging an inability to work since August 28, 1998. (Tr. 40 42). Reyes claimed that he was unable to work due to HIV infection and an anxiety disorder. (Tr. 44K). Reyes's application was denied initially and upon reconsideration. (Tr. 30 31, 33 35). At Reyes's request, a hearing was held before an administrative law judge ("ALJ") on July

28, 2000, at which time Reyes appeared and testified. (Tr. 262 278). On September 8, 2000, the ALJ issued his decision, finding that Reyes was not disabled. (Tr. 8 27). On March 2, 2001, the Appeals Council of the Social Security Administration denied Reyes's request for review, and the ALJ's denial became the Social Security Commissioner's final decision. (Tr. 4 5).

DISCUSSION

*A. Standard of Review*

Under the Social Security Act, the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, this Court will set aside the "decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). Substantial evidence is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "The substantial evidence test also applies to inferences and conclusions drawn from findings on facts." *Levine v. Gardner,* 360 F.2d 727, 730 (2d Cir.1966). Therefore, "the Commissioner's findings of fact and the inferences and conclusions drawn from such findings are conclusive, even if the reviewing court's analysis differs from the analysis of the Commissioner." *Worthy v. Barnhart,* No. 01 Civ. 7907(JSM), 2002 WL 31873463 (S.D.N.Y. Dec.23, 2002). In reviewing the ALJ's decision in light of the record, the district court does not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan,* 949 F.2d 57 (2d Cir.1991). Thus, this Court will grant the Commissioner's motion for judgment if the Commission's finding was based on substantial evidence and was not in legal error.

*B. Lack of Opposition to Motion to Dismiss*

**\*3** **[1]** In a proceeding for judicial review of a final decision of the Commissioner denying benefits, the plaintiff bears the burden of establishing the existence of a disability. *See, e.g., Curry v.. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Melville v. Apfel,* 198 F.3d 45, 51 (2d Cir.1999). Plaintiff Reyes, however, has not filed any brief or affidavit opposing the Commissioner's motion for

judgment on the pleadings. Thus, Reyes has not pointed to any specific testimony or evidence which he believes the Commissioner has overlooked, unjustly weighed, or otherwise should have considered. The conclusory allegations of Plaintiff's complaint are insufficient to defeat the Commissioner's motion for judgment on the pleadings. *See, e.g., Jiang v. Barnhart,* No. 03 Civ.0077 LAK AJP, 2003 WL 21526937, \*9 (S.D.N.Y. July 8, 2003); *Alvarez v. Barnhardt,* No. 02 Civ.3121 JSM AJP, 2002 WL 31663570 (S.D.N.Y. Nov.26, 2002); *Morel v. Massanari,* No. 01CIV0186KMWAJP, 2001 WL 776950 (S.D.N.Y. July 11, 2001).

That said, this Court reaches the same conclusion based on an evaluation of the merits of Plaintiff's claim. Reviewing the motion on the basis of the Commissioner's submissions alone in the absence of Reyes's opposition, *see Worthy v. Barnhart,* No. 01 Div. 7907(JSM). WL 31873463 (S.D.N.Y. Dec. 23, 2002), the Court finds that the Commissioner's decision was not in legal error and was supported by substantial evidence.

*C. The Applicable Law*

To establish disability within the meaning of the Act, a claimant must prove that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," and that the existence of such impairments is demonstrated by evidence supported by data obtained by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C.A 1382c(a)(3) (West 2003); *see also* 42 U.S.C.A. §§ 423(d) (West 2003). The total effect of all the impairments suffered by the person must be so severe that he is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C.A. § 423(d)(2)(A) (West 2003).

The Commission's regulations set forth a five-step procedure for the evaluation of disability claims. 20 C.F.R. §§ 404.1520, 416.920. These five steps are as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

**\*4** *DeChirico v. Callahan,* 134 F.3d 1117, 1179  1180 (2d Cir.1998). "The burden is on the claimant to prove that he is disabled within the meaning of the Act." *Id.* Once the claimant meets his burden, the burden shifts to the Commissioner to prove that the claimant is capable of working. *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996).

The following factors are also considered in determining whether a claimant is disabled: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

education background, age, and work experience." *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983).

Finally, the Commission's regulations provide that "[i]f [the Commission finds] that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the Commission] will give it controlling weight." 20 C.F.R. § 404.1527(d).

### D. The Commissioner's Findings

**[2]** The ALJ used the five-step evaluation process to determine whether Reyes is disabled for the purpose of receiving SSI benefits. (Tr. 12). First, the ALJ found that Reyes has not engaged in substantial gainful activity since his diagnosis with HIV. *Id.* Second, the ALJ found that Reyes's impairments were severe. (Tr. 13). Third, the ALJ found that these impairments did not fall within one of the impairments listed in Appendix 1, Subpart P of the Regulations. *Id.* Fourth, the ALJ found that because of his impairments, Reyes was unable to perform his past relevant work of a shipping clerk. (Tr. 15). Finally, the ALJ considered Reyes's age, education, and vocationally relevant past work experience in conjunction with the Medical Vocational Guidelines of Appendix 2 of Subpart P of the Regulations. *Id.* Using Medical Vocational Rule 204.00, the ALJ determined that Reyes was "not disabled." (Tr. 16). As a result, the ALJ concluded that Reyes was not under a disability for the purpose of receiving SSI payments. *Id.* The Commissioner accepted the ALJ's dcision on March 2, 2001. (Tr. 4  5).

### E. Review of the Commissioner's Finding

**[3]** This Court concludes that the ALJ's decision was not based on legal error or unsupported by substantial evidence. The ALJ applied the appropriate five-step evaluation process, and the ALJ's findings were based on substantial evidence. Reyes's medical history supports the ALJ's findings that he was impaired as a result of HIV and could not return to his prior work as a shipping clerk. However, these impairments do not fall under one of the impairments in Appendix I that would entitle Reyes to SSI benefits without further inquiry. Various medical reports, several of which were prepared by physicians who treated Reyes over the course of several months, indicate that Reyes is not limited in physical movement

or in psychological adjustment. Reyes himself admits to living and traveling on his own, and to considering going back to school and volunteering. Thus, the ALJ's finding that Reyes could perform other jobs existing in significant numbers in the national economy thus was supported by substantial evidence.

## CONCLUSION

**\*5** For the reasons stated above, the Commissioner's motion for judgment on the pleadings is granted. The Clerk of the Court shall close the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 439495, 94 Soc.Sec.Rep.Serv. 483

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

SSR 96-6P (S.S.A.), 1996 WL 374180

Social Security Ruling

POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE
FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND
OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE
AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE

SSR 96-6p

July 2, 1996

**\*1 PURPOSE:** To clarify Social Security Administration policy regarding the consideration of findings of fact by State agency medical and psychological consultants and other program physicians and psychologists by adjudicators at the administrative law judge and Appeals Council levels. Also, to restore to the Rulings and clarify policy interpretations regarding administrative law judge and Appeals Council responsibility for obtaining opinions of physicians or psychologists designated by the Commissioner regarding equivalence to listings in the Listing of Impairments (appendix 1, subpart P of 20 CFR part 404) formerly in SSR 83-19. In particular, to emphasize the following longstanding policies and policy interpretations:

1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review.

2. Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.

3. An updated medical expert opinion must be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made.

**CITATIONS (AUTHORITY):** Sections 216(i), 223(d) and 1614(a) of the Social Security Act (the Act), as amended; Regulations No. 4, sections 404.1502, 404.1512(b)(6), 404.1526, 404.1527, and 404.1546; and Regulations No. 16, sections 416.902, 416.912(b)(6), 416.926, 416.927, and 416.946.

**INTRODUCTION:** Regulations 20 CFR 404.1527 and 416.927 set forth detailed rules for evaluating medical opinions about an individual's impairment(s) offered by medical sources and the medical opinions of State agency medical and psychological consultants and other nonexamining sources. Paragraph (a) of these regulations provides that "medical opinions" are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite his or her impairment(s), and the individual's physical or mental restrictions. Paragraph (b) provides that, in deciding whether an individual is disabled, the adjudicator will always consider the medical opinions in the case record together with the rest of the relevant evidence. Paragraphs (c), (d), and (e) then provide general rules for evaluating the record, with particular attention to medical and other opinions from acceptable medical sources.

**\*2** Paragraph (f) provides that findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists become opinions at the administrative law judge and Appeals Council levels of

administrative review and requires administrative law judges and the Appeals Council to consider and evaluate these opinions when making a decision in a particular case.

State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act. As members of the teams that make determinations of disability at the initial and reconsideration levels of the administrative review process (except in disability hearings), they consider the medical evidence in disability cases and make findings of fact on the medical issues, including, but not limited to, the existence and severity of an individual's impairment(s), the existence and severity of an individual's symptoms, whether the individual's impairment(s) meets or is equivalent in severity to the requirements for any impairment listed in 20 CFR part 404, subpart P, appendix 1 (the Listing of Impairments), and the individual's residual functional capacity (RFC).

**POLICY INTERPRETATION:** Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.

Paragraphs 404.1527(f) and 416.927(f) provide that the rules for considering medical and other opinions of treating sources and other sources in paragraphs (a) through (e) also apply when we consider the medical opinions of nonexamining sources, including State agency medical and psychological consultants and other program physicians and psychologists. The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.

For this reason, the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

**\*3** In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source s medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

The following additional guidelines apply at the administrative law judge and Appeals Council levels to opinions about equivalence to a listing in the Listing of Impairments and RFC assessments, issues that are reserved to the Commissioner in 20 CFR 404.1527(e) and 416.927(e). (See also SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

*Medical Equivalence to an Impairment in the Listing of Impairments.*

The administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled. As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments. However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.

When an administrative law judge or the Appeals Council finds that an individual s impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant. However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert [2] in the following circumstances:

 **\*4**  \* When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

\* When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.


When an updated medical judgment as to medical equivalence is required at the administrative law judge level in either of the circumstances above, the administrative law judge must call on a medical expert. When an updated medical judgment as to medical equivalence is required at the Appeals Council level in either of the circumstances above, the Appeals Council must call on the services of its medical support staff.

*Assessment of RFC.*

Although the administrative law judge and the Appeals Council are responsible for assessing an individual's RFC at their respective levels of administrative review, the administrative law judge or Appeals Council must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists. At the administrative law judge and Appeals Council levels, RFC assessments by State agency medical or psychological consultants or other program physicians or psychologists are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s). Again, they are to be evaluated considering all of the factors set out in the regulations for considering opinion evidence.

**EFFECTIVE DATE:** This Ruling is effective on the date of its publication in the *Federal Register.*

**CROSS-REFERENCES: Source Opinions on Issues Reserved to the Commissioner;" Program Operations Manual System, section DI 24515.007; and Hearings, Appeals, and Litigation Law Manual, section I-5-310.**

[1] "Medical sources are defined in 20 CFR 404.1502 and 416.902 as "treating sources, "sources of record (i.e., medical sources that have provided an individual with medical treatment or evaluation, but do not have or did not have an ongoing treatment relationship with the individual), and "consultative examiners for the Social Security Administration.

[2] The term "medical expert is being used to refer to the source of expert medical opinion designated as a "medical advisor in 20 CFR 404.1512(b)(6), 404.1527(f), 416.912(b)(6), and 416.927(f). This term is being used because it describes the role of the "medical expert as an expert witness rather than an advisor in the course of an administrative law judge hearing.

Social Security Administration

Department of Health and Human Services
SSR 96-6P (S.S.A.), 1996 WL 374180

     © 20 7 Thomson Reuters. No c a m to or g na U.S. Government Works.

2015 WL 1126014
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nicole CARRERA o/b/o V.M.C., Plaintiff,
v.
Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

Civil Action No. 1:13–cv–1414 (GLS/ESH).
|
Signed March 12, 2015.

**Attorneys and Law Firms**

Legal Aid Society of Northeastern NY, Mary Martha
Withington, Esq ., of Counsel, Saratoga Springs, NY, for
the Plaintiff.

Social Security Administration, Office of Regional
General Counsel, Region II, Joshua L. Kershner, Esq., of
Counsel, New York, NY, for the Defendant.

### *ORDER*

GARY L. SHARPE, Chief Judge.

**\*1** The above-captioned matter comes to this court
following a ReportRecommendation by Magistrate Judge
Earl S. Hines, duly filed January 30, 2015. Following
fourteen days from the service thereof, the Clerk has sent
the file, including any and all objections filed by the parties
herein.

No objections having been filed, and the court
having reviewed the Magistrate Judge's Report
Recommendation for clear error, it is hereby

ORDERED that the Report Recommendation of
Magistrate Judge Earl S. Hines filed January 30, 2015
(Dkt. No. 14) is ACCEPTED in its entirety for the reasons
stated therein; and it is further

ORDERED that the Commissioner's decision is
REVERSED, and the case is REMANDED pursuant
to 42 U.S.C. § 405(g), sentence four; to consider new

evidence and for further proceedings in accordance with
the recommendation; and it is further

ORDERED that the Clerk close this case and provide a
copy of this Order to the parties in accordance to the local
rules.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

EARL S. HINES, United States Magistrate Judge.

Nicole Carrera ("Carrera"), invoking subject-matter
jurisdiction under 42 U.S.C. § 405(g), complains of the
denial of an application for supplemental security income
("SSI") filed on behalf of a minor child, "VMC." [2] A
reviewing court's limited role is to determine whether (a)
the Commissioner applied proper legal standards and (b)
the decision is supported by substantial evidence. *See
Lamay v. Commissioner of Soc. Sec.,* 562 F.3d 503, 507
(2d Cir.2009), *cert. denied,* 559 U.S. 962 (2010); *Berry
v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see also*
42 U.S.C. § 405(g). Courts cannot retry factual issues *de
novo* or substitute their interpretations of administrative
records for that of the Commissioner when substantial
evidence supports the decision. *Yancey v. Apfel,* 145
F.3d 106, 111 (2d Cir.1998). Neither can they overturn
administrative rulings because they would have reached a
different conclusion had the matter come before them in
the first instance. *See Campbell v. Astrue,* 465 Fed. App'x
4, 5 (2d Cir.2012) (summary order).

| | |
|---|---|
| 1 | "The purpose of providing SSI benefits to minor children is to provide benefits to children while they are children, thus enabling them as 'among the most disadvantaged of all Americans, to enter society as 'self supporting members. " *Maldonado v. Apfel,* 55 F.Supp.2d 296, 307 (S.D.N.Y.1999) (quoting H.R.Rep. No. 92 231 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5133 34). |
| 2 | In accordance with Rule 5.2(a) of the Federal Rules of Civil Procedure and 8.1 of the Local Rules for the Northern District of New York, the minor in whose behalf the application was filed is referred to by initials. |

## I. Background

VMC, born in 2001, resided with her mother and two brothers (one 2 years older and the other one year younger) at all material times. According to Carrera, all three siblings have autism, with VMC being the highest functioning of all three. Originally from Long Island, New York, the family relocated to Florida and then North Carolina, where they resided until December 2008. [3] While in North Carolina, the family was exposed to domestic violence by Carrera's spouse, a convicted felon, who violated a protective order and threatened to kill Carrera. (T. 318 19). By family court order, Rensselaer County, New York, in spring 2009, Carrera was granted sole legal and physical custody of the children, and their father was ordered to have no contact. (T. 311 16). The family has changed its last name, social security numbers, and relocated to upstate New York. (T. 208 09). The address has been kept confidential. (T. 60 61).

[3]    In a Report of Contact found in the administrative record, dated June 23, 2010, it is noted that Carrera is a victim of domestic violence whose abuser has stalked her and attempted to murder her when he found her after relocating initially from New York to Florida and again after relocating to North Carolina.

**\*2** VMC received special education for "global delays" before entering Kindergarten. She was classified and received services under autism through her 3d grade school year. Specifically, she received support from a consultant teacher on a daily basis for 40 minutes, and two program modifications.

In a reevaluation for special education services conducted prior to entering 4th grade, in August 2010, a Special Education Committee found she no longer required academic support through special education and declassified her. She was placed in general education but continued to receive extended time on tests longer than 30 minutes.

## II. Claim

In August 2008, when VMC was seven years old and entering the second grade, Carrera applied in VMC's behalf for disability-based supplemental security income

benefits. Carrera identified autism, Asperger's Disorder, [4] Attention Deficit/Hyperactivity Disorder ("ADHD"), and sleep disorder as VMC's disabling impairments.

[4]    Asperger's Syndrome is a developmental disorder akin to autism with the following characteristics: "Language and cognition generally better than in autism; socially isolated and often viewed as odd or eccentric; clumsiness; repetitive patterns of behavior, interests, and activities; atypical sensory responses (e.g., exquisite sensitivity to noises, food odors or tastes, or clothing textures); pragmatic deficits (e.g., extremely concrete use of language or difficulty recognizing irony or jokes). *Luckett v. Astrue,* No. 2:09 cv 00037 KJN, 2010 WL 3825703, at \*1, n. 4 (E.D.Cal. Sept. 28,2010) (quoting *Mark H. Beers, M.D., et al.,* eds., The Merck Manual of Diagnosis and Therapy 2487 (Merck Research Labs., 18th ed. 2006) ("Merck Manual ")).

VMC's case was assigned to administrative law judge Arthur Patane ("ALJ Patane"), who conducted an evidentiary hearing in December 2010. (T. 34, 55 74). Carrera and VMC appeared, along with counsel. (*Id.*). ALJ Patane received into evidence (a) testimony from Carrera and VMC, (b) forensic reports from state agency consultants, and (c) VMC's medical and school records. (*Id.*).

## III. Commissioner's Decision

*A. Adjudicative Protocol*
The governing statute provides that:

[a]n individual under the age of 18 ... [may receive supplemental security income benefits] .... if that individual has a *medically determinable ... mental impairment, which results in marked and severe functional limitations,* and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i) (emphasis added). To apply these statutory standards pragmatically to submitted claims, the Commissioner has established by regulation a three-step sequential analysis for determining whether a child is disabled for purposes of children's benefits:

1. Is the child engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P, 20 C.F.R. § 416.924(a)?[5] If so, benefits are granted.

[5]     The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings ). Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 404.1520(a) (4)(iii), (d).

20 C.F.R. § 416.924(a)-(d).

When an impairment does not medically *equal* any of the "Listing of Impairments," it is evaluated next for *functional equivalence.* An adjudicator considers how a child functions in everyday-life activities segregated for analytical purposes into "domains" delineating "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(l). The domains are:

**\*3**   (i) Acquiring and using information;

(ii) Attending and completing tasks;

(iii) Interacting and relating with others;

(iv) Moving about and manipulating objects;

(v) Caring for yourself; and,

(vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal an impairment in the listings, an impairment must result in "marked" limitations[6] in *two* domains of functioning or an "extreme" limitation in *one.* [7] 20 C.F.R. § 416.926a(d).

[6]     A "marked  limitation  interferes  seriously  with ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2)(i).

[7]     An "extreme  limitation means "more than marked, and represents an impairment which "interferes very

seriously with ... ability to independently initiate, sustain, or complete activities,  and this rating is only "give n] to the worst limitations. 20 C.F.R. § 416.926a(e)(3).

When reviewing a child's impairments for functional equivalence, adjudicators must consider "all of the relevant evidence," [8] and employ a "whole child" approach. This requires administrative law judges to consider a child's everyday activities, determine all domains involved in performing them, consider whether that child's medically determinable impairment accounts for limitations in activities, and determine what degree such impairment limits that child's ability to function age-appropriately in each domain. [9]

[8]     "All of the relevant evidence  includes objective medical evidence and other relevant evidence from medical sources; information form other sources, such as school teacher, family members, or friends; the claimant's statement (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in all setting (i.e., at home, at school, and in the community). SSR 09 2p, TITLE XVI: DETERMINING CHILDHOOD DISABILITY DOCUMENTING A CHILD'S IMPAIRMENT RELATED LIMITATIONS, 2009 WL 396032, at *11 (SSA Feb. 18, 2009).

[9]     *See* SSR 09 1p, TITLE XVI: DETERMINING CHILDHOOD DISABILITY UNDER THE FUNCTIONAL EQUIVALENCE RULE THE "WHOLE CHILD  APPROACH, 2009 WL 396031, at *2  3 (SSA Feb. 17, 2009).

### B. ALJ Patane's Decision

ALJ Patane faithfully applied the evaluative protocol described above when deciding Carrera's application in behalf of VMC. At Step 1, ALJ Patane found that VMC had not engaged in substantial gainful activity at any time since August 29, 2008, the application date. At Step 2, ALJ Patane determined that VMC has severe impairments of autism, Asperger's Disorder, ADHD, and sleep disorder. At Step 3, ALJ Patane first considered whether VMC's impairments met or medically equaled criteria of the Commissioner's Listing 112.10 for Autistic Disorder and Other Pervasive Developmental Disorders, and determined that they did not because they were "not attended with specific clinical signs and diagnostic

findings required to meet the requirements set forth in any of the child or adult listings." [0] (T. 37).

[10]  To meet requirements of this listing, a child first must have an autistic disorder or other pervasive development disorder characterized by "qualitative deficits in development of reciprocal social interaction, verbal and nonverbal communication skills, and imaginative activity. In addition, the child must exhibit a markedly restricted repertoire of activities and interests (Paragraph "A criteria). *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 112.10(A). Second, the child must establish that her disorder results in at least two marked impairment related functional limitations (Paragraph "B criteria). *Id.,* at § 112 .10(B).

"B criteria "describe impairment related functional limitations. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(A). To establish the B criteria for Listing 112.10, for children (age 3 to attainment of age 18), there must be at least two of the appropriate age group criteria in paragraphs B2 of 112.02. *See id .,* at § 112.10(B). Paragraph B2 of 112.02 states "B criteria as follows:

a. Marked impairment in age appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

*Id.,* at § 112.02(B)(2)(a) (d).

ALJ Patane next compared VMC's impairments to the prescribed functional-equivalence domains. ALJ Patane found that VMC has *less than marked limitations* in the first five domains (*i.e.,* acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; and caring for yourself) and *no limitations* in the sixth domain (*i.e.,* health and physical well being). When making these findings, ALJ Patane considered VMC's *improved school performance* and *withdrawal from special education classes* upon entering fourth grade to be especially significant. (T. 44 46).

[11]  Under Domain 1 (acquiring and using information), ALJ Patane noted that " i]n August 2010, the Subcommittee on Special Education concluded that the claimant's cognitive and academic abilities were good enough that she no longer needed or was qualified to receive special education services. (T. 44). Under Domain 2 (attending and completing tasks), ALJ Patane found, " a]s noted above, the claimant was recently found ineligible to receive any special education services for problems functioning in this or any other domain. (T. 45). Under Domain 3 (interacting and relating to others), ALJ Patane concluded, " a]s noted throughout this decision, by August 2010, despite her diagnosed impairments, the claimant's overall functioning had improved to such a degree that she was no longer eligible to receive any special education services . (T. 46).

Because VMC did not demonstrate two marked domain limitations or one extreme limitation, ALJ Patane concluded that VMC does not have an impairment or combination of impairments functionally equaling a listed impairment. And, having previously determined that VMC's impairments neither met or medically equaled a listed disability, ALJ Patane concluded that VMC was not disabled.

Carrera's claim was denied in a written decision issued on February 3, 2011.

*C. Appeals Council Action*

**\*4**  Carrera timely requested Appeals Council review of ALJ Patane's decision. While her request was pending before the Appeals Counsel, Carrera proffered additional evidence consisting of 9 pages of medical treatment records from treating pediatrician, Scott C. Bello, M.D., of Capital Care Medical Group, dated January 2012 to

May 2013, and 46 pages of educational records from Granville School District dated December 2011 to May 2013. [2]

Attached as Appendix A to Plaintiff's Brief.

On November 11, 2013, approximately two years and nine months after ALJ Patane's decision, the Appeals Council denied Carrera's request for review. It stated that Carrera's new evidence did "not provide a basis for changing the Administrative Law Judge's decision" (T. 1), and explained:

> The Administrative Law Judge decided your case through February 3, 2011. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before February 3, 2011.

> If you want us to consider whether you were disabled after February 3, 2011, you need to apply again. We are returning the evidence to you to use in your new claim.

(T. 2).

### IV. Points of Alleged Error

Upon receiving notice of the Appeals Council's denial of her request for review, Carrera timely instituted this case, represented by counsel. Carrera's brief presents three denominated points of error, as follows:

1. The Administrative Law Judge committed reversible error in failing to find the combination of Plaintiff's autism and attention deficit disorder meet or equal the listing found at 20 C.F.R., Part 404, Subpart P, Appendix 1 at Section 112.10 for autistic disorder and other pervasive developmental disorders;

2. The Administrative Law Judge committed reversible error in failing to find Plaintiff has marked impairments in the domains of attending and completing tasks, interacting and relating with others, and caring for herself; and

3. The decision of the Administrative Law Judge is against the substantial weight of the evidence and is incorrect as a matter of law.

(Dkt. No. 11, p. 2).

### V. Discussion and Analysis

Although the *focus* of Carrera's arguments varies somewhat in each of her proffered points of error, the *central thrust* of all her arguments is that ALJ Patane erred in concluding that VMC was not disabled because Carrera presented good and sufficient evidence to satisfy the sequential Step 3 requirement that a child's impairment "meet, medically equal or functionally equal" a presumptively-disabling listed impairment. At worst, such arguments invite the court to exceed its narrow authority by reweighing evidence and coming to a different conclusion. At best, they are misdirected. The governing circuit court of appeals recently explained that "whether there is substantial evidence supporting the [claimant]'s view is not the question." *Bonet ex rel. T.B. v. Colvin,* 532 Fed. App'x 58, 59 (2d Cir.2013) (summary order). Rather, the court "must decide whether substantial evidence supports *the ALJ's decision." Id.* (emphasis in original).

**\*5** "Substantial Evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales,* 402 U.S. 378, 401 (1978); *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004). To be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.,* 306 U.S. 262, 299 300 (1939) (cited in Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed.1991)). Given this, Carrera's irregular approach, *i.e.,* emphasizing evidence *supporting* her claim, can succeed only if there is *no contrary evidence* a reasonable mind might accept as adequate to establish factual findings made by ALJ Patane. It requires a showing of either a total lack of evidence supporting those findings, or a showing that evidence supporting Carrera's view is so overwhelming, while evidence to the contrary is so sparse, weak or incredible, that a finding based thereon is patently unreasonable.

Entwined and deeply imbedded within Carrera's misdirected contentions are some arguments cognizable under traditional substantial evidence analysis. These generally relate to the degree of weight ALJ Patane afforded to evidence from various evidentiary sources. Specifically, Carrera argues that ALJ Patane erred when giving "great weight" to evidence from a non-examining state agency psychological consultant, Lori Brandon Souther, Ph.D., [3] while only giving "substantial weight" to evidence from a treating pediatrician, Scott C. Bello, M.D., F.A.A.P, [4] and no specific quantum of weight to evidence from a school psychologist, Hope Saulter, Ph.D. [5] Carrera also maintains that ALJ Patane erred by failing to explain reasons for not finding credible Carrera's subjective testimony and written reports about the severity of VMC's symptoms.

[13]    Dr. Souther reviewed the evidence of record on January 28, 2009, as part of an initial disability determination explanation in this case. In a Childhood Disability Evaluation, Dr. Souther found that VMC has impairments of ADHD and Autistic Disorder and Other Pervasive Developmental Disorders, but that they do not meet, medically equal, or functionally equal any listed impairment. (T. 384 89).

[14]    Dr. Bello, a board certified pediatric developmental behavioral health physician, treated VMC between April, 2009, and September 14, 2010. He submitted a letter in behalf of Carrera's application stating that VMC has highfunctioning autism (Asperger's Syndrome) which interferes with her behaviors in the social domain as well as in the adaptive (activities of daily living domain). Dr. Bello observed that VMC's self help skills appeared to be better in the school setting due to the high structure of the classroom, but that VMC's ability to take care of her personal needs in an age appropriate manner while at home was seriously impaired. He also noted that VMC needed constant supervision when at home. (T. 411).

[15]    Dr. Saulter reviewed results of psychological tests, teacher and parent interviews and VMC's "presentation when VMC was a Kindergarten student. She concluded that VMC met the diagnostic criteria for an autism spectrum disorder, but the VMC's condition was relatively mild, and VMC was considered "high functioning. Based on that evaluation VMC was found eligible to receive special education services. (T. 342 50).

First, there was no error in assigning great weight to Dr. Souther's evaluation. State agency psychological consultants are highly qualified experts in Social Security disability evaluation. *See* 20 C.F.R. § 416.927(e)(2)(i). Their opinions can be given weight, even greater weight than opinions of treating physicians, when, as here, they are supported by substantial evidence. *See, e.g., Netter v. Astrue,* 272 Fed. App'x 54, 55 56 (2d Cir.2008) (summary order).

Second, Carrera's complaints about ALJ Patane's relative weighting of the evidence lacks substance. Carrera fails to identify any opinions of Dr. Bello and Dr. Saulter that support medical of functional equivalency to the Listing at issue. Carrera also fails to demonstrate that ALJ Patane *rejected* Dr. Bello's or Dr. Saulter's assessments in any material respect. Although ALJ Patane used the term "great weight" when referring to Dr. Souther, and "substantial weight" when referring to Dr. Bello, ALJ Patane affirmatively *relied* on Dr. Bellows's May 2010 letter that describes VMC as having "high-functioning autism, specifically Asperger's Syndrome" (T. 40, 411) as well the Kindergarten psychological report from Dr. Saulter (T. 41, 342 50) to conclude that VMC did not exhibit evidence of marked or extreme functional limitations in domains 2, 3, and 5.

**\*6** There is considerable doubt that evidence lifted up for consideration by Carrera could be viewed as sufficient to meet all requirements of Listing 112.10. [6] But even if it were, there was contrary competent evidence that ALJ Patane found more persuasive in the exercise of sound discretion. VMC consistently was assessed with average cognitive skills in both 2007 (Dr. Saulter) and 2010 (psychologist Ovitt). (T. 338, 345). VMC was able "to get along well" with other students, was noted to be "social," like talking with others, and engaged in "extensive conversations" with other classmates, and had spent a good part of her summer vacation with a close friend. (T. 46, 65, 294, 304). School records consistently emphasized that VMC was able to care for herself, and participated in a wide range of activities with very little support. (T. 45, 49, 178, 294, 304, 338, 356 58). Occupational therapy evaluations in 2008 and 2010 reported that she did not require services. (T. 178, 356 58). Finally, school records showed that VMC had normal memory skills, average academic abilities and grades between a B

👉 and A

👉 on a 3d grade report card. (T. 43  45, 49, 294, 302  03, 324, 338, 360.

16   Carrera advocates that her evidence showed marked limitations in two "B criteria  categories under the Listing, but points to no evidence satisfying the predicate requirements of "qualitative deficits in the development of reciprocal social interaction; qualitative deficits in verbal and nonverbal communication and in imaginative activity; and markedly restricted repertoire of activities and interests.  Listing 112.10(A)(1).

Third, Carrera's contention that her subjective testimony regarding the severity of VMC's symptoms and behaviors was not considered and/or improperly rejected by ALJ Patane lacks merit. ALJ Patane documented at length Carrera's testimony and written reports regarding VMC's symptoms and behaviors at home. (T. 38  39).

ALJ Patane clearly considered "all the relevant evidence" in the case record before reaching his decision. He set forth in conscientious and meticulous detail narrative summaries of the testimony of Carrera and VMC; diagnoses, opinions, and progress notes of VMC's pediatrician, Scott C. Bello, M.D., F.A.A.P.; the opinion of non-examining State agency pediatric consultant, Lori Brandon Souther, Ph.D.; educational records; questionnaires prepared by teachers (*e.g.,* Ms. Weaver, Ms. Parker, and Ms. Leroy); conclusions of school psychologists, Hope Saulter, Ph.D. and Heather B. Ovitt, M.A., C.A.S.; evaluations by occupational therapists, Dana Kropf and Danielle N. Ryerson; and findings by an August 2010 Subcommittee on Special Education that VMC no longer met the criteria for classification as a student with a disability, and was no longer eligible to receive special education services.

ALJ Patane then utilized the domain framework set forth *supra* in his inquiry into whether the VMC's impairments were functionally equal to a listed disability. With respect to functional-equivalent domain analysis, ALJ Patane made separate findings as to each domain. He cited substantial evidence supporting each finding. In short, ALJ Patane's written decision is an exemplary model of administrative competence and expertise. There is no discernible or demonstrated legal error or evidentiary deficiency in ALJ Patane's decision based on the evidence before him.

## VI. Appeals Council Error

**\*7** As reported earlier, Carrera's request for review remained pending for over two years and nine months before the Appeals Council acted. During that time, Carrera submitted additional evidence which the Appeals Council rejected. In this proceeding, Carrera argues:

> In light of the inordinately lengthy period this matter sat waiting to be reached for review, the *new and material evidence* should have been considered, *if for nothing less than administrative expediency and cost savings.*

(Dkt. No. 11, p. 20) (emphasis added). Congress has not authorized federal courts to overturn administrative actions lacking administrative expediency and cost efficiencies. Courts may, however, entertain complaints that new and material evidence was overlooked or improperly rejected.

### A. Role of Appeals Council; Authority to Consider New Evidence

The Appeals Council may review a case when (1) there appears to be an abuse of discretion by the administrative law judge, (2) there is an error of law, (3) the administrative law judge's findings are not supported by substantial evidence, or (4) there is a broad policy or procedural issue that may affect the general public interest. 20 C.F.R. § 416.1470(a). When reviewing a denial of SSI benefits, the Appeals Council may consider "new and material" [7] evidence that the plaintiff presents. 20 C.F.R. § 416.1470(b).

17   Congress acted in 1980 to limit the power of district courts to order remands for "new evidence  in Social Security cases. *See Melkonyan v. Sullivan,* 501 U.S. 89, 100  01 (1991). Reviewing courts now may order that additional evidence be taken before the Commissioner:

      only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding....

      42 U.S.C. § 405(g).

Consistent with the 1980 Amendment, the Commissioner promulgated a regulation relating specifically to Appeals Council review of new evidence. In addition to requiring that evidence be new and material, the regulation provides:

> (b) ... if new and material evidence is submitted, the Appeals Council shall consider the additional evidence *only where it relates to the period on or before the date of the administrative law judge hearing decision.*

20 C.F.R. § 416.1470(b) (emphasis added).

Reviewing courts may order additional evidence to be taken before the Commissioner if (1) the evidence is new, (2) the evidence is material, and (3) there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. *Pollard v. Halter,* 377 F.3d 183, 193 (2d Cir.2004) (citing 42 U.S.C. § 405(g)); *see also* 20 C.F.R. § 416.1470(b); *Perez v. Chater,* 77 F.3d 41, 44 45 (2d Cir.1996); *Rutkowski v. Astrue,* 368 Fed. App'x 226, 229 (2d Cir.2010) (summary order). New evidence must not be "merely cumulative of what is already in the record." *Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir.1988) (citation omitted). Material evidence is evidence that is probative and relevant to the claimant's condition during the time period for which benefits were denied. *Id.* Also, to be material, the evidence must also present a reasonable possibility that it would influence the Commissioner to decide claimant's application differently. *Id.* (citations omitted).

*B. Evidence Submitted to Appeals Council*

Additional evidence submitted by Carrera consisted of approximately 9 pages of treatment records from Dr. Bello dated January 2012 to May 2013. (Dkt. No 11, App'x A, pp. 47 54), and approximately 46 pages of records from Granville School District dated December 2011 to May 2013 (Dkt. No 11, App'x A, pp. 1 46). Dr. Bello's progress notes during this period primarily reflect visits for medication refills. (Dkt. No 11, App'x A, pp. 47 54), and appear to be largely cumulative. Dr. Bello expresses no new opinions regarding VMC's functional limitations. [8]

[18]    The "treating physician rule applies to the Appeals Council when it considers new evidence containing findings and opinions of a treating physician. *See Asturias v. Colvin,* No. 13 CV 143 JTC, 2014 WL 3110028, at *5 (W.D.N.Y. July 7, 2014); *Toth v. Colvin,* No. 5:12 CV 1532 (NAM/VEB), 2014 WL

421381, at *5 (N.D.N.Y. Feb. 4, 2014). Thus, when claimants submit to the Appeals Council treating physician opinions on the nature and severity of their impairments during the relevant period of disability, "the treating physician rule applies, and the Appeals Council must give good reasons for the weight accorded to that opinion. *James v. Commissioner of Soc. Sec.,* No. 06 CV 6180 (DLI)(WP), 2009 WL 2496485, at *10 (E.D.N.Y. Aug. 14, 2009). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand. *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999) (citing *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998)). Further, " i]t is insufficient for the Appeals Council to merely acknowledge that they reviewed new evidence from a treating physician without providing such reasoning. *Seifried ex rel. A.A.B. v. Commissioner of Soc. Sec.,* No. 6:13 CV 0347 (LEK/TWD), 2014 WL 4828191, at *4 (N.D.N.Y. Sept. 29, 2014) (citing *Shrack v. Astrue,* 608 F.Supp.2d 297, 302 (D.Conn.2009)).

**\*8**    The new educational records, however, indicate that VMC was reclassified as a student qualifying for special education services as a result of her autism. (Dkt. No 11, App'x A, pp. 3, 7). VMC was provided an individualized education program ("IEP") [9] for the 2011 12 school year (5th grade), and received integrated co-teaching services and psychological counseling services. (*Id.,* App'x A, pp. 3, 11). Educational records and standardized test results demonstrate that VMC continued to struggle in mathematics, functioning below standard. (*Id.,* App'x A, pp. 42 44).

[19]    Under federal law (Individuals with Disabilities Education Act ("IDEA )), students with disabilities who meet federal and state requirements for special education receive instruction under an individualized education program. *See* 20 U.S.C. § 1400(d)(1) A). "IEP refers both to the educational program to be provided to a child with a disability and to the written document that describes that educational program.

VMC's general education teacher, Mr. Condon, reported *clinically significant concerns* in the area of *withdrawal* and at-risk concerns in the areas of learning problems, atypicality, leadership, and functional communication. (Dkt. No. 11, App'x A, pp. 27, 29). Ms. Brown, VMC's regular education math teacher, reported at-risk concerns in the areas of learning problems, atypicality, withdrawal, adaptability, social skills, leadership skills, study skills, and functional communication. (*Id.*). Recommendations

for VMC included step-by-step instruction, preferential seating, additional test taking time, lined and graphed paper in math and writing assignments and help with organization of all materials. (*Id.,* App'x A, pp. 27 28). Both Mr. Condon and Ms. Brown reported VMC as:

> having difficulty concentrating/ focusing, sustaining attention, completing homework, completing work in class, and displaying feelings appropriate. She has poor organizational skills, is unaware of social cues, and at times can be withdrawn.

(*Id.,* App'x A, p. 16).

Additionally, included with her educational records is an incident list, revealing that VMC received a five-day, out-of-school suspension for written threats toward another student, and a second incident in which VMC was made to write a letter of apology. (Dkt. No. 11, App'x A, p. 37).

*C. Application*

The evidence in question was generated *after* ALJ Patane's decision. The Appeals Council rejected it as irrelevant on that basis. The Second Circuit, however, holds that "medical evidence generated after an ALJ's decision cannot be deemed irrelevant solely because of timing." *Newbury v. Astrue,* 321 Fed. App'x 16, 18 n. 2 (2d Cir.2009) (summary order) (citing *Pollard v. Halter,* 377 F.3d 183, 193 (2d Cir.2004)). That is because "[e]xaminations and testing conducted after the ALJ's decision is rendered may still be relevant if they clarify a pre-hearing disability and/ or diagnoses." *Sears v. Colvin,* No. 12 CV 570 (MAD/ ATB), 2013 WL 6506496, at *6 (N.D.N.Y. Dec. 12, 2013) (citation omitted). Hence, categorical refusal to consider new and material evidence solely because it was created after the date of the administrative law judge's decision can constitute reversible error. *Pollard,* 377 F .3d at 193 ("Although the new evidence consists of documents generated after the ALJ rendered his decision, this does not necessarily mean that it had no bearing on the Commissioner's evaluation of [the Claimant's] claims. To the contrary, the evidence directly supports many of her earlier contentions regarding [the] condition. It strongly suggests that, during the relevant time period, [her] condition was far more serious than previously thought"); *see also Sergenton v. Barnhart,* 470 F.Supp.2d 194, 204 (E.D.N.Y.2007) (remanding to consider post-hearing diagnostic evidence suggesting that impairment was substantially more severe than previously diagnosed).

**\*9** Here, the post-hearing evidence clearly was new, as it was not in existence when ALJ Patane conducted the evidentiary hearing or when he issued his decision. Nor is it cumulative. It indicates that reclassification in special education was warranted for VMC based on objective testing and teacher observations based on the severity of VMC's autism, and that disciplinary measures were necessary due to repeated behavioral problems.

Because the records did not exist, Carrera had good cause for not presenting them earlier. *See Pollard,* 377 F.3d at 193 ("Because the new evidence submitted by [claimant] did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new' and that 'good cause' existed for her failure to submit this evidence to the ALJ."). The question boils down, then, to whether the new evidence was material.

Clearly, the post-decision educational records were probative and could influence the Commissioner or ALJ Patane to decide the case differently. ALJ Patane emphasized repeatedly that his findings were influenced heavily by evidence indicating that VMC no longer needed or was qualified to receive special education services. (T. 42 43, 44, 45, 46). The new evidence would dispel that notion. [20]

[20]  In her 6th grade year, VMC was classified and received services under autism with diagnoses of Asperger's Syndrome, ADHD and difficulty with math. (Dkt. No. 11, App'x A, p. 16). VMC's new IEP recommended additional services and accommodations. She receive integrated co teaching services in math class on a daily basis for 40 minutes. It was further recommended that VMC participate in psychological counseling services once a week for 30 minutes. Several program modifications were directed, including: access to computer for lengthy assignments; preferential seating close to the teacher; use of graph paper to complete math problems to help organize her written math work and decrease errors in computation; use of special line paper for her writing assignments due to her difficulty with the size and spacing of her written work; check for understanding, such as ask to restate the directions of have her complete an example to ensure understanding of the

task/material; additional examples of newly taught concepts, if needed; organizational system, such as the use of a portfolio or binder type file system to keep all classroom materials organized by color/subjects; and preset to changes in schedules or routines so must be sure VMC knows what changes are being made to her daily routine. (Dkt. No. 11, pp. 11–12). Additionally, she received testing accommodations of extended time; administration in a location with minimal distractions; access to computer and program; and use of additional paper. (Dkt. No. 11, pp. 12–13).

It also could have been interpreted as indicating more serious limitations in various domains. For example, Domain 3 (interacting and relating with others), could be interpreted differently by factoring VMC's five-day, out-of-school disciplinary suspension for making a written threat toward another student (Dkt. No. 11, App'x A, p. 37), and her one-day suspension for telling another student that she hates Chinese and Asian people. (*Id.*). Additionally, her teacher, Mr. Condon reported "clinically significant" concerns in the area of "Withdrawal." He reported that VMC "almost always has trouble making new friends and often avoids other children." (*Id.,* p. 25). Another teacher, Mrs. Brown also reported "at-risk" concerns in the areas of "Withdrawal" and "Social Skills," noting VMC "never makes friends easily." (*Id.*). Given all this, an administrative adjudicator might find that VMC was extremely limited in her ability to interact and relate to other people.

Mr. Condon also reported "at-risk" concerns in the areas of Learning Problems, Atypicality, Leadership, and Functional Communication (Dkt. No. 11, App'x A, p. 27). Ms. Brown, VMC's regular education math teacher, also reported at-risk concerns in the areas of learning problems, atypicality, withdrawal, adaptability, social skills, leadership skills, study skills, and functional communication. In combination, this might significantly affect findings regarding additional domains (*e.g.,* acquiring and using information (Domain 1) and/or attending or completing tasks (Domain 2)).

The new evidence also is relevant to Domain 5 (caring for oneself). It reflects "clinically significant" concerns in the area of self-esteem and "at risk" concerns in the areas of attitude to school, depression, and relations with parent. (Dkt. No. 11, App'x A, p. 27). Hence, psychological counseling was added to her related services. (*Id.,* p. 11).

**\*10** A much closer question is whether the new evidence is material in the sense of pertaining to the VMC's condition *during the time period for which benefits were denied.* It is possible, of course, that the new evidence documents only that VMC's condition worsened with time, in which case it might not be relevant to VMC's condition during the time for which benefits were denied. Post-determination diagnoses may indicate only more recent onset of disability.

It is equally possible, however, that the new evidence clarifies a pre-hearing disability and suggests that, during the relevant time period, VMC's condition was more serious than previously thought. The evidence before ALJ Patane related to VMC's assessments from Kindergarten through third grade. The new evidence was developed when VMC was more mature and her condition, therefore, easier to diagnose and assess. Further, the new evidence tellingly may reveal that when VMC was subjected to increased demands and higher expectations of regular classes, her underlying deficiencies present all along were more exposed and put into new light.

A reviewing court cannot make that assessment. The Appeals Council's cursory, formulaic rejection of the evidence, unsupported by any legal or factual reasoning does not suffice. Accordingly, the proper course for this court is to remand the matter to the Commissioner for reconsideration in light of the new evidence.[2]

21    *See Chavis v. Colvin,* No. 5:12–cv–1634 (GLS), 2014 WL 582253, at \*3 (N.D.N.Y. Feb. 13, 2014) (internal quotations and citations omitted) (remanding due to Appeals Council's mishandling of new medical evidence and stating: "Because there is reasonable basis for doubting whether the Commissioner applied the appropriate legal standards, even if the ultimate decision may be arguably supported by substantial evidence, the Commissioner's decision is reversed and remanded for further administrative proceedings. ").

### VII. Recommendation

The Commissioner's decision should be REVERSED, and the case should be REMANDED pursuant to 42 U.S.C. § 405(g), sentence four,[22] to consider new evidence and for further proceedings in accordance with this recommendation.

22    *See Sears v. Colvin,* No. 8:12 cv 570 (MAD/ATB), 2013 WL 6506496, at *4 (N.D.N.Y. Dec. 12, 2013) (sentence four as opposed to sentence six remand is appropriate); *see Titus ex rel. N.M.C. v. Astrue,* No. 09 CV 0093 (GTS/VEB), 2010 WL 3323738, at *5 (N.D.N.Y. July 6, 2010) (collecting cases).

### VIII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

### FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.

*Thomas v. Arn,* 474 U.S. 140, 155 (1985); *Graham v. City of New York,* 443 Fed. App'x 657, 658 (2d Cir.2011) (summary order); *FDIC v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the *30* day of *January* 2015.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 1126014

---

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

SSR 09-2P (S.S.A.), 2009 WL 396032

Social Security Ruling

Docket No. SSA-2008-0062]

SOCIAL SECURITY RULING, SSR 09-2P.; TITLE XVI: DETERMINING CHILDHOOD
DISABILITY—DOCUMENTING A CHILD'S IMPAIRMENT-RELATED LIMITATIONS

SSR 09-2P
February 18, 2009

Policy Interpretation Ruling

*Title XVI: Determining Childhood Disability—Documenting a Child's Impairment-Related Limitations*

**\*1** Purpose: This SSR provides policy interpretations and consolidates information from our regulations, training materials, and question-and-answer documents about documenting and evaluating evidence of a child's impairment-related limitations and related issues.

Citations (Authority): Sections 1614(a)(3) and 1614(a)(4) of the Social Security Act, as amended; Regulations No. 4, subpart P, appendix 1; and Regulations No. 16, subpart I, sections 416.902, 416.906, 416.909, 416.912, 416.913, 416.923, 416.924, 416.924a, 416.924b, 416.925, 416.926, 416.926a, and 416.994a.

Introduction: A child who applies for Supplemental Security Income (SSI)[2] is "disabled" if the child is not engaged in substantial gainful activity and has a medically determinable physical or mental impairment or combination of impairments[3] that results in "marked and severe functional limitations."[4] 20 CFR 416.906. This means that the impairment(s) must meet or medically equal a listing in the Listing of Impairments (the listings),[5] or functionally equal the listings (also referred to as "functional equivalence"). 20 CFR 416.924 and 416.926a.

As we explain in greater detail in SSR 09-1p, we always evaluate the "whole child" when we make a finding regarding functional equivalence, unless we can otherwise make a fully favorable determination or decision.[6] We focus first on the child's activities, and evaluate how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments. 20 CFR 416.926a(b) and (c). We consider what activities the child cannot do, has difficulty doing, needs help doing, or is restricted from doing because of the impairment(s). 20 CFR 416.926a(a). Activities are everything a child does at home, at school, and in the community, 24 hours a day, 7 days a week.[7]

We next evaluate the effects of a child's impairment(s) by rating the degree to which the impairment(s) limits functioning in six "domains." Domains are broad areas of functioning intended to capture all of what a child can or cannot do. We use the following six domains:
(1) Acquiring and using information,

(2) Attending and completing tasks,

(3) Interacting and relating with others,

(4) Moving about and manipulating objects,

(5) Caring for yourself, and

**\*2** (6) Health and physical well-being.

20 CFR 416.926a(b)(1). [8]

To functionally equal the listings, an impairment(s) must be of listing-level severity; that is, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. [9] 20 CFR 416.926a(a).

This SSR explains the evidence we need to document a child's impairment-related limitations, the sources of evidence we commonly see in childhood disability cases, how we consider the evidence we receive from early intervention and school programs (including special education), how we address inconsistencies in the evidence, and other issues related to the development of evidence about functioning. [0]

Policy Interpretation

*I. General*

We use evidence of a child's functioning to determine whether the child's medically determinable impairment(s):
• Is "severe"   that is, causes more than minimal functional limitations (20 CFR 416.924(c));

• Meets or medically equals a listed impairment when the listing criteria include functioning (20 CFR 416.924a(b)(1)); and

• Functionally equals the listings (20 CFR 416.926a).

When we consider functioning in children, we evaluate how the impairment(s) affects the ability to function age-appropriately. A child functions age-appropriately when initiating, sustaining, and completing age-appropriate activities. "Functioning" includes everything a child does throughout a day at home, at school, and in the community. Examples include, getting dressed for school, cooperating with caregivers, playing with friends, and doing class assignments.

As we explain in Section III below, evidence of a child's functioning can come from a wide variety of sources. We will consider all of the relevant evidence we receive about a child's functioning to help us understand how the impairment(s) affects the child's day-to-day activities.

*II. What Evidence Do We Need About a Child's Impairment-Related Limitations?*

We need evidence that is sufficient to evaluate a child's limitations on a longitudinal basis; that is, over time. This evidence will help us answer the following questions about whether the child's impairment(s) affects day-to-day functioning and whether the child's activities are typical of other children of the same age who do not have impairments. Accordingly, we need evidence to help us determine the following:
• What activities is the child able to perform?

• What activities is the child not able to perform?

• Which of the child's activities are limited or restricted compared to other children of the same age who do not have impairments?

• Where does the child have difficulty with activities    at home, in childcare, at school, or in the community?

 **\*3** • Does the child have difficulty independently initiating, sustaining, or completing activities?

• What kind and how much help does the child need to do activities, and how often does the child need it?

• Does the child need a structured or supportive setting, what type of structure or support does the child need, and how often does the child need it?


We do not require our adjudicators to provide formal answers to these specific questions in the determination or decision. However, the evidence should create a clear picture of the child's functioning in the context of the six functional equivalence domains so that we can determine the severity of limitation in each domain. The critical element in evaluating the severity of a child's limitations is how appropriately, effectively, and independently the child performs age-appropriate activities.

Also, a child who is having significant but unexplained problems may have an impairment(s) that has not yet been diagnosed, or may have a diagnosed impairment(s) for which we lack evidence. For example, children who are many grades behind in school often have a medically determinable impairment(s). In many cases, the school will have evaluated the child, and the school records will provide information about whether there is a medically determinable impairment(s).    It may be necessary to further develop information from the child's medical source(s) or purchase a consultative examination (CE). Adjudicators should pursue indications that an impairment(s) may be present if that fact may be material to the determination or decision.

*III. Sources of Evidence About a Child's Impairment-Related Limitations*

Once we have evidence from an acceptable medical source [2] that establishes the existence of at least one medically determinable impairment, we consider all relevant evidence in the case record to determine whether a child is disabled. This evidence may come from acceptable medical sources and from a wide variety of "other sources." [3]

Medical Sources: Acceptable medical sources can provide information about how an impairment(s) affects a child's everyday activities. For example, a pediatrician might discuss the impact of asthma on a child's participation in physical activities, or a speech-language pathologist might discuss how a language disorder contributes to limited attention and problems in school.

We cannot use evidence from other medical sources who are not "acceptable medical sources" to establish that a child has a medically determinable impairment. However, we can use evidence from these sources, such as nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, occupational therapists (OTs), physical therapists (PTs), and psychiatric social workers (PSWs), to determine the severity of the impairment(s) and how it affects the child's ability to function compared to children of the same age who do not have impairments. For example:
 **\*4** • A PSW might comment on the child's ability to handle stressful situations.

• An OT or PT may evaluate the impact of a musculoskeletal disorder on the child's activities and comment on muscle tone and strength and how it affects the child's ability to walk with a brace.

• An OT might comment on the child's ability to use motor skills to get dressed without assistance.

Non-Medical Sources: Evidence from other sources who are not medical sources and who know and have contact with the child can also be very important to our understanding of the severity of a child's impairment(s) and how it affects day-to-day functioning. These sources include parents and caregivers, educational personnel (for example, teachers, early intervention team members, counselors, developmental center workers, and daycare center workers), public and private social welfare agency personnel, and others (for example, siblings, friends, neighbors, and clergy). Therefore, we will consider evidence from such non-medical sources when we determine the severity of the child's impairment(s) and how the child typically functions compared to children of the same age who do not have impairments.

*IV. Early Intervention and School Programs* [14]

In most cases, early intervention (EI) and school programs are significant sources of evidence about a child's impairment-related limitations. Children from birth to the attainment of age 3 may receive EI services if they are experiencing delays in one or more developmental areas or if they have a diagnosed physical or mental condition that is likely to result in such delays. [5] Children from ages 3 through 5 may attend preschool or other daycare programs. Children age 6 and older usually attend school and may receive special education and related services [6] if they require specially designed instruction because of their unique needs related to a physical or mental impairment(s).

We require adjudicators to try to get EI and school records whenever they are needed to make a determination or decision regarding a child's disability. We do not require information from EI or school personnel in every case because sometimes we can decide that a child is disabled without it, such as when the child's impairment(s) meets the requirements of a listing. We may also have to make a determination or decision without EI or school evidence when we are unable to obtain it.

A. Comprehensive Evaluations in EI or School Programs

We will consider the results of comprehensive evaluations we receive. Children receive comprehensive evaluations when they are candidates for EI or special education and related services and periodically after that when they receive these services. These evaluations are usually conducted by a team of qualified personnel [7] who can assess a child in all areas of suspected delay or educational need.

As part of a comprehensive evaluation, the EI or school program will use a variety of assessment procedures and tools to identify a child's unique strengths and needs, as well as all of the services appropriate to address those needs. For younger children, the primary focus of the evaluation is their level of functioning in terms of developmental milestones. For school-age children, the primary focus is their level of academic skills and related developmental needs.

**\*5** The evaluation generally includes:
• Observations of the child in a learning environment or a natural setting, such as in the home;

• Alternative and informal assessments, such as play-based assessment and review of completed classroom assignments;

• Interviews with parents, teachers, or other appropriate people, including child behavior checklists; and

• Standardized tests, such as a formal development test for a toddler or a formal intelligence or language test for an older child.

When we request information from EI programs or schools, we will ask for the most recent comprehensive evaluation and test results, as well as other evidence that supports the analysis of the child's development or academic skills and related developmental needs. Some children may have received a comprehensive evaluation, but may not be receiving EI or special education services. Therefore, we will request this information even if a child is not receiving services.

B. Individualized Family Service Plans and Individualized Education Programs

The agency providing EI services or special education and related services will develop a written plan documenting the child's eligibility for services, the therapeutic or educational goals, the services the agency will provide, and the setting(s) where the agency will provide these services. Infants and toddlers should have an Individualized Family Service Plan (IFSP). Preschool and school-age children should have an Individualized Education Program (IEP), including an IEP transition plan for children beginning at age 14.

Both IFSPs and IEPs are important sources of specific information about a child's abilities and impairment-related limitations, and provide valuable information about the various kinds and levels of support a child receives. For example, an IEP will describe:
• Supplementary aids and services, such as speech-language pathology services, counseling, transportation, and orientation and mobility services;

• Modifications to the academic program made to accommodate the child's impairment(s), such as reading instruction in a resource room;

• The role of a classroom aide assigned to the child, such as assistance in moving from one classroom to the next; and

• The characteristics of the child's self-contained classroom, such as teacher-student ratio.

This information about supports children receive can be critical to determining the extent to which their impairments compromise their ability to independently initiate, sustain, and complete activities. In general, if a child needs a person, a structured or supportive setting, medication, treatment, or a device to improve or enable functioning, the child will not be as independent as same-aged peers who do not have impairments. We will generally find that such a child has a limitation, even if the child is functioning well with the help or support. The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independently the child functions, and the more severe we will find the limitation to be. [8]

**\*6** 1. Present Level of Development or Educational Performance. The first part of an IFSP or IEP describes and analyzes the child's present level of development (for example, physical or cognitive development) or academic skills based on the comprehensive evaluation or subsequent assessments and other information that is available at the time the IFSP or IEP is developed. [9]

2. Goals and Objectives. The second part of an IFSP or IEP consists of one or more sets of goals and specific objectives for the infant or toddler's development or the preschool or school-age child's education. The IFSP or IEP includes goals for improvement within 3-6 months (for infants and toddlers) or 1 year for preschool and school-age children. We can infer how the child is currently functioning from these goals. For example, if an IEP goal is ¢= BQP:0029¢="will be able to read at a 4th grade level,"¢=EQP:0029¢= we can reasonably conclude that the child was not performing at that level when the IEP was written.

Based on broad developmental or educational goals, the written plan will outline specific objectives organized around the discrete physical or mental skills that must be mastered in order to achieve the goal. The plan also includes the kinds of activities and tasks the teacher or therapist will undertake with the child to develop the targeted skills. For example:
• An IFSP goal for a toddler from an occupational therapist might be: ¢= BQP:0030¢="The child will use fine/gross motor skills to handle age-appropriate materials during play,"¢=EQP:0030¢= while a specific objective (one of many) would identify the skills to be developed (for example, articulation of the thumb and all fingers for grasping) and the particular manipulative tasks to be used to develop the needed skills (for example, molding modeling clay into balls).

• An IEP goal for an 11-year-old from a special educator might be: ¢= BQP:0031¢="The child will independently read simple stories at the 4th grade level,"¢=EQP:0031¢= while a specific objective (one of many) would identify the skills to be developed (for example, use of phonetic cues to identify initial, medial, and ending sounds in new words), and the particular instruction methods to be used to develop the needed skills (for example, small group instruction with practice sounding out unfamiliar words).

Children who reach age 14 begin the transition from high school to the adult workplace. The IEP transition plan describes a student's levels of functioning based on reasonable estimates by both the student and the special education team and identifies the kinds of vocational and living skills the child needs to develop in order to move into adulthood. The IEP transition goals may range from the development of skills appropriate to supervised and supported work and living settings to those needed in independent work and living situations.

Both the IFSP and IEP can provide useful information about a child's functioning. However, the underlying purpose of these documents is not to determine disability under our rules. Rather, the IFSP or IEP is used to design the individualized services and supports a child needs to maximize growth and development or to participate in and progress in the general education curriculum. In contrast, we use the information in the IFSP or IEP to help determine if the child has marked and severe functional limitations.

 **7** It is important to remember, therefore, that the goals in an IFSP or IEP are frequently set at a level that the child can readily achieve to foster a sense of accomplishment. Those goals are frequently lower than what would be expected of a child the same age without impairments. In this regard:
• A child who achieves a goal may still have limitations. The child may have achieved the goal simply because it was set low, and may be developing or acquiring skills at a slower rate than children the same age without impairments.

• On the other hand, the fact that the child does not achieve a goal is likely an indication of the severity of the child's impairment-related limitations. However, the child's failure to achieve a goal does not, by itself, establish that the impairment(s) functionally equals the listings.

Therefore, we must consider the purpose of the goals provided in an IFSP or IEP. And, as with any single piece of evidence, we will consider facts, such as whether a child achieves goals in an IFSP or IEP, along with other relevant information in the case record.

3. Services, Settings, and Supports. The third part of the IFSP or IEP documents what services the child needs, the settings in which the services will be provided, and any supports the child needs. The services needed may include special education placement, early intervention services, related services (such as occupational therapy, counseling, and transportation services), and supplementary services (such as peer tutoring and a one-on-one aide). The settings for services may include any setting that is typical for the child's same-aged peers and classroom placement (described in a. below). The supports a child needs may include adaptive equipment (such as a special seat), assistive technology (such as a communication board), and accommodations (described in b. below).

The IFSP may have an additional section for "other services," which outlines services that the child may be receiving from other sources. An EI program should coordinate the services a child needs with other State and Federal programs. If the IFSP identifies such services, we will request the information from the other programs unless we determine that the additional information would not affect the outcome of the case given the other evidence already in the record.

a. Classroom Placements

When a child receives special education services under an IEP, the IEP will include information about the setting where the child will receive the services. There is a continuum of alternative placements including, but not limited to:

**\*10**  • Regular classrooms,

• Regular classrooms with "pull-out" services, such as a resource room,

• Special education classrooms,

• Alternative schools,

• Day treatment programs, and

• Residential schools.

The decision to provide services in a particular setting may be based on factors other than the severity of the child's limitations. Therefore, details about the child's performance in school and other settings (for example, how well the child is performing) are important components of our analysis. As we explain in more detail in SSR 09-1p, we will consider the kinds and levels of the support the child receives.

b. Accommodations

Some students with impairments need accommodations in their educational program in order to participate in the general curriculum. In this context, accommodations are practices and procedures that allow a child to complete the same assignment or test as other students, but with a change in:

• Presentation, or how instruction or directions are delivered (for example, read orally to the child by an adult, or provided in large print, on audiotape, or via a screen reader).

• Response, or how the student solves problems or completes assignments (for example, using an augmentative communication device or dictating answers to a scribe).

• Setting, or how the environment is set up (for example, seating the child near the teacher or seating the child away from distractions).

• Timing/Scheduling, or the time period during which the lesson or assignment is scheduled (for example, allowing extra time to complete an assignment or scheduling tests around a child's medication regimen).

C. Section 504 Plans

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of disability in programs and activities that receive Federal financial assistance. [20] Schools must provide a free, appropriate public education to each student with a disability. [2] Children must receive educational and related aids and services that are designed to meet their educational needs, even if they are not provided any special education services under the Individuals with Disabilities Education Act (IDEA). [22] Schools will conduct an evaluation of specific areas of educational need for children who have disabilities that limit their access to the educational setting. If a child is qualified under section 504, the school will have a written plan for the aids, services, and accommodations that will be provided. We will consider any section 504 plans when we request information from a child's school.

*V. Standard of Comparison*

 **11** Because we compare a child's functioning to the functioning of other children the same age who do not have impairments, we should understand the standard of comparison used by sources of the information. For example, a special education teacher may say a child is "doing well." Without knowing the standard of comparison, this could mean:

• Compared to that teacher's expectations for the child,

• Compared to other children in the special education class, or

• Compared to children the same age who do not have impairments.

Therefore, the adjudicator will consider both the standards used by the teacher or other source to rate the quality of the child's functioning and the characteristics of the group to whom the child is being compared. 20 CFR 416.924a(b)(3)(ii).

*VI. Resolving Inconsistencies in the Evidence*

Adjudicators should analyze and evaluate relevant evidence for consistency, and resolve any inconsistencies that need to be resolved. [23]

After reviewing all of the relevant evidence, we determine whether there is sufficient evidence to make a finding about disability. "All of the relevant evidence" means:

• The relevant objective medical evidence and other relevant evidence from medical sources;

• Relevant information from other sources, such as school teachers, family members, or friends;

• The claimant's statements (including statements from the child's parent(s) or other caregivers); and

• Any other relevant evidence in the case record, including how the child functions over time and across settings.

If there is sufficient evidence and there are no inconsistencies in the case record, we will make a determination or decision. However, the fact that there is an inconsistency in the evidence does not automatically mean that we need to request additional evidence, or that we cannot make a determination or decision. Often, we will be able to resolve the issue with the evidence in the case record because most of the evidence or the most probative evidence outweighs the inconsistent evidence and additional information would not change the determination or decision.

Sometimes an inconsistency may not be "material"; that is, it may not have any effect on the outcome of the case or on any of the major findings. Obviously, an inconsistency would be immaterial if the decision would be fully favorable

regardless of the resolution. For example, if one piece of evidence shows the child's birth weight as 950 grams and another shows it as 1025 grams, the inconsistency is not material because we would find that the child's impairment(s) functionally equals the listings under 20 CFR 416.926a(m)(6) based on either birth weight. Similarly, an inconsistency could also be immaterial in an unfavorable determination or decision when resolution of the inconsistency would not affect the outcome. This could occur, for example, if there is inconsistent evidence about a limitation in an activity, but no evidence supporting a rating of "marked" limitation of a relevant domain.

**\*12** At other times, an apparent inconsistency may not be a true inconsistency. For example, the record for a child with attention-deficit/hyperactivity disorder (AD/HD) may include good, longitudinal evidence of hyperactivity at home and in the classroom, but show a lack of hyperactivity during a CE. While this may appear to be an inconsistency, it is a well-known clinical phenomenon that children with some impairments (for example, AD/HD) may be calmer, less inattentive, or less out-of-control in a novel or one-to-one setting, such as a CE. See 20 CFR 416.924a(b)(6). [24]

In some cases, the longitudinal history may reveal sudden, negative changes in the child's functioning; for example, a child who previously did well in school suddenly begins to fail. In these situations, we should try to ascertain the reason for these changes whenever they are material to the decision.

In all other cases in which the evidence is insufficient, including when a material inconsistency exists that we cannot resolve based on an evaluation of all of the relevant evidence in the case record, we will try to complete the record by requesting additional or clarifying information. [25]

Effective Date: This SSR is effective on March 20, 2009.

Cross-References: SSR 09-1p, Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule The "Whole Child" Approach; SSR 09-3p, Title XVI: Determining Childhood Disability The Functional Equivalence Domain of "Acquiring and Using Information"; SSR 09-4p, Title XVI: Determining Childhood Disability The Functional Equivalence Domain of "Attending and Completing Tasks"; SSR 09-5p, Title XVI: Determining Childhood Disability The Functional Equivalence Domain of "Interacting and Relating with Others"; SSR 09-6p, Title XVI: Determining Childhood Disability The Functional Equivalence Domain of "Moving About and Manipulating Objects"; SSR 09-7p, Title XVI: Determining Childhood Disability The Functional Equivalence Domain of "Caring For Yourself"; SSR 09-8p, Title XVI: Determining Childhood Disability The Functional Equivalence Domain of "Health and Physical Well-Being"; SSR 06-03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies; and Program Operations Manual System (POMS) DI 24515.055, DI 25225.030, DI 25225.035, DI 25225.040, DI 25225.045, DI 25225.050, and DI 25225.055.

---

[1] The definition of disability in section 1614(a)(3)(C) of the Social Security Act (the Act) applies to any "individual who has not attained age 18. In this SSR, we use the word "child to refer to any such person, regardless of whether the person is considered a "child for purposes of the SSI program under section 1614(c) of the Act.

[2] For simplicity, we refer in this SSR only to initial claims for benefits. However, the policy interpretations in this SSR also apply to continuing disability reviews of children under section 1614(a)(4) of the Act and 20 CFR 416.994a.

[3] We use the term "impairment(s) in this SSR to refer to an ¢ BQP:0005¢ "impairment or a combination of impairments. ¢ EQP:0005¢

[4] The impairment(s) must also satisfy the duration requirement in section 1614(a)(3)(A) of the Act; that is, it must be expected to result in death, or must have lasted or be expected to last for a continuous period of not less than 12 months.

5    For each major body system, the listings describe impairments we consider severe enough to cause "marked and severe functional limitations. 20 CFR 416.925(a); 20 CFR part 404, subpart P, appendix 1.

6    See SSR 09 1p, Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule The "Whole Child Approach.

7    However, some children have chronic physical or mental impairments that are characterized by episodes of exacerbation (worsening) and remission (improvement); therefore, their level of functioning may vary considerably over time. To properly evaluate the severity of a child's limitations in functioning, as described in the following paragraphs, we must consider any variations in the child's level of functioning to determine the impact of the chronic illness on the child's ability to function longitudinally; that is, over time. For more information about how we evaluate the severity of a child's limitations, see SSR 09 1p.

8    For the first five domains, we describe typical development and functioning using five age categories: Newborns and young infants (birth to attainment of age 1); older infants and toddlers (age 1 to attainment of age 3); preschool children (age 3 to attainment of age 6); school age children (age 6 to attainment of age 12); and adolescents (age 12 to attainment of age 18). We do not use age categories in the sixth domain because that domain does not address typical development and functioning, as we explain in SSR 09 8p, Title XVI: Determining Childhood Disability The Functional Equivalence Domain of "Health and Physical Well Being.

9    See 20 CFR 416.926a(e) for definitions of the terms "marked and "extreme.

10   For more information about the domains, see the cross references at the end of this SSR.

11   This will be especially true in cases in which the child is behind in school because of mental retardation, borderline intellectual functioning, or a learning disability, which can be established by evidence from a school psychologist, or because of a language disorder, which can be established by a qualified speech language pathologist. See 20 CFR 416.913(a). However, school records may include evidence from other kinds of acceptable medical sources establishing the existence of a medically determinable impairment.

12   The term "acceptable medical source is defined in 20 CFR 416.902 as ¢ BQP:0021¢ "one of the sources described in 416.913(a) who provides evidence about your impairments. ¢ EQP:0021¢

13   We explain what the term "other sources means in 20 CFR 416.913(d). For more information about how we consider opinion evidence from "other sources, including opinions about functional limitations, see SSR 06 03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 71 FR 45593 (2006), available at: http://www.socialsecurity.gov/OP Home/rulings/di/01/SSR2006 03 01.html. For information about how we consider opinion evidence from acceptable medical sources, see generally 20 CFR 416.927.

14   School programs also include preschool programs, such as Early Head Start (for children birth to age 3) and Head Start (ages 3 through 5).

15   EI services may include occupational therapy, physical therapy, speech therapy, psychological services, audiology, health services, nutrition services, nursing services, and assistive technology devices. The developmental areas are: Cognitive development; physical development, including vision and hearing; communication development; social or emotional development; and adaptive development.

16   "Related services includes transportation and such developmental, corrective, and other supportive services (such as physical and occupational therapy) as are required to assist a child with a disability to benefit from special education. A child who does not qualify for special education may qualify for related services under section 504 of the Rehabilitation Act of 1973 to ensure a free, appropriate public education. See section IV.C., below.

17   The evaluation team may include personnel who are "acceptable medical sources under our rules. When the team includes such people, the comprehensive evaluation may provide the primary evidence we need to both establish and evaluate the child's impairment and resulting limitations.

18    See generally 20 CFR 416.924a(b). See also SSR 09 1p.

19    IFSPs and IEPs frequently reference underlying psychological or developmental testing, and therefore, may indicate that there is other relevant evidence available.

20    Public Law 93 112, section 504; 29 U.S.C. 794(a), as amended.

21    See 34 CFR 104.33(a). "Appropriate in this context means the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of the Department of Education's regulations. 34 CFR 104.33(b).

22    20 U.S.C. 1400, et seq.

23    This basic policy is also contained in other rules on evidence, including 20 CFR 416.912, 416.913, 416.924a(a), 416.927, and 416.929. For our rules on how we consider test results, see also section 112.00D of the listings for IQ and other tests related to mental disorders, and 20 CFR 416.924a(a)(1)(ii) and 416.926a(b)(4) for all testing.

24    This example highlights the importance of getting a full picture of the "whole child and of our longstanding policy that we must consider each piece of evidence in the context of the remainder of the case record. Accepting the observation of the child's behavior or performance in an unusual setting, like a CE, without considering the rest of the evidence could lead to an erroneous conclusion about the child's overall functioning.

25    With respect to testing, we provide in 20 CFR 416.926a(b)(4)(iii) that we will try to resolve material inconsistencies between test scores and other information in the case record. We explain that, while it is our responsibility to resolve any material inconsistencies, the interpretation of a test is ¢ BQP:0038¢ "primarily the responsibility of the psychologist or other professional who administered the test. ¢ EQP:0038¢ If necessary, we may recontact the professional who administered the test for further clarification. However, we may also resolve an inconsistency with other information in the case record, by questioning other people who can provide us with information about a child's day to day functioning, or by purchasing a consultative examination. This regulation also provides that when we do not believe that a test score accurately indicates a child's abilities, we will document our reasons for not accepting the score in the case record, or in the decision at the administrative law judge hearing and Appeals Council levels (when the Appeals Council makes a decision).

Social Security Administration

Department of Health and Human Services
SSR 09-2P (S.S.A.), 2009 WL 396032

**End of Document**                                    © 20 7 Thomson Reuters. No c a m to or g na U.S. Government Works.

SSR 09-1P (S.S.A.), 2009 WL 396031

Social Security Ruling

Docket No. SSA-2008-0062; Social Security Ruling, SSR 09-1p

TITLE XVI: DETERMINING CHILDHOOD DISABILITY UNDER THE
FUNCTIONAL EQUIVALENCE RULE—THE "WHOLE CHILD" APPROACH

SSR 09-1P
February 17, 2009

Policy Interpretation Ruling

*Title XVI: Determining Childhood Disability Under the
Functiona l Equivalence Rule—The "Whole Child" Approach*

**\*1** Purpose: This SSR provides policy interpretations and consolidates information from our regulations, training materials, and question-and-answer documents about our "whole child" approach for determining whether a child's impairment(s) functionally equals the listings.

Citations: Sections 1614(a)(3), 1614(a)(4), and 1614(c) of the Social Security Act, as amended; Regulations No. 4, subpart P, appendix 1; and Regulations No. 16, subpart I, sections 416.902, 416.906, 416.909, 416.923, 416.924, 416.924a, 416.924b, 416.925, 416.926, 416.926a, and 416.994a.

Introduction: A child   who applies for Supplemental Security Income (SSI) [2] is "disabled" if the child is not engaged in substantial gainful activity and has a medically determinable physical or mental impairment or combination of impairments [3] that results in "marked and severe functional limitations." [4] 20 CFR 416.906. This means that the impairment(s) must meet or medically equal a listing in the Listing of Impairments (the listings), [5] or functionally equal the listing s (also referred to as "functional equivalence"). 20 CFR 416.924 and 416.926a.

To functionally equal the listings, an impairment(s) must be of listing-level severity; that is, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. [6] 20 CFR 416.926a(a). Domains are broad areas of functioning intended to capture all of what a child can or cannot do. We use the following six domains:
(1) Acquiring and using information,

(2) Attending and completing tasks,

(3) Interacting and relating with others,

(4) Moving about and manipulating objects,

(5) Caring for yourself, and

(6) Health and physical well-being.

20 CFR 416.926a(b)(1). [7]

Our rules provide that we start our evaluation of functional equivalence by considering the child's functioning without considering the domains or individual impairments. They pr ovide that "[w]hen we evaluate your functioning and decide which domains may be affected by your impairment(s), we will look first at your activities and limitations and restrictions." [8] 20 CFR 416.926a(c) (emphasis added). Our rules also provide that we:

look at the information we have in your case record about how your functioning is affected during all of your activities when we decide whether your impairment or combination of impairments functionally equals the listings. Your activities are everything you do at home, at school, and in your community.

**\*2** 20 CFR 416.926a(b) (emphasis added).

After we identify which of a child's activities are limited, we determine which domains are involved in those activities. We then determine whether the child's impairment(s) could affect those domains and account for the limitations. This is because:

[a]ny given activity may involve the integrated use of many abilities and skills; therefore, any single limitation may be the result of the interactive and cumulative effects of one or more impairments. And any given impairment may have effects in more than one domain; therefore, we will evaluate the limitations from your impairment(s) in any affected domain(s).

20 CFR 416.926a(c). We then rate the severity of the limitations in each affected domain.

This technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination   the interactive and cumulative effects of the impairments   because it starts with a consideration of actual functioning in all settings. We have long called this technique our "whole child" approach.

Policy Interpretation

*I. General*

We always evaluate the "whole child" when we make a finding regarding functional equivalence, unless we can make a fully favorable determination or decision without having to do so. The functional equivalence rules require us to begin by considering how the child functions every day and in all settings compared to other children the same age who do not have impairments. After we determine how the child functions in all settings, we use the domains to create a picture of how, and the extent to which, the child is limited by identifying the abilities that are used to do each activity, and assigning each activity to any and all of the domains involved in doing it. We then determine whether the child's medically determinable impairment(s) accounts for the limitations we have identified. Finally, we rate the overall severity of limitation in each domain to determine whether the child is "disabled" as defined in the Act.

More specifically, we consider the following questions.

1. How does the child function? "Functioning" refers to a child's activities; that is, everything a child does throughout the day at home, at school, and in the community, such as getting dressed for school, cooperating with caregivers, playing with friends, and doing class assignments. We consider:

• What activities the child is able to perform,

• What activities the child is not able to perform,

• Which of the child's activities are limited or restricted,

• Where the child has difficulty with activities    at home, in childcare, at school, or in the community,

• Whether the child has difficulty independently initiating, sustaining, or completing activities,

• The kind of help, and how much help the child needs to do activities, and how often the child needs it, and

 **3** • Whether the child needs a structured or supportive setting, what type of structure or support the child needs, and how often the child needs it.


20 CFR 416.926a(b)(2).

2. Which domains are involved in performing the activities? We assign each activity to any and all of the domains involved in performing it. Many activities require more than one of the abilities described by the first five domains and may also be affected by problems that we evaluate in the sixth domain.

3. Could the child's medically determinable impairment(s) account for limitations in the child's activities? If it could, and there is no evidence to the contrary, we conclude that the impairment(s) causes the activity limitations we have identified in each domain.

4. To what degree does the impairment(s) limit the child's ability to function age-appropriately in each domain? We consider how well the child can initiate, sustain, and complete activities, including the kind, extent, and frequency of help or adaptations the child needs, the effects of structured or supportive settings on the child's functioning, where the child has difficulties (at home, at school, and in the community), and all other factors that are relevant to the determination of the degree of limitation. 20 CFR 416.924a.

This technique of looking first at the child's actual functioning in all activities and settings and considering all domains that are involved in doing those activities, accounts for the interactive and cumulative effects of the child's impairment(s), including any impairments that are not "severe." This is because limitations in a child's activities will generally be the manifestation of any difficulties that result from the impairments both individually and in combination. [9]

In sections II, III, and IV, we provide more detail ore detail about the technique for determining functional equivalence. However, we do not require our adjudicators to discuss all of the considerations in the sections below in their determinations and decisions, only to provide sufficient detail so that any subsequent reviewers can understand how they made their findings.

*II. Determining Which Domains Are Involved in Doing Activities*

A. General

The "whole child" approach recognizes that many activities require the use of more than one of the abilities described in the first five domains, and that they may also be affected by a problem that we consider in the sixth domain. A single impairment, as well as a combination of impairments, may result in limitations that require evaluation in more than one domain. [0] Conversely, a combination of impairments, as well as a single impairment, may result in limitations that we rate in only one domain.

Therefore, it is incorrect to assume that the effects of a particular medical impairment must be rated in only one domain or that a combination of impairments must always be rated in several. Rather, adjudicators must consider the particular effects of a child's impairment(s) on the child's activities in any and all of the domains that the child uses to do those activities, based on the evidence in the case record.

 **\*4**  In the sections that follow, we provide examples to illustrate how we apply these principles. These examples do not indicate whether a child is disabled, only how we assign limitations in a child's activities to a domain or domains. The rating of severity   determining whether the child is disabled   comes later. See sections III and IV below.

B. Examples of Activities That Typically Require Two or More Abilities

1. Tying shoes. Tying shoes typically requires abilities in at least four domains:
• Learning and remembering the sequence for tying (Acquiring and using information),

• Focusing on the task (Attending and completing tasks),

• Using the fingers and hands to do the task (Moving about and manipulating objects), and

• Taking responsibility for dressing and appearance (Caring for yourself).


Therefore, depending on the nature and effects of the impairment(s), a child who has difficulty tying his shoes may have limitations in one, two, three, or even all of these domains. For example, if a child has a deformity of the hands and fingers that affects only manipulation, the only domain that might be affected is "Moving about and manipulating objects." However, if the child has pain or other symptoms, there might also be a problem in concentration, which we would also evaluate in the domain of "Attending and completing tasks." There might also be limitations in other domains. [2]

2. Riding a public bus. Taking a public bus independently typically requires the abilities in the first five domains:
• Knowing how, where, and when to catch the bus, which bus to ride, the amount of the fare and how to pay it, and how and where to get off, as well as properly accomplishing these tasks (Acquiring and using information, Attending and completing tasks).

• Relating appropriately to the driver and other passengers (Interacting and relating with others),

• Being physically able to get on and off the bus (Moving about and manipulating objects), and

• Following safety rules (Caring for yourself).


Again, depending on the nature and particular effects of the impairment(s), a child who has difficulty riding a public bus may have limitations in any one, two, several, or even all of these domains.

C. Example of a Child With a Single Impairment That Is Rated in More Than One Domain

A boy in elementary school with attention-deficit/hyperactivity disorder (AD/HD) has trouble with all of the following activities.

1. Reading class assignments. The child repeatedly misreads words by impulsively guessing what they are based on the first letters or the shapes of the words, and he is not keeping up with the rest of his class. His ability to learn and think about information in school is at least partly dependent on how well he can read. These difficulties indicate a limitation in the domain of "Acquiring and using information."

2. Following classroom instructions. The child generally carries out only the first part of three-part instructions. Being unable to sustain focus, he quickly goes on to unrelated activities. He also makes mistakes in carrying out the instructions on which he does try to focus. He needs controlled, directed attention to carry out instructions correctly. These difficulties indicate a limitation in the domain of "Attending and completing tasks."

**\*5** 3. Playing with others. The child will typically approach a group of children, interrupt whoever is talking, and begin telling his own story, leading to conflicts with the other children. To successfully interact and relate with peers, the child must understand the social situation and use appropriate behaviors to approach other children. These difficulties indicate a limitation in the domain of "Interacting and relating with others."

4. Avoiding danger. The child often impulsively dashes out into the street without looking for cars and considering his safety. Being responsible for his own safety requires the child to stop moving and to be cautious before stepping into the street. These difficulties in self-related activities indicate a limitation in the domain of "Caring for yourself."

Therefore, even though attentional difficulties and hyperactivity are hallmarks of AD/HD, in this case it would be incorrect to assume that this child's AD/HD causes limitations only in the domain of "Attending and completing tasks." This child's activities demonstrate that his single impairment causes limitations that we must rate in four domains.

D. Example of a Child With a Combination of Impairments That Is Rated in Only One Domain

A girl in middle school has a mild hearing disorder that affects both her hearing and speech. She also has a repaired complete cleft lip and palate that affects her speech as well as her appearance. She has difficulty hearing other children, especially on the playground during games, and they have difficulty understanding what she says. The other children do not approach her, and they also make fun of her because of her appearance and speech difficulties. Consequently, she has difficulty forming friendships with her classmates. She tends to stay to herself during recess and lunchtime and plays alone when at home. [3]

However, she does not have any difficulty learning. She completes all her schoolwork and chores on time, appropriately, and without unusual assistance, is well-behaved and otherwise cares for herself age-appropriately. She also has no motor difficulties.

In this example, the evidence shows that the child has only social limitations at school and in her neighborhood, and that the limitations in her activities are the result of her difficulty communicating effectively with other children because of her hearing and speech problems and appearance. Therefore, the combination of this child's two impairments causes limitations only in the domain of "Interacting and relating with others."

It is unnecessary to evaluate the effects of each of the child's impairments separately and then to determine their combined effects. Since we start by evaluating her functioning (in this case, her social limitations), the limitations in interacting and relating with others established by the evidence in the case record reflect the combined effects of her impairments.

E. Example of a Child With a Combination of Impairments That Is Rated in More Than One Domain

**\*6** An adolescent has a diagnosis of borderline intellectual functioning (BIF) and has been a "slow learner" throughout school. She also has recently been diagnosed with depression. She has received special education services throughout

her school years and is now in the 11th grade. She has attended special classes for all of her academic subjects, but has been mainstreamed for some elective courses and extracurricular activities. Her teacher reports that she performed satisfactorily in most of her classes in previous years, but for the past two semesters has become inattentive in class, has failed three academic subjects because of inattention and failure to complete her assignments, and has frequently refused to go to school. Her mother reports that at home the child cries a lot, sleeps as long as 12 hours every night, eats irregularly, complains of headaches, and is irritable, uncooperative, and angry more often than not. Despite many attempts, the parent has been unable to engage her daughter in talking about what is wrong and how she might help.

The student's difficulty with activities at school and at home involves three, and possibly four, domains:

1. Her many years of placement in special education classes for all academic work indicate a limitation that we would rate in the domain of "Acquiring and using information."

2. Her inattention in class and current failure in three academic subjects as a consequence indicate that there is also a limitation in the domain of "Attending and completing tasks."

3. Her mother's description of some of the child's difficulties at home (for example, crying, oversleeping, physical complaints, and irritability) and the child's avoidance of dealing with them indicate a limitation in the domain of "Caring for yourself."

4. In addition, if her refusal to talk with her mother and her anger and uncooperativeness exceed what would be expected of adolescents of the same age who do not have any impairments, this would indicate a limitation in the domain of "Interacting and relating with others."

*III. Rating Severity*

A. General

Once we have determined which of a child's activities are limited, which domain or domains are involved, and that the limitations are the result of a medically determinable impairment(s), we rate the severity of the limitations and determine whether the impairment(s) functionally equals the listings. We consider all relevant evidence in the case record, including objective medical and other evidence, and all of the relevant factors discussed in 20 CFR 416.924a. [4]

It is important to determine the extent to which an impairment(s) compromises a child's ability to independently initiate, sustain, and complete activities. To do so, we consider the kinds of help or support the child needs in order to function. See 20 CFR 416.924a(b). In general, if a child needs a person, medication, treatment, device, or structured, supportive setting to make his functioning possible or to improve the functioning, the child will not be as independent as same-age peers who do not have impairments. Such a child will have a limitation, even if he is functioning well with the help or support.

**\*7** The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independent the child is in functioning, and the more severe we will find the limitation to be. For example:

• A 10-year-old child who is dressed appropriately may appear not to be limited in this activity. However, if the evidence in the case record shows that the child needs significant help from her parents with the basics of dressing every day (for example, putting on and buttoning shirts), the child will have a limitation of that activity. [5]

• A 14-year-old child who has a serious emotional disturbance may be given "wrap-around services" that include the services of an adult who supervises the child at school. With these services, the child attends school, participates in

activities with other children, and does not take any actions that endanger himself or others. However, the degree of "extra help" [6] the child needs to function demonstrates a limitation in at least the domains of "Interacting and relating with others" and "Caring for yourself."

B. Rating the Severity of Limitations in the Domains

When we determine the degree to which the child's impairment(s) limits each affected domain, we use the definitions of "marked" or "extreme" in our regulations. See 20 CFR 416.926a(e). The following discussion provides further guidance about how to apply those definitions.

To determine whether there is a "marked" or an "extreme" limitation in a domain, we use a picture constructed of the child's functioning in each domain. This last step in the "whole child" approach summarizes everything we know about a child's limited activities. The rating of limitation in a domain is then based on the answers to these questions:

1. How many of the child's activities in the domain are limited (for example, one, few, several, many, or all)?

2. How important are the limited activities to the child's age-appropriate functioning (for example, basic, marginally important, or essential)?

3. How frequently do the activities occur and how frequently are they limited (for example, daily, once a week, or only occasionally)?

4. Where do the limitations occur (for example, only at home or in all settings)?

5. What factors are involved in the limited activities (for example, does the child receive support from a person, medication, treatment, device, or structured/supportive setting)?

There is no set formula for applying these considerations in each case. A child's day-to-day functioning may be seriously or very seriously limited whether an impairment(s) limits only one activity or whether it limits several. See 20 CFR 416.926a(e)(2) and (e)(3). Also, we may find that a child has a "marked" or "extreme" limitation of a domain even though the child does not have serious or very serious limitations every day. As in any case, we must consider the effects of the impairment(s) longitudinally (that is, over time) when we evaluate the severity of the child's limitations. [7] The judgment about whether there is a "marked" or "extreme" limitation of a domain depends on the importance and frequency of the limited activities and the relative weight of the other considerations described above.

*10 Adjudicators must also be alert to the possibility that limitation of several seemingly minor activities may point to a larger problem that requires further evaluation. For example, a young child may have serious difficulty with common childhood activities such as scribbling, using scissors, or copying shapes, which in themselves may not appear to be important to age-appropriate functioning. It would be unlikely, however, that a young child would have serious difficulty with those common activities but have no trouble with other activities, such as buttoning a shirt or printing letters, that also involve fine motor or perceptual-motor ability. Such additional difficulties would indicate that the child has more significant problems with age-appropriate functioning than just scribbling, using scissors, or copying shapes alone might suggest.

Finally, the rating of limitation of a domain is not an "average" of what activities the child can and cannot do. When evaluating whether a child's functioning is age-appropriate, adjudicators must consider evidence about all of the child's activities. We do not "average" all of the findings in the evidence about a child's activities to come up with a rating for

the domain as a whole. The fact that a child can do a particular activity or set of activities relatively well does not negate the difficulties the child has in doing other activities.

*IV. Example of a Functional Equivalence Analysis*

In this section, we provide an example of how we would consider a child's activities at the functional equivalence step. In this example, we provide only partial evidence to illustrate how we consider activities and sort them into the domains. We do not rate the severity of the limitations because we are not providing complete evidence and because rating severity based on a specific set of case facts would not be useful in other cases.

Example: A parent files a claim on behalf of her 8-year-old son, alleging that anxiety keeps him from living normally, going to school regularly, and playing with other children. The evidence establishes that the child has a generalized anxiety disorder (GAD) that is "severe" but that does not meet or medically equal listing 112.06.

A. How does the child function?

The child says that he cannot sleep because he is afraid of the dark and the noises he hears outside, and that he needs to be awake and keep his eyes open as long as possible in case anything happens. His mother reports that he refuses to go to bed, must be coaxed into his room, frequently will not stay there, and gets up and watches television until he falls asleep in front of it. He does not sleep well at night and in the daytime is often irritable. Sometimes, he is combative. He cries when he has to leave for school, and his mother must sometimes ride with him on the school bus. His teacher reports a reduction in his energy and attention in school, that he has trouble focusing in class and does little work at school or at home, and that he may not be promoted at the end of the year because he has fallen behind in his learning. She also reports that he sometimes refuses to leave the classroom for recess or activities anywhere else in the school building or playground, and that an aide must stay with him when he does. She says that the child seems suspicious of other children in his class because he frequently reports things they do and say that worry and frighten him.

**\*11** The child is seen regularly by a clinical psychologist. Results of formal evaluation, including an anxiety scale and a depression inventory, contribute to a profile of GAD. His pediatrician prescribed two kinds of medications, but both had unacceptable side effects, so the child does not take them. He is in play therapy.

B. Which domains are involved in the child's limited activities?

The following chart [8] provides a picture of the child's functioning, including information about several factors that are relevant to determining the severity of his limitations; for example, help from a parent and school aide, medications, and play therapy. As shown in the chart, the descriptions from the evidence about how the child functions must be specific, not general. For example, "the child is anxious" is a general conclusion, while the notes in the chart below state specifically what the child does and how he does it, based on his own words and the observations of the medical sources and adults who know him and spend the most time with him.

| Acquiring & using information | Attending & completing tasks | Interacting & relating with others | Moving about & manipulating objects | Caring for yourself | Health & physical well-being |
|---|---|---|---|---|---|
| Does tt e work n c ass or at | Attent on at schoo s reduced; | Desp te orders from mother, | (No m tat ons.) | D ff cu ty s eep ng; afra d of | Ped atr c an has tr ed short term |

| | | | | |
|---|---|---|---|---|
| home and has fa en beh nd; may not be promoted to next grade n schoo | has troub e focus ng n c ass; does tt e work n c ass or at home | refuses to go to bed; mother must coax h m nto bedroom; w not stay n bed; gets up and watches TV unt fa s as eep. May be combat ve at home. Somet mes refuses to eave c assroom for recess and act v t es e sewhere; n that case, an a de must stay w th h m. Frequent y reports other ch dren's act ons and conversat ons; seems susp c ous of them | dark and outs de no ses; needs to stay awake and keep eyes open (be v g ant). Parent must coax h m nto bedroom. W not stay n bed; watches TV unt fa s as eep. Is rr tab e because of ack of s eep. Cr es when has to eave for schoo ; mother may have to r de bus w th h m to schoo . Anx ety sca e shows GAD. Ch d s n p ay therapy | Va um; ch d comp a ned of stomach cramps and headache; tr ed short term At van; s de effects were d zz ness and dayt me s eep ness. |

C. Could the child's medically determinable impairment(s) limit any of his activities?

**\*12** In the example described above, the medically determinable impairment of GAD clearly accounts for the child's problems, and there is no evidence to the contrary. [9] Therefore, it is appropriate to conclude that the child's GAD results in limitations that are evaluated in five of the six domains, as indicated in the chart above.

*V. Responsibility for Determining Functional Equivalence*

The responsibility for making functional equivalence determinations depends on the level of the administrative review process.

• For initial and reconsideration determinations, the State agency medical or psychological consultant has the overall responsibility for determining functional equivalence.

• When an SSI recipient has requested a hearing before a disability hearing officer at the reconsideration level, the disability hearing officer determines functional equivalence.

• For cases at the Administrative Law Judge (ALJ) and Appeals Council (AC) levels (when the AC makes a decision), the ALJ or AC determines functional equivalence. 20 CFR 416.926a(n).

While SSR 96-6p [20] requires that an ALJ or the AC must obtain an updated medical expert opinion before making a decision of disability based on medical equivalence, there is no such requirement for decisions of disability based on functional equivalence. Therefore, ALJs and the AC (when the AC makes a decision) are not required to obtain updated medical expert opinions when they determine that a child's impairment(s) functionally equals the listings. [2]

**\*13** Effective date: This SSR is effective on March 19, 2009.

Cross-References: SSR 09-2p, Title: Determining Childhood Disability  Documenting a Child's Impairment-Related Limitations; SSR 09-3p, Title XVI: Determining Childhood Disability  The Functional Equivalence Domain of "Acquiring and Using Information"; SSR 09-4p, Title XVI: Determining Childhood Disability  The Functional Equivalence Domain of "Attending and Completing Tasks"; SSR 09-5p, Title XVI: Determining Childhood Disability  "Interacting and Relating with Others"; SSR 09-6p, Title XVI: Determining Childhood Disability  The Functional Equivalence Domain of "Moving About and Manipulating Objects"; SSR 09-7p, Title XVI: Determining Childhood Disability  The Functional Equivalence Domain of "Caring for Yourself"; SSR 09-8p, Title XVI: Determining Childhood Disability  The Functional Equivalence Domain of "Health and Physical Well-Being"; SSR 98-1p, Title XVI: Determining Medical Equivalence in Childhood Disability Claims When a Child Has Marked Limitations in Cognition and Speech; SSR 96-6p, Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence; and Program Operations Manual System (POMS) DI 25225.030, DI 25225.035, DI 25225.040, DI 25225.045, DI 25225.050, and DI 25225.055.

[1]     The definition of disability in section 1614(a)(3)(C) of the Social Security Act (the Act) applies to any "individual  who has not attained age 18. In this SSR, we use the word "child  to refer to any such person, regardless of whether the person is considered a "child  for purposes of the SSI program under section 1614(c) of the Act.

[2]     For simplicity we refer in this SSR only to initial claims for benefits. However, the policy interpretations in this SSR also apply to continuing disability reviews of children under section 1614(a)(4) of the Act and 20 CFR 416.994a.

[3]     We use the term "impairment(s)  in this SSR to refer to an "impairment ora combination of impairments.

[4]     The impairment(s) must also satisfy the duration requirement in section 1641(a)(3)(A) of the Act; that is, it must be expected to result in death, or must have lasted or be expected to last for a continuous period of not less than 12 months.

[5]     For each major body system, the listings describe impairments we consider severe enough to cause "marked and severe functional limitations.  20 CFR 416.925(a); 20 CFR part 404, subpart P, appendix 1.

[6]     See 20 CFR 416.926a(e) for definitions of the terms "marked  and "extreme.

[7]     For the first five domains, we describe typical development and functioning using five age categories: Newborns and young infants (birth to attainment of age 1); older infants and toddlers (age 1 to attainment of age 3); preschool children (age 3 to attainment of age 6); school age children (age 6 to attainment of age 12); and adolescents (age 12 to attainment of age 18). We do not use age categories in the sixth domain because that domain does not address typical development and functioning, as we explain in SSR 09 8p title XVI: Determining Childhood Disability  The Functional Equivalence Domain of "Health and Physical Well Being.

[8]     In the preamble to the final childhood disability regulations we published in 2000, we noted that this approach assumes that at this step in the sequential evaluation process for children we have already established the existence of at least one medically determinable impairment that is "severe.  Therefore, * * * we are looking primarily at the extent of the limitation of the child's

functioning. We look at all of the child's activities to determine the child's limitations or restrictions and then decide which domains to use. 65 FR 54747, 54757 (2000).

9   As noted in question no. 3 above, we would not make this assumption if there is evidence indicating that a child's limitations are not attributable to a medically determinable impairment(s). However, in most cases, limitations that are of listing level severity will be associated with underlying physical or mental impairments.

10   Rating the limitations caused by a child's impairment(s) in each and every domain that is affected is not "double weighting" of either the impairment(s) or its effects. Rather, it recognizes the particular effects of the child's impairment(s) in all domains involved in the child's limited activities.

11   By the time we reach the functional equivalence step, we will have already determined that the child has at least one medically determinable impairment that is "severe ; that is, it that causes more than minimal functional limitations. 20 CFR 416.924. Therefore, the child must have a limitation in at least one domain.

12   Children who have mental disorders will often have limitations that are rated in more than one domain, but as we explain in the domain specific SSRs referenced at the end of this SSR, physical impairments can also have effects that must be assigned to more than one domain.

13   Even though this child's underlying ability to socialize may not be affected, there is a limitation in her ability to interact and relate with other children because of indirect effects of her impairments that limit her opportunity to use the ability.

14   As provided in 20 CFR 416.924a(b), we consider these factors whenever we evaluate functioning at any step of the sequential evaluation process for children. We also use these factors to determine whether a child has a limitation, not just the severity of the limitations.

15   The domain or domains in which we would rate the limitation would depend on the reason(s) that the child needs the help. For example, the child may have motor difficulties (Moving about and manipulating objects), difficulties learning or remembering how to dress appropriately (Acquiring and using information), difficulties with attention or impulsivity (Attending and completing tasks), or a combination of some or all of these problems. There may be limitations we would evaluate in other domains as well.

16   See 20 CFR 416.924a(b)(5).

## B. Rating the Severity of Limitations in the Domains

**\*14**   When we determine the degree to which the child's impairment(s) limits each affected domain, we use the definitions of "marked" or "extreme" in our regulations. See 20 CFR 416.926a(e). The following discussion provides further guidance about how to apply those definitions.

17   For example, in 20 CFR 416.924a(b)(8), we provide: "If you have a chronic impairment(s) that is characterized by episodes of exacerbation (worsening) and remission (improvement), we will consider the frequency and severity of your episodes of exacerbation as factors that may be limiting your functioning. Your level of functioning may vary considerably over time. Proper evaluation of your ability to function in any domain requires us to take into account any variations in your level of functioning to determine the impact of your chronic illness on your ability to function over time. When we published this rule in 2000, we explained that, while we adopted the language from section 12.00D of the adult mental disorders listings, " t]his principle is equally applicable to children and adults, and to both physical and mental impairments. See 65 FR at 54754.

18   This chart is for illustration only. We do not require our adjudicators to develop or use such a chart.

19   With other facts, additional development might be needed. For example, if the evidence in this case showed that the child performed poorly in sports (which we mention as a typical activity of children without impairments), we would note that GAD would not be expected to affect the child's physical ability to move about and manipulate objects. Therefore, poor performance in sports in a child with GAD might be attributable to something other than the mental disorder. There may

not be a medical reason at all: The child might do poorly because he does not like to play any sport, is not good at sports, or is not interested in them. On the other hand, there might be another impairment not yet documented by evidence from an acceptable medical source that would limit motor functioning and interfere with the child's day to day activities; in such instances, additional development might be needed to complete the evaluation of the child's functioning.

[20]  See SSR 96 6p, Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence, 61 FR 34466 (1996), available at: http:// www.socialsecurity.gov/OP  Home/rulings/di/01/SSR96 06 di 01.html.

[21]  For cases pending at the ALJ and AC levels from States in the Ninth Circuit (Alaska, Arizona, California, Guam, Hawaii, Idaho, Montana, Nevada, Northern Mariana Islands, Oregon, and Washington) at the time of the ALJ or AC decision, see Acquiescence Ruling 04 1(9), Howard on behalf of Wolff v. Barnhart, 341 F.3d 1006 (9th Cir. 2003)  Applicability of the Statutory Requirement for Pediatrician Review in Childhood Disability Cases to the Hearings and Appeals Levels of the Administrative Review Process  Title XVI of the Social Security Act, 69 FR 22578 (2004), available at: http:// www.socialsecurity.gov/OP  Home/rulings/ar/09/AR2004 01 ar 09.html.

Social Security Administration

Department of Health and Human Services

SSR 09-1P (S.S.A.), 2009 WL 396031

**End of Document**                                                © 20  7 Thomson Reuters. No c a m to or g na  U.S. Government Works.